Matthew R. Arnold
DC Bar No. 1618616

William S. Eubanks II
DC Bar No. 987036

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
matt@eubankslegal.com
(202) 656-3599
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>    MARICOPA AUDUBON SOCIETY,<br>    and MOUNT GRAHAM COALITION,<br><br>                    Plaintiffs,<br><br>        v.<br><br>RANDY MOORE, *Chief, U.S. Forest Service*;<br>    TOM VILSACK, *Secretary, U.S.*<br>    *Department of Agriculture*;<br>    DEB HAALAND, *Secretary, U.S.*<br>    *Department of the Interior*; and<br>    MARTHA WILLIAMS, *Director*<br>    *U.S. Fish and Wildlife Service*,<br><br>                    Defendants. | Case No. _____<br><br><br><br><br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This case challenges the United States Fish and Wildlife Service ("FWS") and

United States Forest Service's ("USFS") failure to protect and ensure the recovery of the

critically endangered Mount Graham red squirrel (*Tamiasciurus hudsonicus grahamensis*)

("Mount Graham red squirrel" or "squirrel"), as required by the Endangered Species Act

1

("ESA"), 16 U.S.C. §§ 1531-1544. By any metric, the red squirrel is teetering on the brink of extinction; it now bears the somber distinction of being the rarest and most imperiled mammal in the United States. In fact, "the best available information to date regarding [the species'] home range size" considers the squirrel to be "the United States' *most endangered* breeding population of terrestrial mammal."[1]

2.      Since its listing as endangered in 1987, the Mount Graham red squirrel population has declined precipitously due to recurring threats to its survival, recovery, and critical habitat, including three decades worth of human development, wildfires of ever-increasing intensity, insect infestations, and inappropriate backburning undertaken under the guise of "structure protection." For example, a recent spate of intense wildfires and backburning on Mount Graham killed roughly 75% of the entire population and reduced its numbers to less than 80 remaining individuals, placing the species' genetic diversity in grave peril and driving the species even further towards the precipice of extinction. With the near-total destruction of its designated critical habitat, the few surviving squirrels have largely sought refuge amongst the mixed conifer forests at Mount Graham's lower elevations, including in the Ash Creek drainage, which is secondary habitat that FWS has since 1988 recognized as vital to the red squirrel's survival.

3.      Since the recent and stunning collapse of the Mount Graham red squirrel population, USFS and FWS have repeatedly failed to prioritize the species' survival and recovery, as required by the ESA. This pattern of disregard is evident in the agencies' recent reauthorizations for two separate developments in the crucially important Ash Creek drainage—the Old Columbine Recreational Cabins ("Cabins") and the Organizational Camp ("Camp"). The

---

[1] Merrick et al., *Endemic Population Response to Increasingly Severe Fire: A Cascade of Endangerment for the Mt. Graham Red Squirrel*, 71 BioScience 161, 162 (2021) (emphasis added).

Biological Opinions ("BiOps") for both, which represent the culmination of the agencies' formal consultations under the ESA, only came about as the result of Plaintiffs' prior suit urging the agencies to reexamine the species' bleak survival prospects in the wake of massive, habitat-destroying wildfires and backburning in the Coronado National Forest. But rather than take these opportunities to meaningfully examine how best to protect the squirrel from increasing anthropogenic stressors, the agencies have instead used these BiOps to paper over the squirrel's perilous condition and maintain conditions that are contributing directly to the species' demise.

4.     The BiOps at issue in this case are functionally identical and both violate the ESA in several respects. For instance, both entirely fail to determine whether the species is *already* in jeopardy of extinction by virtue of its precipitous population declines following the recent stand-replacing wildfires and backburning in the Coronado National Forest. By omitting that critical, threshold determination, the agencies have rendered meaningless their own conclusion that the loss of yet more vital habitat will not "deepen" the squirrels' jeopardy of extinction or "alter" its recovery. In any case, this self-serving (and unsupported) conclusion is only part of the jeopardy analysis required by the ESA; the other is whether the underlying authorizations are impeding and/or, in light of recent wildfires and other events, will continue to further impede the squirrel's recovery—a point that neither BiOp addressed.

5.     Even setting aside the agencies' obfuscation regarding the clear-cut jeopardy that threatens the squirrel's survival and recovery prospects, the BiOps arbitrarily undervalue the potential effects of the action by relying on a mitigation measure that does not square with the best available science regarding the Mount Graham red squirrel, or the agencies' prior utilization of a similar measure. Finally, the BiOps also include flagrantly illegal metrics for determining whether and/or when additional renewed consultation would be necessary to protect the squirrel

1    by vesting the agencies with a kind of unfettered discretion that has been roundly rejected by

2    reviewing courts.

3         6.     For these reasons, as explained in further detail below, USFS and FWS have

4    violated the ESA, its implementing regulations, and the ESA's citizen suit provision, 16 U.S.C. §

5    1540(g). Additionally, the agencies have acted in a manner that is "arbitrary and capricious, an

6    abuse of discretion," "otherwise not in accordance with law," and "without observance of

7    procedure required by law" within the meaning of the Administrative Procedure Act ("APA"), 5

8    U.S.C. § 706(2)(A), (D). Accordingly, operation of the recreational facilities in the Ash Creek

9    drainage must be immediately enjoined, the agencies' decisions implementing such activities

10   should be vacated and remanded, and the agencies should be ordered to immediately re-engage

11   in consultation under Section 7 of the ESA, 16 U.S.C. § 1540(g); 5 U.S.C. § 706.

12                                        **JURISDICTION**

13        7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16

14   U.S.C. § 1540(g).

15                                          **PARTIES**

16        8.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) non-profit

17   corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico.

18   The Center works through science, law, and policy to secure a future for all species, great or

19   small, hovering on the brink of extinction. The Center is actively involved in species and habitat

20   protection issues throughout the United States and the world, including protection of plant and

21   animal species from the impacts of climate change, wildfires, and human-caused habitat

22   destruction. In addition to more than 625,000 supporters and online activists, the Center has

23   more than 70,000 members and more than 1.7 million supporters throughout the United States

and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the Mount Graham red squirrel and its habitat harmed by the decisions challenged in this case.

9.     Plaintiff Maricopa Audubon Society is a 501(c)(3) non-profit organization dedicated to the enjoyment of birds and other wildlife with a primary focus on protection through fellowship, education, and community involvement. Maricopa Audubon is a chapter of the National Audubon Society. Maricopa Audubon has over 2,300 members, primarily in central Arizona. Maricopa Audubon Society has played a central role in protecting endangered species in the Southwest through public education efforts, field surveys, public field trips, and position papers.

10.     Plaintiff Mount Graham Coalition, Inc., ("the Coalition") is a non-profit organization dedicated to the ecological preservation of Mount Graham, other southwestern mountains, riparian areas, and deserts in the region. The Coalition's mission is to provide educational and technical assistance to its members and the general public so that they may protect the few remaining natural areas for the plant and animals that exist there, for the sacred nature of these areas, and for the enjoyment of all. The Coalition has been active in the protection of Mount Graham—*Dzil Nchaa Si'An* (the "Big Seated Mountain")—since 1985.

11.     Plaintiffs' members use and enjoy the Coronado National Forest for a variety of purposes, including hiking, fishing, camping, viewing and photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members derive scientific, aesthetic, recreational, vocational, and spiritual benefits from the Coronado

National Forest, including the areas and habitat where the critically endangered Mount Graham red squirrel is found.

12.     Plaintiffs' members intend to, and have plans to, continue to use and enjoy the Coronado National Forest frequently and on an ongoing basis in the future, including during the remainder of 2022 and once again in 2023. The areas of the Coronado National Forest that Plaintiffs' members intend to continue to use and enjoy include specific areas where the Mount Graham red squirrel is likely to be found, as well in areas designated as critical habitat for the species—including areas that are located in the respective action areas for the challenged agency actions.

13.     The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of the Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and the APA continue. The relief sought will redress Plaintiffs' and their members' injuries by ensuring that the Mount Graham red squirrel does not go extinct and by ensuring that the species' recovery prospects are not impaired or jeopardized.

14.     Defendant Randy Moore is the Chief of USFS, an agency within the U.S. Department of Agriculture, and is directly responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for overseeing USFS's actions challenged in this lawsuit, and is sued in his official capacity.

15.     Defendant Tom Vilsack is the Secretary of the U.S. Department of Agriculture, and is ultimately responsible for overseeing the work of USFS, an agency within the Department of Agriculture. He is sued in his official capacity.

16.     Defendant Martha Williams is the Director of FWS, an agency within the U.S. Department of Interior, and is directly responsible for the supervision, management, and control of the agency. Accordingly, she is responsible for overseeing FWS's actions challenged in this lawsuit, and is sued in her official capacity.

17.     Defendant Deb Haaland is the Secretary of the U.S. Department of the Interior and is ultimately responsible for overseeing the work of FWS, an agency within the Department of the Interior. She is sued in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     Endangered Species Act

18.     Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. As such, the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

19.     Under the ESA, a species may be listed as endangered or threatened. An endangered species—a status which is reserved for species in the most perilous condition—is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

7

20.     Section 9 of the ESA makes it unlawful for any person to "take" an endangered species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is further defined by FWS regulations to encompass habitat modification or degradation that injures an endangered species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering, *see* 50 C.F.R. § 17.3, and "harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.*

21.     Section 7(a)(2) of the ESA further requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation, before undertaking any action that may have direct or indirect effects on listed species, an action agency must engage in consultation with FWS in order to evaluate the impact of the proposed action. *See id.* § 1536(a). FWS has defined the term "action" for the purposes of Section 7 broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03.

22.     The purpose of consultation is to ensure that the action at issue "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy

1    to a listed species if it "reasonably would be expected, directly or indirectly, to reduce

2    appreciably the likelihood of *both* the survival *and* recovery of a listed species in the wild by

3    reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02

4    (emphases added). Thus, during consultation the action agency and FWS must consider whether

5    "the agency action will [] appreciably reduce the odds of success for future recovery planning, by

6    tipping a listed species too far into danger." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

7    524 F.3d 917, 936 (9th Cir. 2008). The evaluation of the effects of the proposed action on listed

8    species during consultation must use "the best scientific . . . data available." 16 U.S.C. §

9    1536(a)(2).

10        23.    Consultation under Section 7(a)(2) may be "formal" or "informal" in nature.

11   Informal consultation is "an optional process" consisting of all correspondence between the

12   action agency and FWS, which is designed to assist the action agency, rather than FWS, in

13   determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal

14   consultation, the action agency requests information from the FWS as to whether any listed

15   species may be present in the action area. If listed species may be present, Section 7(c) of the

16   ESA requires the action agency to prepare and submit to FWS a "biological assessment" ("BA")

17   that evaluates the potential effects of the action on listed species and critical habitat. As part of

18   the BA, the action agency must make a finding as to whether the proposed action may affect

19   listed species and submit the BA to FWS for review and potential concurrence with its finding.

20   16 U.S.C. § 1536(c). If the action agency finds that the proposed action "may affect, but is not

21   likely to adversely affect" any listed species or critical habitat, and FWS concurs with this

22   finding, then the consultation process is terminated. 50 C.F.R. § 402.14(b).

24. On the other hand, if the action agency finds that the proposed action "may affect" listed species or critical habitat by having any potentially adverse effect that may occur and is not insignificant or discountable, then formal consultation is required. *See* 50 C.F.R. § 402.11. Following completion of the BA, the action agency must initiate formal consultation through a written request to FWS. *See* 50 C.F.R. § 402.14(c). The result of a formal consultation is the preparation of a BiOp by FWS, which is a compilation and analysis of the best available scientific data on the status of the species and how it would be affected by the proposed action. When preparing a BiOp, FWS must: (1) "review all relevant information;" (2) "evaluate the current status of the listed species;" and (3) "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). As such, a BiOp must include a description of the proposed action, a review of the status of the species and its designated critical habitat, a discussion of the environmental baseline, and an analysis of the direct and indirect effects of the proposed action and the cumulative effects of reasonably certain future state, tribal, local, and private actions. *Id.*

25. At the end of the formal consultation process, FWS issues either a no-jeopardy or a jeopardy BiOp. With a no-jeopardy BiOp, FWS determines that the proposed action is not likely to jeopardize the continued existence of listed species or adversely modify critical habitat. If, as part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written Incidental Take Statement ("ITS") specifying the "impact of such incidental taking on the species" and "any reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. §

1536(b)(4). Take in excess of that authorized by the ITS violates the Section 9 of the ESA's

prohibition on take. *Id.* § 1538. With a jeopardy BiOp, FWS determines that the proposed action

will jeopardize the continued existence of listed species or destroy or adversely modify critical

habitat. In a jeopardy BiOp, FWS may offer the action agency reasonable and prudent

alternatives to the proposed action that will avoid jeopardy to a listed species or adverse habitat

modification, if they exist. *Id.* § 1536(b)(3)(A).

26.     Where a BiOp has been issued and "discretionary Federal involvement or control

over the action has been retained or is authorized by law," the action agency is required to

reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f new information

reveals effects of the action that may affect listed species or critical habitat in a manner or to an

extent not previously considered," or (2) "[i]f the identified action is subsequently modified in a

manner that causes an effect to the listed species or critical habitat that was not considered in the

biological opinion." 50 C.F.R. § 402.16(a)(2), (3). Additionally, consultation must be reinitiated

if, over the course of the action, the amount or extent of incidental take is exceeded. *Id.* §

402.16(a)(1).

27.     The ESA provides that agencies must hold action in abeyance until any legally

required consultation is complete. Section 7(d) of the ESA prohibits an action agency from

making "any irreversible or irretrievable commitment of resources with respect to the agency

action which has the effect of foreclosing the formulation or implementation of any reasonable

and prudent alternative measures which would not violate [Section 7] (a)(2)." 16 U.S.C. §

1536(d). "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied."

50 C.F.R. § 402.09. The purpose of this requirement is to ensure that the status quo will be

maintained during the consultation process. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d

1  290, 294 (9th Cir.1992) ("In order to maintain the status quo, section 7(d) forbids 'irreversible or

2  irretrievable commitment of resources' during the consultation period").

3      28.    Section 4(f) of the ESA reinforces the Act's emphasis on bringing species to the

4  point where its protections are no longer necessary. Congress provided that for every listed

5  species under its jurisdiction the relevant management agency "shall develop and implement

6  plans," known as "recovery plans," "for the conservation and survival of endangered species and

7  threatened species, unless "such a plan will not promote the conservation of the species." 16

8  U.S.C. § 1533(f)(1). These recovery plans must, "to the maximum extent practicable," describe

9  "site-specific management actions [that] may be necessary to achieve the plan's goal for the

10  conservation and survival of the species," and "objective, measurable criteria which, when met,

11  would result in" the species' removal from the list of endangered or threatened species. *Id.*

12      **B.**    <u>**Administrative Procedure Act**</u>

13      29.    The APA, 5 U.S.C. §§ 701–706, provides for judicial review of agency action.

14  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings,

15  and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

16  accordance with law." *Id.* § 706(2)(A). An agency action is arbitrary and capricious if the agency

17  "relied on factors which Congress has not intended it to consider, entirely failed to consider an

18  important aspect of the problem, offered an explanation for its decision that runs counter to the

19  evidence before the agency," or if the agency's decision "is so implausible that it could not be

20  ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v.*

21  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When reviewing agency action under the

22  APA, a court must ensure that the agency reviewed the relevant data and articulated a

23  satisfactory explanation establishing a "rational connection between the facts found and the

1   choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision

2   arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Under

3   the APA, a reviewing court must also set aside agency action, findings, and conclusions found to

4   be without observance of procedure required by law. *Id.* § 706(2)(D).

5                                    **FACTUAL BACKGROUND**

6   **A.     The Mount Graham Red Squirrel Background, Listing Status, and**
7   **        Critical Habitat**
8
9           30.     The Mount Graham red squirrel is a small, grayish-brown arboreal subspecies of

10  the American red squirrel. Smaller than most other subspecies of red squirrel, the Mount Graham

11  red squirrel is characterized by the tinged rusty or yellowish stripe running along the centerline

12  of its back. The squirrel's diet consists primarily of conifer seeds and, during the winter, seed-

13  bearing cones that it has stored in middens.[2]

---

[2] Middens are areas on the forest floor where the red squirrels cache spruce, fir, and pine cones. Middens also typically include cone scales and other debris left behind from feeding. These sites can accumulate to considerable depths, creating cool microenvironments for seed storage. The Mount Graham red squirrel shows high site fidelity to a few middens, which are the focal point of an individual squirrel's territory, and they guard them against competitors vigorously.



*The above photograph, captured on August 18, 1989 by Dr. Robin Silver, depicts a female Mount Graham Red Squirrel on Emerald Peak, the present-day site of the University of Arizona's Large Binocular Telescope.*

31.     The entire population of the Mount Graham red squirrel is found on lands located within the Coronado National Forest—specifically, the Pinaleño Mountains in Graham County, Arizona. Since the last ice age, nearly 10,000 years ago, the red squirrel has been isolated from other native squirrel subspecies on this vegetated "sky island" surrounded by the desert valley below. Within its remarkably limited range, the Mount Graham red squirrel has relied on two different canopied-forest assemblages. Historically, the red squirrel was found at higher elevations in and around mixed spruce-fir forests, especially those comprised of Englemann spruce and corkbark fir. At present, however, largely due to the destruction or degradation of higher-elevation spruce-fir habitat, the species is almost exclusively found at lower elevations in mixed conifer forests dominated by old-growth Douglas fir and/or white fir.[3] The few remaining

---

[3] In the southern limits of its range, the species is commonly referred to as "spruce squirrels" because of their strong association with forests dominated by spruce and Douglas-fir (formerly known as Douglas spruce).

1  red squirrels are limited primarily to five areas in the Coronado National Forest that bear these

2  lower elevation forest assemblages: the Grant Hill area, the Riggs Lake/Grand View Peak area,

3  Snow Flat/Hospital Flat, Turkey Flat, and Columbine. To date, none of these areas has been

4  designated as critical habitat.[4] The latter area, the Columbine area, located in the Ash Creek

5  Drainage, is home to the Old Columbine summer home tract and the Arizona Church of Christ

6  Bible Camp.

7       32.    The Mount Graham red squirrel was first described in 1884, at which point it was

8  considered common. However, largely due to logging operations in the Pinaleño Mountains

9  between the 1880s and 1930s in the mixed conifer, and the introduction of non-historically

10  present Abert squirrels in the early 1940s by the Arizona Game and Fish Department ("AGFD"),

11  the red squirrel suffered dramatic population declines. By the 1950s, the species was considered

12  rare. Between 1958 and 1966, biologists were unable to locate any red squirrels and it was

13  presumed to be extinct. In the early 1970s, however, at least four red squirrels were reported by

14  AGFD and USFS personnel. In 1985, researchers conducting a survey commissioned by FWS

15  estimated the population to be between 300 and 500 individuals. Subsequent revisions to that

16  study estimated that, in 1988, only 280 individuals remained in the wild.

---

[4] On April 16, 2019, Plaintiffs filed suit in this Court against FWS to compel agency action on their December 14, 2017 petition to revise existing critical habitat for the Mount Graham red squirrel by including the Grant Hill, Riggs Lake, Turkey Flat, and Columbine areas as critical habitat under the ESA. *See* ECF No. 1, *Center for Biological Diversity v. Bernhardt*, 4:19-cv-00218-RCC (D. Ariz. April 16, 2019). The parties agreed to settle the matter, and FWS has subsequently issued a 90-day finding on the petition. FWS found that the petition to list these areas as critical habitat "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 90-Day Findings for Three Species, 84 Fed. Reg. 46927, 46928 (Sept. 6, 2019). To date, the petition remains under review by FWS.

1        33.     Citing a century-long decline in the species' habitat, the Mount Graham red

2  squirrel was first proposed for listing as endangered under the ESA on May 21, 1986. *See*

3  Proposed Determination of Endangered Status and Critical Habitat for the Mount Graham Red

4  Squirrel, 51 Fed. Reg. 18,630, 18,630 (May 21, 1986). Roughly a year later, the squirrel was

5  listed as endangered. *See* Determination of Endangered Status for the Mount Graham Red

6  Squirrel, 52 Fed. Reg. 20,994, 20,994–99 (June 3, 1987). FWS based the final listing

7  determination on a number of factors, including the proposed construction of an astrophysical

8  observatory, the prevalence of annual forest fires in the Coronado National Forest, road

9  construction projects, and recreational development within the species' known habitat. *Id.* at

10  20,997. These factors, coupled with the red squirrel's "restricted population size and

11  distribution," led FWS to conclude that the species "is particularly vulnerable to any disturbance

12  that might bring about further declines in its already precariously low numbers and weakening of

13  genetic viability." *Id.* at 20,998.

14        34.     On January 5, 1990, FWS designated critical habitat for the Mount Graham red

15  squirrel. *See* Designation of Critical Habitat for the Endangered *Tamiasciurus hudsonicus*

16  *grahamensis* (Mount Graham Red Squirrel), 55 Fed. Reg. 425, 425-29 (Jan. 5, 1990). It includes

17  three areas on Mount Graham: (1) the area above 10,000 feet surrounding Hawk and Plain View

18  peaks and a portion of the area above 9,800 feet; (2) the north-facing slopes of Heliograph Peak

19  above 9,200 feet; and (3) the east-facing slope of Webb Peak above 9,700 feet. FWS selected

20  these areas, which at the time contained 70% of all known red squirrel middens, due to the

21  presence of mature spruce-fir forest—i.e., the species' primary habitat at higher elevations. At

22  that time, FWS did not designate as critical habitat the old growth Douglas fir and/or white fir

23  found at lower elevations where the vast majority of Mount Graham red squirrels persist today.

1        35.     Surveys conducted by FWS in the wake of a 2017 forest fire, discussed below,

2 "showed a significant decline" in the Mount Graham red squirrel's population, with biologists

3 projecting that "*only 35 squirrels*" remained in the wild. FWS, *Surveys of Endangered Mount*

4 *Graham Red Squirrel Show Decline Due to Impacts from the Frye Fire* (Oct. 17, 2017),

5 https://bit.ly/3S15XvU (emphasis added). Since that fire, the squirrel's population has increased,

6 albeit modestly, to 109 individuals in 2020, and remained the same in 2021. Thus, the squirrel's

7 current total population represents approximately 39% of that at the time of its listing as

8 endangered.

9        36.     FWS has recognized that "[t]he greatest overarching threat to the Mount Graham

10 red squirrel is the loss or potential loss of its habitat." FWS, Draft Mount Graham Red Squirrel

11 Recovery Plan ("2011 Draft Recovery Plan") at 25 (May 2011). As such, the squirrel's Recovery

12 Plan makes crystal clear that "[r]eforestation of degraded habitats will eventually provide a wider

13 and more secure land base for the species and thus, is a *major priority* for recovery." FWS,

14 Mount Graham Red Squirrel Recovery Plan ("1993 Final Recovery Plan") at 16 (May 3, 1993)

15 (emphasis added); *see also* 2011 Draft Recovery Plan at 32 (emphasizing "projects to restore

16 and/or create red squirrel habitat" "[b]ecause population numbers and habitat are currently much

17 reduced"). Indeed, the squirrel's Recovery Plan even identifies specific, habitat-level areas where

18 such restoration is imperative, including, namely, "lower elevations between 2,400 m (8,000 ft)

19 and 2,898m (9,500 ft)"—i.e., the elevation at which the Cabins and Camp are located. Final

20 Recovery Plan at 19; *see also* 2011 Draft Recovery Plan at 40 (listing, as a "recovery action," the

21 need to "[e]valuate options for returning developed areas to habitat for the Mount Graham red

22 squirrel").

**B.**      **The Mount Graham International Observatory, Initial Destruction of the Mount Graham Red Squirrel's Critical Habitat, and FWS's Recommended Mitigation Measures**

37.      In 1984, astrophysicists led by the University of Arizona sought to construct on Mount Graham the largest array of telescopes anywhere in the world at that time. Cognizant of the potential devastation that this observatory, known as the Mount Graham International Observatory ("MGIO"), would have on the red squirrel's already precariously fragile population, USFS and FWS undertook formal consultation on the University's preferred alternative, which entailed siting three telescopes on High Peak and four telescopes on Emerald Peak, the latter of which contained, at the time, the most abundant red squirrel habitat. FWS issued its BiOp in 1988, concluding that construction and operation of the MGIO on just 23.36 acres would likely jeopardize the continued existence of the Mount Graham red squirrel. *See* FWS, Biological Opinion on the Coronado National Forest Plan and the Mount Graham Astrophysical Area Plan ("1988 BiOp") at 4 (July 14, 1988). FWS therefore proposed three "reasonable and prudent alternatives," one of which, Alternative 3, contemplated the construction of telescopes on Emerald Peak. Notably, FWS's Alternative 3 concluded that because Emerald Peak was a vital portion of the red squirrel's already severely diminished habitat, mitigation measures must be undertaken to ensure the species' survival. The mitigation measures recognized that it was "imperative that habitat restoration via reforestation be accelerated" in alternative locations that could support stable red squirrel populations, including those portions of its range located at a lower elevation. *Id.* at 33. FWS observed that "[t]he summer homes at Columbine and the Arizona Bible Camp are along a forest road that leads into the Ash Creek drainage, an area that has considerable potential for red squirrels." *Id.* at 28. Thus, "[r]emoval of the Bible Camp and summer homes would enable those acreages (2.5 and 14.5 respectively) to be incorporated into

18

forest restoration plans for the area." *Id.* Although those two locations are not located within the spruce-fir assemblages typical of the red squirrel's critical habitat, FWS determined that "[r]emoval of the Bible Camp and summer homes and subsequent restoration represents the best opportunity to regain previously lost habitat outside the refugium." *Id.* at 29.

38. Frustrated by perceived delays associated with the legally mandated consultation between USFS and FWS, the University of Arizona lobbied Congress to intervene. It responded in 1988 by enacting the Arizona-Idaho Conservation Act ("AICA"), Pub. L. No. 100-696, 102 Stat. 4571 (Nov. 18, 1988). Through the AICA, Congress required USFS to adopt Alternative 3 of the 1988 BiOp, i.e., construction of telescopes on Emerald Peak, including all roads and associated support facilities. With respect to FWS's proposed mitigation measures, however, Section 605 of AICA delayed the removal of the Bible Camp and summer homes, instead providing that:

> Prior to the termination, nonrenewal or modification of those Special Use Authorizations for the areas noted above, [USFS] shall, with the assistance of [FWS], conduct a biological study to determine the effects of such special use authorizations upon the Mount Graham red squirrel and other threatened or endangered species. . . . In addition to the biological study, [USFS] shall initiate consultation with [FWS] pursuant to section 7(a)(2) of the Endangered Species Act regarding the termination, nonrenewal, extension or modification of the special use authorizations.

39. The AICA faced strenuous opposition, giving rise to numerous appeals to U.S. Court of Appeals for the Ninth Circuit. *See Mt. Graham Red Squirrel v. Yeutter*, 930 F.2d 703 (9th Cir. 1991); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568 (9th Cir. 1993). Although the Ninth Circuit ultimately rejected those challenges, it noted that:

> The possible extinction of an endangered species is not a threat that we take lightly. If the Mount Graham Red Squirrel becomes extinct as a result of the astrophysical research project, then the new telescopes will not represent an unqualified step

19

forward in our quest for greater knowledge. As we expand our horizons by building bigger and better telescopes, we would do well to remember that we also have much to learn from the plant and animal life in the world around us. By contributing to the extinction of an endangered species, we limit our horizons at least as seriously as we do by delaying or even disallowing the construction of new telescopes . . . We can only hope that Congress's decision will prove to be a wise one.

*Madigan*, 954 F.2d at 1463. Thereafter, three telescopes, along with associated roads and support infrastructure, were constructed on Mount Graham.

## C.     Post-Construction Depletion of the Mount Graham Red Squirrel's Habitat

40.     Even apart from the MGIO's impact on the species and its habitat, the red squirrel has since suffered even further declines attributable to climate change. In 1996, for instance, biologists began to document the first widespread signs of red squirrel mortality due to invasive insects. Those mortalities were particularly notable in the spruce-fir complexes at higher elevations. In 2005, researchers concluded that "[i]nsect mortality, along with the effects of drought over the last several years, have rendered most, if not all, of the area within the boundaries of [Mount Graham red squirrel] critical habitat useless to [Mount Graham red squirrels]." FWS, Biological Opinion on Fire-Suppression Actions Associated with the Nuttall-Gibson Complex Wildfire ("Nuttall-Gibson BiOp") at 31 (June 8, 2007).

41.     In addition, 1996 saw the first major post-MGIO construction wildfire—known as the Clark Peak Fire. That fire, which started in April 1996 on Mount Graham's northwest slope, burned roughly 6,500 acres until it was eventually contained on May 9, 1996. FWS's evaluation of the fire estimated that 15 red squirrels were killed, 21% of its remaining critical habitat was lost, and 50% of the middens in the burn path were destroyed. Nuttall-Gibson BiOp at 33. Notwithstanding that devastation, however, FWS "concluded that [USFS's fire] suppression was not likely to have jeopardized the continued existence of the [Mount Graham red squirrel]; nor did it result in destruction or adverse modification of critical habitat." *Id.*

1    42.    In 2004, two more fires broke out in the Coronado National Forest—the Gibson

2    and Nuttall fires. Together, these wildfires came to be called the Nuttall-Gibson Complex Fire,

3    which burned nearly 29,900 acres of oak woodland, ponderosa pine, mixed-conifer, and spruce-

4    fir forest. Roughly 1,323 acres of designated red squirrel critical habitat were located within the

5    fire perimeter; however, because the species had "been eliminated from much of the spruce-fir

6    forest devastated by insect damage and fire," only 786 of acres were considered by FWS to be

7    "suitable [red squirrel] habitat." Nuttall-Gibson BiOp at 35. According to FWS's retrospective

8    analysis of the Nuttall-Gibson Complex Wildfire, "[a]pproximately 27 percent (214 of 786 acres)

9    of the critical habitat was categorized as having moderate-severity burn effects. The same

10   percentage (27 percent) of critical habitat was categorized as high-severity burn effects (212 of

11   786 acres)." *Id.* Thus, the Nuttall-Gibson Complex Wildfire was responsible for the destruction

12   of 54% of the Mount Graham red squirrel's critical habitat within the fire perimeter. FWS

13   therefore concluded that "[w]ith the loss of most of the spruce-fir forest, the mixed conifer

14   zone"—i.e., the habitat-type located in and around the Bible Camp and the Old Columbine

15   summer homes—"is now much more important for survival of the [Mount Graham red squirrel];

16   however, most of that forest type is not designated as critical habitat." *Id.*

17   43.    During the Nuttall-Gibson Complex Fire, USFS's firefighting efforts prioritized

18   protection of the MGIO over the few remaining acres of suitable red squirrel habitat. Indeed,

19   subsequent evaluations by USFS have concluded that "the MGIO and other modern

20   developments on [Mount Graham] have precipitated aggressive firefighting techniques, and

21   inhibited the restoration of the natural ecosystem processes." USFS, Final Environmental Impact

22   Statement for the Pinaleño Ecosystem Restoration Project at 176 (Feb. 2010).

44.     In 2017, yet another wildfire broke out on Mount Graham. That fire, known as the Frye Fire, proved to be historic—consuming approximately 48,443 acres on and around Mount Graham. Field surveys conducted since indicate the Frye Fire's impacts on the Mount Graham red squirrel have been devastating. Before the Frye Fire, FWS projected the red squirrel's population to range between 199 and 346 individuals; immediately after the fire, however, FWS estimated that only 35 individuals remained. Although a 2020 survey indicates that the population has since increased to 109 total individuals, that number still represents a loss of 68% of the species' pre-fire population. The most recent survey, conducted in 2021, found that the species' total population remained stagnant, with only 109 individuals left in the wild. The species, therefore, continues to lag well behind the 300-individual target envisioned by FWS's Recovery Plan.

45.     Even setting aside those individual red squirrels lost directly to the Frye Fire, the effects of that event will inevitably echo far beyond the fire itself; as FWS itself recognized in the wake of the Nuttall-Gibson Complex Wildfire:

> [S]mall populations can exhibit genetic or demographic problems that further compromise the ability of the subspecies to survive. Low genetic variability in small populations is a concern because deleterious alleles are expressed more frequently, disease resistance might be compromised, and there is little capacity for evolutionary change in response to environmental change.

Nuttall-Gibson BiOp at 30. Thus, the genetic viability of the Mount Graham red squirrel at this extremely suppressed population level is at grave risk of undermining the species' ability to survive and recover.

**D.     The Old Columbine Summer Home Tract and the Arizona Church of Christ Bible Camp**

46.     The Old Columbine summer home tract and the Arizona Church of Christ Bible Camp are both located on the Coronado National Forest in the Ash Creek drainage (on Mount

Graham's north slope)—an area that FWS and USFS have both long recognized as crucial for the red squirrel's recovery. As early as 1988, for instance, FWS observed that the area is comprised of a "habitat type where the [USFS] predicts the greater gains in red squirrel equivalents over time," meaning that "any augmentation to this area, especially in the Ash Creek drainage, is worthwhile." *See* 1988 BiOp at 29 (citing USFS, Coronado National Forest, Mount Graham Red Squirrel, An Expanded Biological Assessment (Feb. 1988)). Importantly, that "augmentation," FWS explained, includes the "[r]emoval of the Bible Camp and summer homes and subsequent reforestation," as such action "represents the best opportunity to regain previously lost habitat outside the refugium." *Id.* According to FWS, this area has become "much more important for survival of the [species]" in the wake of stand-replacing wildfires that have routinely plagued the Coronado National Forest. Nuttall-Gibson BiOp at 33.

### 1.   *The Old Columbine Summer Home Tract*

47.     The Old Columbine summer home tract was first established in the 1920s and has been authorized by USFS under special use permits ("SUPs") issued pursuant to its statutory authorities. The tract encompasses fourteen residences on roughly 25 acres.

48.     On December 31, 2008, the SUP for the Old Columbine and Turkey Flat recreation residence tracts expired. In July 2005, USFS announced that it intended to renew the SUP for both tracts from January 1, 2009 to December 31, 2028. Pursuant to its obligation under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347, USFS prepared an Environmental Impact Statement ("EIS") to evaluate the effects of and alternatives to its decision. USFS finalized its EIS in 2014. The Columbine FEIS analyzed four alternatives, including USFS's preferred alternative of reissuing the SUP for both the Old Columbine and

1   Turkey Flat residential tracts. Columbine FEIS at 11–14. With respect to the Mount Graham red

2   squirrel, the Columbine FEIS conceded that:

3       Human presence at the recreation residences and, in general, all recreation sites on
4       Mt. Graham, increases the probability that individual squirrels may be accidentally
5       injured or killed. In addition, squirrels are at risk from the effects of catastrophic
6       wildland fire, which continues to occur on the mountain because [of] fire
7       suppression in [Mount Graham red squirrel] habitat at Old Columbine and other
8       man-made facilities (the wildland-urban interface or WUI). Fire suppression has
9       and will continue to be an impediment to the return of a frequent, low-intensity,
10      natural fire cycle to the ecosystem.
11
12  *Id.* at 8. Furthermore, USFS acknowledged that "the continued presence of the residences at Old

13  Columbine inhibits the restoration of approximately 25 acres of forest to historic conditions" that

14  would benefit the red squirrel and promote its recovery prospects. *Id.*

15      49.    In connection with its proposed renewal of the SUP (and as required by Section

16  605(a) of AICA), USFS engaged in formal consultation with FWS pursuant to Section 7(a)(2) of

17  the ESA. FWS issued a BiOp on August 18, 2008, concluding that "the effects of the proposed

18  re-issuance of [SUPs] for the Mt. Graham summerhomes at Old Columbine and Turkey

19  Flat . . . are neither likely to jeopardize the continued existence of the [Mount Graham red

20  squirrel], nor result in destruction or adverse modification of critical habitat." FWS, Biological

21  Opinion on Mount Graham Summerhome Special Use Permit Residence Renewal ("Columbine

22  BiOp"), at 17 (Aug. 18, 2008). The Columbine BiOp's jeopardy analysis was predicated upon

23  FWS's estimate that between 199 and 346 individual red squirrels existed range-wide at that

24  time. *Id.* at 9. During the duration of the permit, the ITS included in the Columbine BiOp

25  authorized the take of one red squirrel at the Old Columbine tract and one red squirrel at the

26  Turkey Flat tract. *Id.* at 19. The Columbine BiOp also included a standard reinitiation notice,

27  providing that

> [R]einitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; or (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion . . . .

Columbine BiOp at 22.

50.     In March of 2015, USFS issued its Record of Decision ("ROD") for the renewal of the recreational residences at Old Columbine and Turkey Flat. *See* USFS, Record of Decision, New Special-Use Permits for Recreation Residences on the Safford Ranger District ("Columbine ROD") (March 2015). The ROD adopted USFS's preferred alternative, reauthorizing all existing residences and associated access roads at both Old Columbine and Turkey Flat until December 31, 2028. Columbine ROD at 6.

51.     In the summer of 2017, the Frye Fire—which killed between 61-78% of the entire remaining red squirrel population and decimated a significant portion of its remaining habitat (including a substantial percentage of the species' designated critical habitat)—burned through the areas in and around both the Old Columbine and Turkey Flat residential tracts. Indeed, the fire's mosaic pattern burned "right up to the cabins at Old Columbine before suddenly shifting direction." Jon Johnson, *Mount Graham Still Recuperating at One Year Anniversary of Frye Fire Start*, Gila Herald (June 9, 2018), https://bit.ly/3gvwApX. Even setting aside the burn path of the fire itself, both Old Columbine and Turkey Flat were subjected in the wake of the fire to significant flooding caused by erosion and firefighting efforts. *Id.*

### 2.   *The Arizona Church of Christ Bible Camp*

52.     The Arizona Church of Christ Bible Camp ("Camp") began operation in the Coronado National Forest in 1966 and encompasses roughly 20 acres within the Ash Creek drainage. *See* Columbine FEIS at 26. The Camp is located just over 1,200 yards away from the

1   Old Columbine summer home tract, connected by the same mixed conifer assemblage that FWS

2   has found to be crucial to the red squirrel's continued survival. The Camp's facilities include a

3   dining hall, generator house, shower house with a septic tank and leach field, tool shed, two toilet

4   buildings, its own water and electrical systems, six barracks buildings, four ramada shelters, and

5   roughly a quarter-mile of access road. Much of that infrastructure, however, has been damaged

6   in the post-Frye Fire flooding or is in a general state of disrepair due to the Camp's infrequent

7   use over the past 10 to 15 years.

8       53.     The most recent SUP for the Camp expired on December 31, 2008. The terms and

9   conditions of the Camp's most recently operative SUP provide that:

> At the end of the term of occupancy authorized by this permit, or upon abandonment, or termination for cause, Act of God or catastrophic event, or in the public interest, the holder shall remove within a reasonable time all structures and improvements except those owned by the United States, and shall return the site to a condition approved by the authorized officer unless otherwise agreed to in writing or in this permit. If the holder fails to remove all such structures or improvements within a reasonable period—not to exceed, one hundred and eighty (180) days from the date the authorization of occupancy is ended—the improvements shall become the property of the United States, but in such event, the holder remains obligated and liable for the cost of their removal and the restoration of the site.

21  USFS, Term Special Use Permit for Recreational Residences, Holder No. 5114/01, Type Site

22  No. 123 (Sept. 26, 1994). With respect to transferability, the permit provides that "[i]f the holder

23  through voluntary sale, transfer, enforcement of contract, foreclosure, or other legal proceeding

24  shall cease to be-the owner of the physical improvements," within the tract, the "permit *shall* be

25  terminated." *Id.* at VII.C. (emphasis added). Notwithstanding this language, the permit also

26  allows an authorized purchaser to assume the remainder of an existing permit term. *Id.* ("If the

27  person to whom title to said improvements is transferred is deemed by the authorizing officer to

28  be qualified as a holder, then such person to whom title has been transferred will be granted a

1    new permit. Such new permit will be for the *remainder of the term of the original holder*."

2    (emphasis added)).

3         54.    Despite the expiration of the Camp's SUP more than twelve years ago, the

4    permitholder did not remove the structures or improvements authorized by the SUP, as expressly

5    required by the SUP upon expiration. Nor, upon information and belief, has USFS required the

6    prior permitholder to pay for the removal and restoration of the site, even though the SUP

7    required this action upon expiration of the SUP. Rather, USFS recently accepted comments on a

8    renewal of the long-expired SUP. *See* USFS, Scoping Notice on Reissuance of Special Use

9    Permit for the Arizona Church of Christ Bible Camp (Dec. 3, 2020), https://bit.ly/3BjI2lj.

10         55.    As the recent scoping notice makes clear, USFS plans to reissue a SUP that would

11    allow Camp operations to resume and the existing facilities to remain in their existing locations,

12    notwithstanding that the Camp infrastructure has existed in these locations of the Coronado

13    National Forest without lawful authorization under a valid SUP for more than twelve years.

14                   3.   *Plaintiffs' Efforts to Compel Reinitiated Consultation Over the Ash Creek*
15                        *Drainage Projects*

16         56.    The historic Frye Fire was finally contained in July 2017. As explained above,

17    this single fire led to an unprecedented collapse in the squirrel's population. Yet, *three years*

18    later, USFS and FWS had not even begun the process for reinitiating consultation over the

19    effects of the Camp and Cabins on the species' severely diminished population, the population's

20    fragmented, isolated and vulnerable state, and the fact that the Camp and Cabins are occupying

21    the largest, short-term recoverable canopied forested habitat in the upper elevations of the

22    mountain.

23         57.    In light of this unreasonable delay, Plaintiffs filed suit in this Court to compel

24    reinitiated consultation under Section 7 of the ESA. *See Center for Biological Diversity v.*

27

1 | *Christiansen*, 4:20-cv-00251-BGM (D. Ariz. June 10, 2020). The parties entered into settlement

2 | negotiations shortly after the suit was filed, ultimately reaching an agreement in late 2020. *See*

3 | Settlement Agreement, *Center for Biological Diversity v. Christiansen*, 4:20-cv-00251-JCH-

4 | BGM (D. Ariz. December 28, 2020), ECF No. 19.

5 |     58.    Per the terms of that settlement, the Defendants agreed to "conclude the

6 | reinitiated consultation process on the 2015 reissuance of the special use permit for the [Cabins]

7 | by April 1, 2021," and "conclude the consultation process on [USFS]'s decision responding to

8 | the application for reissuance of the special use permit for the [] Camp by August 16, 2021." *Id.*

9 | at 3, ¶ 1.

10 |     **E.**    **The 2021 BiOps for the Cabins and Camp Areas**

11 |     *1.*    *The Cabins BiOp (March 31, 2021)*

12 |     59.    On March 31, 2021, FWS issued its BiOp purporting analyze the effects of the

13 | Cabins' special use permit on the small Mount Graham red squirrel population that survived the

14 | Frye Fire. *See* FWS, Reinitiation of Consultation for Old Columbine Recreational Residences

15 | (March 31, 2021) [hereinafter "Cabins BiOp"]. As described by FWS, the proposed action for

16 | purposes of consultation includes the renewal of "special use permits for 14 recreational

17 | residences and associated utility structures and outbuildings on 25 acres at the Old Columbine

18 | site in the Pinaleño Mountains." *Id.* at 3. The Cabins BiOp assumes the same "baseline level of

19 | disturbance" to the Mount Graham red squirrel "as that consulted on in 2008," and "does not

20 | include any new structures or activities." *Id.*

21 |     60.    The BiOp begins by noting that the squirrel's population is now estimated to be

22 | around 109 total individuals, which remains well below the "fairly stable" population numbers

23 | recorded during the early 2000s. *See id* at 10-11. As discussed above, however, this most recent

1   population estimate also falls well short of the squirrel's Recovery Plan threshold target of 300

2   adult squirrels. *See id.* at 12 ("[T]he goal of the [recovery] plan is to first increase and stabilize

3   the population by providing sufficient habitat to maintain a population of squirrels that never

4   fluctuates below 300 adults and is distributed throughout the Pinaleño Mountains.").[5]

5       61.     With respect to the environmental baseline, the Cabins BiOp attempts to

6   downplay the magnitude of the Frye Fire's impact on the Mount Graham red squirrel by

7   asserting that relative to the rest of the Ash Creek drainage, the action area (i.e., the 45-acre

8   "Cabin Area") was spared from some of the worst fire damage during the 2017 Frye Fire. *Id.* at

9   14 ("Although habitat directly within the Cabin Area did not entirely burn at high severity, much

10  of the [red squirrel] habitat adjacent to it in Ash Creek drainage, the greater Columbine area, and

11  Webb Peak burned at high severity and caused considerable loss of active squirrel territories,

12  middens, and habitat."). Thus, the Cabin Area presently contains at least five active middens,

13  four of which are located 200 feet or fewer from the nearest cabin. *See id.* at 14-15.

14      62.     Despite its earlier observation about relative fire impacts, the Cabins BiOp's

15  discussion of the environmental baseline sidesteps any relative evaluations of the effects of the

16  action, as proposed, to the importance of this area as suitable red squirrel habitat *without the*

17  *cabins present*. This oversight is particularly notable given that the 2004 Nuttall-Gibson Fire and

---

[5] The present disparity between this recovery trigger and the squirrel's severely depleted population is also concerning because the factors that led to its initial listing under the ESA—i.e., the "construction of an astrophysical observatory, occurrences of high-severity wildland fires, proposed road construction and improvements, and recreational developments at high elevations on the mountain," Cabins BiOp at 9—still remain and, if anything, are becoming more frequent and intense, *see* Merrick et al., *supra* note 1 at 166 (finding that "two decades of increasingly severe disturbance events has reduced the number of [red squirrels] the forest can support by an estimated 86%."); *see also id.* at 170 (observing that wildfires in the Coronado National Forest are growing more severe due to "[w]armer, longer fire seasons," "[p]ast fire suppression" efforts, and the ongoing 20-year drought, which the authors describe as "among the most severe megadroughts" in history).

1    2017 Frye Fire destroyed "nearly all of the remaining spruce–fir and the majority of mixed

2    conifer forest on the mountain," Merrick et al., *supra* note 1 at 162, leaving the Cabin Area as

3    one of the very few remaining places where the squirrels can survive the elevated stressors

4    associated with post-fire periods. *See id.* at 169 ("For many species, fire itself does not pose the

5    greatest risk to survival, rather the postfire period spent searching for and reestablishing

6    territories, searching for food, nest or den sites, and mates leaves individuals vulnerable to

7    predation, starvation, or without adequate shelter.").

8        63.    As to the effects of the action, the Cabins BiOp notes there are "three types of

9    consequences the proposed action could have on [the squirrels] within the Cabin Area: 1) injury

10   or death due to vehicle strikes on roads, 2) potential impacts to behavior due to disturbance, and

11   3) impacts to the subspecies through the removal of potential habitat." *Id.* at 16. Although the

12   2008 BiOp found that at least one squirrel would be taken as a result of a vehicle strike, *see* 2008

13   BiOp at 14, the Cabins BiOp finds that only sub-lethal take is likely, *see* Cabins BiOp at 17.

14   Specifically, FWS concluded that "all [squirrels] within the 45-acre Cabin Area . . . will be taken

15   in the form of harassment," *id.* at 25, "due to noise and human presence," *id.* at 17, or "habitat

16   alteration or removal as cabin permittees maintain or improve their cabins," *id.* at 21.

17       64.    To mitigate this expected take (and to reach a no-jeopardy finding), FWS

18   repeatedly pointed to USFS's planned "conservation measures"—specifically, a proposed 92-

19   foot buffer zone around active middens in which USFS will generally prohibit vegetation

20   removal, "modifications to cabin footprints," and "[m]aterials, generators, and other noise

21   creating machinery." *See id.* at 6, 17-19, 21, 22.10 According to FWS, the 92-foot buffer "should

22   offset the consequences of [the Cabin Area] disturbance" by "prevent[ing] changes to [squirrel]

23   habitat within a distance deemed important to midden-site selection." Cabins BiOp at 19, 24.

65.     According to the Cabins BiOp, the 92-foot mitigation buffer is based on the findings of a 2007 study that examined midden-site selection following habitat destruction or disturbance. *See id.* at 17 (citing Wood et al., *Fine-Scale Analysis of Mount Graham Red Squirrel Habitat Following Disturbance*, 71 J. of Wildlife Mgmt. 2,357 (2007)). In that study, researchers found "that midden-site selection best occurs using a 92-foot plot around middens, with strong selection using a 184-foot plot, as well." Cabins BiOp at 9; *see also* Wood et al., *supra* at 2,363 ("[S]quirrels are selecting on a territory scale as we identified, with strong evidence at 28-m and 56-m radii of selection."). FWS, however, never explained in the initial Cabins BiOp why it chose to impose a 92-foot buffer rather than the more protective 184-foot buffer, especially when the 92-foot metric "represent[s] the smallest . . . known red squirrel territory reported in the literature." Wood et al., *supra* at 2,359.

66.     Notably, FWS's unexplained decision to require a less protective buffer around active middens also runs contrary to its own past practice. Relying on the same Wood et al. study during a 2019 consultation with USFS, FWS deemed a 200-foot buffer appropriate to mitigate impacts to red squirrels and their middens after the Frye Fire. *See* FWS, Biological Opinion for Pinaleño Ecosystem Restoration Project at 15 (Sept. 15, 2019) ("The 200-ft radius buffer was selected based on Wood et al. (2007), who found that [squirrels] select midden sites and territories at both a 92- and 184-ft radius scale. The 184-ft radius buffer was rounded up to 200 ft to provide slightly greater protection to middens and [squirrels] found within the project area.").[6]

67.     The larger buffer zone also squares with the 2021 Merrick et al. study on which FWS relies as "the best available information to date regarding [the species'] home range size."

---

[6] A copy of this BiOp was attached to Plaintiffs' notice of intent sent to Defendants on March 11, 2022.

1    Cabins BiOp at 10. As the authors discovered there, squirrels that have survived large fires, like

2    those found in the Cabin Area, show correspondingly larger home ranges (centered around their

3    middens) as a "result of individuals searching more widely for food, nest sites, and new

4    territories." Merrick et al., *supra* note 1 at 168.

5        68.    Ultimately, the Cabins BiOp concludes "that the action, as proposed, is not likely

6    to jeopardize the continued existence of the [Mount Graham red squirrel]." Cabins BiOp at 23.

7    Despite never identifying the species' "tipping point"—i.e., the likely point at which recovery is

8    no longer possible—the BiOp asserts that the loss of a home range will not "push the subspecies

9    over the tipping point and alter its recovery, as indicated by the [species'] population increasing

10   from 35 individuals post-Frye Fire in 2017 to 109 individuals in 2020 following the loss of

11   significant areas of [squirrel] habitat and multiple [squirrel] home ranges." *Id.* at 25. The BiOp

12   never explains why this recent (yet, relatively small) population increase is indicative of the

13   species' ability to recover to the point that ESA protections are no longer necessary.

14       69.    Having concluded that the take associated with continued use of the Cabin Area

15   would not jeopardize the Mount Graham red squirrel, FWS included an ITS in the Cabins BiOp

16   that authorizes sublethal take (i.e., harassment) of all squirrels in the action area.

17       70.    To describe the permissible amount of take, FWS utilized a so-called "take

18   surrogate" in the form of "midden activity." *Id.* Under this surrogate, the permissible level of

19   take is exceeded "if no active middens are present within the Cabin Area over the course of two

20   consecutive annual monitoring surveys conducted by the USFS during the fall." *Id.* According to

21   FWS, "[t]hese surveys are not tied to the annual interagency census conducted each fall; instead,

22   this is a separate survey conducted by the USFS within the Cabin Area to determine midden

23   presence (including newly created middens) and [red squirrel] activity." *Id.* In other words,

1  compared to the annual interagency censuses, this monitoring survey is both specific to the

2  action area *and* more comprehensive because it specifically seeks to catalog all middens present

3  in the action area, including identifying "newly created middens." *See id.* (explaining that the

4  separate annual interagency census "could lead to undercounting" squirrels in the action area

5  because it only "revisits a random sample of known middens each year," including areas outside

6  the action area, and "does not include sweeping areas to look for new middens"). Despite these

7  crucial differences between the comprehensive monitoring survey protocols required by the

8  BiOp in the action area and the more limited scope of the annual interagency census, FWS

9  nevertheless makes reinitiated consultation contingent on two consecutive years of area-wide

10 midden inactivity to rule out a potential undercounting of squirrels in the action area (i.e., "one

11 fall season" in which squirrels "are not present within the Cabin Area."). *Id.* Yet, the BiOp never

12 explains why the substantially more intensive, action-area-specific surveys will not obviate any

13 potential undercounting since these surveys are not plagued by the same methodological

14 shortcomings present in the annual interagency censuses (e.g., random sampling and the

15 exclusion of newly created middens).

16      71.    Setting aside that FWS never explains why, considering the precarious condition

17 of the species and the importance of the Columbine area to its recovery, a single year of area-

18 wide abandonment does not merit reinitiated consultation, even the two consecutive years of

19 inactivity do not provide an automatic trigger for reinitiated consultation. Instead, assuming that

20 condition is met (i.e., "no middens are found to be active within the Cabin Area over two

21 consecutive fall seasons"), USFS and FWS will first "work together to determine if extraneous

22 factors (such as tree disease or poor cone crops) are contributing to the lack of [red squirrel]

23 presence" and will reinitiate consultation only if the two consecutive years of total inactivity are

1    found to be directly attributable to the proposed action's harassment of the species, *id.* at 27—a

2    causal finding as to which the BiOp sets forth no clear criteria that will bind the agencies and

3    that, in any event, FWS concedes is unlikely to be met even if the Cabins are in fact altering the

4    squirrel's feeding or sheltering behavior. *See id.* at 26 ("[Squirrels] experiencing harassment may

5    temporarily alter their feeding or sheltering behavior, but will not likely desert the area because

6    of disturbance.").

7            2.      *The Camp BiOp (August 9, 2021)*

8            72.     On August 9, 2021, FWS issued its BiOp concerning effects of the proposed

9    reissuance of the SUP for the Camp. *See* FWS, Consultation for Reissuance of the

10   Organizational Camp Special Use Permit on Mt. Graham (Aug. 9, 2021) [hereinafter "Camp

11   BiOp"]. According to the BiOp, the action for purposes of consultation includes "the operation

12   and maintenance of an Organizational Camp (the Camp) at the existing location on Mt. Graham

13   for a 20-year period." *Id.* at 3. Despite FWS having previously stated that the Camp occupies 89

14   acres, *see* 2011 Draft Recovery Plan at 20, the Camp BiOp states that it occupies a mere 5.9

15   acres in the Ash Creek drainage. Camp BiOp at 3. According to FWS, the applicant will be

16   permitted "to operate and maintain the existing facilities for a maximum of 120 individuals"

17   annually from April 15th to November 15th, with limited access permitted during the remainder

18   of the year. Id. at 3-4.

19           73.     In most aspects, the Camp BiOp mirrors the analysis and conclusions of the

20   Cabins BiOp discussed above. For instance, FWS again concluded that this SUP "is not likely to

21   jeopardize the continued existence of the [red squirrel]." *Id.* at 32. Likewise, the Camp BiOp

22   summarily concludes that the proposed action will not "push [the squirrel] over the tipping point

23   and alter its recovery," despite never identifying where the species' "tipping point" lies. *Id.* at 28.

34

74.     Unlike the Cabins BiOp, however, the Camp BiOp represents the first time that FWS and USFS have ever consulted over the impacts associated with the Camp, including its operations and infrastructure. Yet, the Camp BiOp's jeopardy analysis assumes that the Camp's operations and infrastructure are part of the environmental baseline, *e.g.*, Camp BiOp at 20, and therefore minimizes the effects of the action by asserting that the species is "habituated to noise and human presence," *id.* at 26, 32.

75.     The Camp BiOp's no-jeopardy conclusion is also premised on the absence of lethal take, and levels of sublethal take (i.e., harassment and displacement of all squirrels in the action area) made acceptable by the same 92-foot buffer around active middens as that employed in the Cabins BiOp. *Id.* at 28. Like the Cabins BiOp, the Camp BiOp lacks any explanation why FWS chose to impose a 92-foot buffer rather than the 184-foot buffer that was also supported by the 2007 Wood et al. study (or the 200-foot buffer adopted by FWS in analogous BiOps relying on Wood et al. after the Frye Fire).

76.     To authorize the expected take, the Camp BiOp includes an ITS that mirrors the one found in the Cabins BiOp, allowing zero lethal take and injury of individual squirrels but permitting sublethal take of "any [red squirrels] occupying middens within the Camp action area" via harassment. *Id.* at 35. The ITS relies on the same take surrogate (i.e., the abandonment of all middens in the action area for two consecutive years) and includes the pre-consultation process by which the consulting agencies will purportedly determine, without any public input or transparency, whether the presence of "extraneous factors" preclude the need for further formal consultation. *Id.* at 36.

1       **F.**     **Plaintiffs' Notice of Intent and Subsequent BiOp "Amendments"**

2       77.     On March 11, 2022, in accordance with 16 U.S.C. § 1540(g)(2), Plaintiffs notified

3 USFS and FWS of their intent to prosecute unremedied violations of the ESA arising from both

4 the Cabins and Camp BiOps. In that Notice of Intent ("NOI"), Plaintiffs identified numerous

5 legal violations under Sections 7 and 4 of the ESA, as well as the Act's implementing

6 regulations.

7       78.     In summary, the NOI explained that both BiOps: (1) failed to analyze the

8 proposed actions' impacts on the squirrels' recovery by evading an identification of the species'

9 "tipping point," i.e., the point at which the squirrel likely will not be able to recover to the point

10 where ESA protections are no longer necessary; (2) failed to adequately examine both the

11 environmental baseline and full effects of the actions by ignoring the value of the respective

12 action areas to the species without the project infrastructure and concomitant disturbances; (3)

13 arbitrarily relied on a conservation measure (i.e., 92-foot buffer zone around all active middens)

14 that contradicts both the "best available science" and the agencies' past practice; (4) utilized a

15 meaningless consultation reinitiation trigger that is internally incoherent and grants the agencies

16 unfettered discretion to skip any future consultations; (5) arbitrarily failed to implement the

17 squirrel's Recovery Plan or at least explain why it was not doing so; and (6) cannot be relied on

18 by USFS without exposing the agency to liability under Sections 7 and 9 of the ESA.

19       79.     On May 6, 2022, FWS purported to "amend" both the Cabins and Camp BiOps

20 (collectively, "Amended BiOps"). However, the Amended BiOps do not change any of the

21 BiOps' operative provisions, nor cure the serious, substantive violations identified by Plaintiffs'

22 NOI; instead, they merely seek to justify the agencies' prior decisions in the Cabins and Camp

23 BiOps by providing further, yet still unpersuasive, explanations for FWS's decisions.

80.     With regard to the inadequate buffer zones, the Amended BiOps fail to enlarge the applicable buffer zones around active squirrel middens to make both BiOps consistent with the agencies' post-Frye Fire practice. Instead, the Amended BiOps simply identify one action— undertaken "before the Frye Fire"—in which FWS deemed a 92-foot buffer zone sufficiently protective for a portion of a forest thinning project that capped the allowable size of vegetation to be removed. *See* Am. Cabins BiOp at 19-20; Am. Camp BiOp at 25-26. However, as Plaintiffs' NOI pointed out (and both Amended BiOps concede), the applicable buffer for this *same* project was increased to 200-feet in response to the widespread ecological devastation of the Frye Fire. Am. Cabins BiOp at 20; Am. Camp BiOp at 26. Despite this, neither Amended BiOp explains why these actions, which also occur after the Frye Fire and affect a squirrel population that is less than one-third the size of that pre-Frye Fire, should be treated differently. The lack of any explanation for the agencies' adoption of such a nominal buffer when more protective options exist is especially flagrant in light of FWS's long-standing recognition that "[r]emoval of the Bible Camp and summer homes and subsequent restoration [of these action areas] represents the best opportunity to regain previously lost habitat outside the refugium," 1988 BiOp at 29— habitat which has only become more important to the squirrel after several catastrophic wildfires, including the 2017 Frye Fire, decimated much of the species' habitat.

81.     On May 11, 2022, five days after FWS issued the "amended" BiOps, FWS and USFS sent a joint letter responding to Plaintiffs' NOI. There, Defendants asserted that they "made changes to [the Cabins and Camp BiOps] to further explain the rationale for using a 92-foot buffer instead of a 200-foot buffer," but "did not edit the [BiOps] in response to [Plaintiffs'] other claims . . . ."

82.     Via letter dated July 8, 2022, Plaintiffs notified Defendants that the Amended BiOps did not remedy any of the violations described in the NOI and, therefore, "may not be relied upon to authorize the special use permits for the Old Columbine Cabins and the Organizational Camp on Mount Graham." Thus, as a means of potentially averting litigation over the BiOps' legal violations, Plaintiffs invited Defendants to discuss more meaningful ways of addressing the harms to Mount Graham red squirrels arising from the proposed actions.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim I – FWS's Violations of the ESA and the APA

83.     Plaintiffs hereby incorporate paragraphs 1-82 by reference.

84.     Except in extraordinary circumstances not present here, the ESA mandates that federal agencies, in consultation with FWS, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species" that has been determined to be "critical." 16 U.S.C. § 1536(a)(2). Accordingly, with respect to every discretionary action undertaken by an agency, the ESA "requires that [the] agency 'insure' that the actions it authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007).

85.     By determining in the Camp and Cabins BiOps, as amended, that the special use permits for the Cabins and/or Camp will not jeopardize the squirrel's survival or recovery prospects, FWS violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), its regulations implementing the ESA, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

86.     By failing to identify, let alone analyze, in both the Cabins and Camp BiOps, as amended, the squirrel's "tipping point" (i.e., the point at which the species' survival *and*

1    recovery is compromised), FWS's conclusion that the proposed actions will not "jeopardize" the

2    species violates Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), its implementing

3    regulations, and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2).

4        87.    By predicating its no-jeopardy conclusion in both the Camp and Cabins BiOps, as

5    amended, on an arbitrarily narrow window of population data (i.e., one that excludes the

6    significant losses from the Frye Fire and the agency's prior jeopardy finding), and by failing to

7    explain that choice despite the growing threats to the species' survival and recovery, FWS has

8    violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2) and its implementing regulations,

9    including the FWS's obligation to base its analysis on the best available scientific information,

10   and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

11       88.    By failing to evaluate the Mount Graham red squirrel's survival and recovery

12   prospects in the absence of the disturbances and infrastructure associated with the Camp and

13   Cabins, and instead concluding without explanation that the loss of two home ranges will not

14   "alter" the squirrels' recovery, FWS's analysis in both the Camp and Cabins BiOps, as amended,

15   illegally skews the species' environmental baseline and/or the effects of the proposed actions, in

16   violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), its implementing regulations,

17   and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2).

18       89.    In issuing the Cabins and Camp BiOps, as amended—including their conclusions

19   that a 92-foot buffer zone around active middens will avert the actions' jeopardizing the

20   squirrel—FWS failed to rely on the best available scientific evidence in violation of Section

21   7(a)(2) of the ESA, its implementing regulations, and has acted arbitrarily and capriciously in

22   violation of the APA, 5 U.S.C. § 706(2).

1        90.    By relying in the Camp and Cabins BiOps, as amended, on a conservation

2   measure (i.e., the 92-foot buffer around active middens) that conflicts with the more protective

3   measure (200-foot buffer) required by FWS in another BiOp post-dating the Frye Fire—yet

4   failing to explain the agency's sudden change in agency practice—FWS has violated Section

5   7(a)(2) of the ESA, its implementing regulations, and has acted arbitrarily and capriciously in

6   violation of the APA, 5 U.S.C. § 706(2).

7        91.    By issuing ITSs in both the Camp and Cabins BiOps, as amended, that rely on

8   vague "pre-consultation" processes, and which vest the agencies with unfettered discretion to

9   avoid any, let alone immediate, reinitiated consultation over the actions' impacts on the highly

10   endangered red squirrel, FWS has violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2),

11   and its implementing regulations, and acted arbitrarily in violation of the APA, 5 U.S.C. §

12   706(2).

13        92.    By making reinitiated consultation contingent in both the Cabins and Camp ITSs

14   on two consecutive years of area-wide midden inactivity due to alleged methodological defects

15   not present in the agencies' separate, action-specific censuses required by the BiOps, FWS has

16   violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations,

17   and acted arbitrarily in violation of the APA, 5 U.S.C. § 706(2).

18        93.    By acknowledging the ostensible difficulty of establishing the cause of take (i.e.,

19   harassment) in both the Cabins and Camp BiOp—yet utilizing a trigger that requires conclusive

20   proof of such causation before reinitiated consultation is required—and by authorizing every

21   single squirrel to be taken in the action areas, FWS has failed to impose measurable criteria that

22   allow the applicant or the public to gauge compliance with the ITS in both the Camp and Cabins

1   BiOps, as amended, in violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), its

2   implementing regulations, and the APA, 5 U.S.C. § 706(2).

3        94.    By failing to implement the squirrel's recovery plan through restoration of the

4   forest in and around the action areas, and by failing to explain why doing so would not promote

5   the species' survival and recovery prospects, as set forth in the species' recovery plans (and as

6   long recognized by FWS as "the best opportunity to regain previously lost habitat" for the

7   species, 1988 BiOp), FWS's Camp and Cabins BiOps, as amended, violate Section 4(f) of the

8   ESA, 16 U.S.C. § 1533(f), and are arbitrary and capricious in violation of the APA, 5 U.S.C. §

9   706(2).

10             **Claim II – USFS's Violations of the ESA**

11        95.    Plaintiffs hereby incorporate paragraphs 1-82 by reference.

12        96.    By relying on the unlawful Cabins BiOp to authorize the special use permit for

13   the Old Columbine summer home tract, and to satisfy its substantive obligation under the ESA to

14   safeguard against jeopardy to the squirrel, USFS has independently violated Section 7(a)(2) of

15   the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations.

16             **PRAYER FOR RELIEF**

17       WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

18       (1)    Declaring that Defendants have violated the Endangered Species Act and the

19   Administrative Procedure Act;

20       (2)    Enjoining USFS from authorizing continued use and occupation of the Old

21   Columbine summer home tract, including "any irreversible or irretrievable commitment of

22   resources with respect to" that action in violation of 16 U.S.C. § 1536(d), until consultation has

23   been reinitiated and completed;

1        (3)     Enjoining USFS from authorizing the use and occupation of the Camp area,

2  including "any irreversible or irretrievable commitment of resources with respect to" that action

3  in violation of 16 U.S.C. § 1536(d), until renewed consultation has been initiated and completed,

4  and a valid special use permit has been issued;

5        (4)     Setting aside the Columbine ROD, and the BiOp upon which it relies, and

6  remanding to USFS and FWS with instructions to immediately reinitiate consultation to address

7  the impacts of the Cabin infrastructure, use, and operation;

8        (5)     Remanding the Amended Camp BiOp to USFS and FWS with instructions to

9  immediately engage in formal consultation to address the impacts of the Camp infrastructure,

10  use, and operation;

11       (6)     Ordering USFS and FWS to complete reinitiated consultation for both the Camp

12  and Cabins by a date certain;

13       (7)     Awarding Plaintiffs their attorneys' fees and costs in this action; and

14       (8)     Granting Plaintiffs any further relief as the Court may deem just and proper.

16              Respectfully submitted this 13th day of September 2022.

20              MATTHEW R. ARNOLD

21              (Admission *pro hac vice* pending)

23              WILLIAM S. EUBANKS, II

24              (Admission *pro hac vice* pending)

26              EUBANKS & ASSOCIATES, PLLC

27              1629 K Street NW, Suite 300

28              Washington, DC 20006

29              Phone: (202) 656-3599

30                      (970) 703-6060

31              Email: matt@eubankslegal.com

32                       bill@eubankslegal.com