TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

S. JAY GOVINDAN, Section Chief
BRIDGET KENNEDY MCNEIL, Assistant Chief
CLIFFORD E. STEVENS, JR.
Senior Trial Attorney (D.C. Bar No. 463906)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20004
Tel: (202) 353-0368
Fax: (202) 305-0275
clifford.stevens@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al., ) | No. 4:22-cv-0412-JAS-AMM |
| ) | |
| Plaintiffs, ) | **DEFENDANTS' OPPOSITION** |
| ) | **TO PLAINTIFFS' MOTION** |
| v. ) | **FOR SUMMARY JUDGMENT** |
| ) | **AND MEMORANDUM IN** |
| Randy Moore, et al., ) | **SUPPORT OF CROSS-MOTION** |
| ) | **FOR SUMMARY JUDGMENT** |
| ) | |
| Defendants. ) | |

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ...................................................................................................... 1

II.  LEGAL AND FACTUAL BACKGROUND ............................................................. 3

  A.  The Endangered Species Act ........................................................................... 3

  B.  The Mount Graham Red Squirrel and Its Habitat .......................................... 5

  C.  The Columbine Cabins ..................................................................................... 7

  D.  The Organizational Camp .............................................................................. 10

  E.  Other Recreational Facilities on Mount Graham .......................................... 13

  F.  Procedural History.......................................................................................... 14

III. STANDARD OF REVIEW ..................................................................................... 15

IV.  ARGUMENT ........................................................................................................... 16

  A.  The Service Reasonably Found That the Cabins and Camp Are Not Likely to
      Jeopardize the Continued Existence of the Squirrel....................................... 16

  B.  Plaintiffs' Arguments Challenging the No-Jeopardy Determinations Are Contrary
      to Law and Contradicted by the Record.......................................................... 21

    1.  Plaintiffs Misstate the ESA Section 7 Jeopardy Standard.............................. 21

    2.  Plaintiffs Mischaracterize the Service's BiOps............................................... 26

    3.  Plaintiffs Present an Inaccurate Picture of the Available Habitat .................. 28

    4.  The Service Properly Analyzed the Effects of the Action in the Context of the
        Environmental Baseline ................................................................................... 31

    5.  The Service Fully Explained Why 92-Foot Midden Buffers Are Appropriate
        Along with Other Related Protections.............................................................. 33

    6.  The BiOps Include Appropriate Triggers for Re-Initiation of Consultation If
        Necessary to Re-Evaluate the Cabins and Camp ............................................ 35

i

7. The Forest Service Did Not Unreasonably Rely on the BiOps ........................ 38

C. The Court Should Not Grant Plaintiffs' Requested Remedy ................................. 39

V. CONCLUSION ................................................................................................ 40

1

## <u>TABLE OF AUTHORITIES</u>

2

**Case(s)**                                                                                   **Page(s)**

3

4

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F.3d 989 (9th Cir. 2012) ...................................................................... 39

5

*Cascadia Wildlands v. Thrailkill,*
6
   49 F. Supp. 3d 774 (D. Or. 2014) ......................................................... 23, 28

7

*Center for Biological Diversity v. FWS,*
8
   441 F. Supp. 3d 843 (D. Ariz. 2020) ..................................................... 24, 25

9

*Center for Biological Diversity v. U.S. Bureau of Land Management,*
10
   698 F.3d 1101 (9th Cir. 2012) .................................................................... 39

11

*City of Tacoma, Wash. v. Fed. Energy Regul. Comm'n,*
12
   *460* F.3d 53 (D.C. Cir. 2006) ...................................................................... 38

13

*Cooling Water Intake Structure Coal. v. EPA,*
14
   905 F.3d 49 (2d Cir. 2018) ......................................................................... 22

15

*Doe ex rel. Gortarez v. Dep't of Homeland Sec.,*
16
   No. CV 09-1329-PHX-DGC, 2010 WL 3564831 (D. Ariz. Sept. 7, 2010) ................. 15

17

*Friends of Del Norte v. California Dep't of Transportation,*
18
   No. 18-CV-00129-JD, 2023 WL 2351649 (N.D. Cal. Mar. 3, 2023) .......................... 35

19

*Gifford Pinchot Task Force v. FWS,*
20
   378 F.3d 1059 (9th Cir. 2004) .................................................................... 22

21

*Kern Cty. Farm Bureau v. Allen,*
22
   450 F.3d 1072 (9th Cir. 2006) .................................................................... 35

23

*Lands Council v. McNair,*
24
   537 F.3d 981 (9th Cir. 2008) ............................................................... 15, 23

25

*Monsanto Co. v. Geertson Seed Farms,*
26
   561 U.S. 139 (2010) .................................................................................. 40

27

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States,*
28
   384 F.3d 721 (9th Cir. 2004) ...................................................................... 15

*National Wildlife Federation* v. *NMFS*,
    524 F.3d 917 (9th Cir. 2008).............................................................. 22, 23, 32

*Native Village of Chickaloon v. NMFS*,
    947 F. Supp. 2d 1031 (D. Alaska 2013).......................................................... 25

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008)........................................................................ 38

*Nw. Env't Def. Ctr. v. NMFS*,
    647 F. Supp. 2d 1221 (D. Or. 2009)............................................................... 32

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    817 F. Supp. 2d 1290 (D. Or. 2011)................................................................. 7

*Occidental Eng'g Co. v. I.N.S.*,
    753 F.2d 766 (9th Cir. 1985).......................................................................... 16

*Oceana, Inc. v. Pritzker*,
    75 F. Supp. 3d 469 (D.D.C. 2014) ................................................................ 23

*Pac. Rivers v. United States Bureau of Land Mgmt.*,
    No. 6:16-CV-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018) ............ 24

*Pacific Coast Federation of Fishermen's Associations v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008) ........................................................ 25

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*,
    898 F.2d 1410 (9th Cir. 1990)........................................................................ 39

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*,
    499 F.3d 1108 (9th Cir. 2007)........................................................................ 15

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010)........................................................................ 15

*Rock Creek All. v. FWS*,
    663 F.3d 439 (9th Cir. 2011).......................................................................... 22

*Safari Club Int'l v. Haaland*,
    31 F.4th 1157 (9th Cir. 2022)......................................................................... 37

iv

*Salmon Spawning & Recovery All. v. NMFS,*
  342 F. App'x 336 (9th Cir. 2009)................................................... 15, 16

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) ......................................................... 16

*Selkirk Conservation All. v. Forsgren,*
  336 F.3d 944 (9th Cir. 2003) ......................................................... 17

*Wild Fish Conservancy v. Salazar,*
  628 F.3d 513 (9th Cir. 2010) ......................................................... 16

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................... 15

16 U.S.C. § 1532(15) ........................................................................... 3

16 U.S.C. § 1532(19) ........................................................................... 4

16 U.S.C. § 1533 ................................................................................. 3

16 U.S.C. § 1536(a)(2) .......................................................... 1, 3, 4, 35

16 U.S.C. § 1536(b)(3)(A) .................................................................. 16

16 U.S.C. § 1536(b)(4) ......................................................................... 5

16 U.S.C. § 1536(o)(2) ......................................................................... 5

16 U.S.C. § 1538(a)(1)(B) ................................................................... 4

**Regulations**

36 C.F.R. § 251.50(b) ........................................................................ 10

50 C.F.R. § 17.11 ................................................................................. 3

50 C.F.R. § 402.02............................................................................ *passim*

50 C.F.R. § 402.12(f) ........................................................................... 4

50 C.F.R. §§ 402.13-402.14 .............................................................. 3, 4

v

50 C.F.R. § 402.14................................................................................................ 3, 4

50 C.F.R. § 402.14(g)(2) ............................................................................................ 17

50 C.F.R. § 402.14(g)(4) ......................................................................................... 17, 32

50 C.F.R. § 402.14(i)(1)(i) .......................................................................................... 35

50 C.F.R. § 402.16 ..................................................................................................... 14

50 C.F.R. § 402.16(a) .................................................................................................. 5

**Federal Register**

51 Fed. Reg. 19,296 (June 3, 1986).......................................................................... 22

83 Fed. Reg. 35,178 (July 25, 2018) ......................................................................... 24

84 Fed. Reg. 44,976 (Aug. 27, 2019) ........................................................................ 24

## I.    INTRODUCTION

Plaintiffs[1] challenge the determination of the U.S. Fish & Wildlife Service (the "Service") that the continued authorization by the U.S. Forest Service (the "Forest Service") of two long-existing recreational sites in the Coronado National Forest in Arizona – 14 recreational residences ("Cabins") dating to the mid-1950s or earlier and an organizational camp facility ("Camp") that began operation in 1966 – is not likely to "jeopardize" the continued existence of the endangered Mount Graham red squirrel ("squirrel"), consistent with the requirements of Section 7(a)(2) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1536(a)(2). The Service's "no-jeopardy" findings for the Cabins and Camp are based on the correct legal standards for assessing agency actions under ESA Section 7, are fully explained and supported by evidence in the administrative record, and represent expert agency judgments that should be upheld under the deferential standard of review applicable to the Service's scientific determinations.

Under the ESA's implementing regulations, to "[j]eopardize the continued existence of" a species "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Applying this standard, the Service reasonably found based on the best available scientific information that the Cabins and the Camp are not likely to cause jeopardy. In detailed biological opinions ("Cabins BiOp" and "Camp BiOp") (collectively, "BiOps"), the Service found among other things that:

- the squirrel has occupied suitable habitat within and adjacent to the areas of the Cabins and the Camp for decades, showing that the existence and operation of these facilities are not preventing the squirrel from using the surrounding habitat or limiting the distribution of the squirrel on Mount Graham;

---

[1] Plaintiffs are the Center for Biological Diversity ("CBD"), Maricopa Audubon Society, and Mount Graham Coalition (collectively, "Plaintiffs").

- the Cabins and Camp would only operate from April 15 to November 15 and any impacts to squirrels during the summer season will be limited to visual or noise disturbance that is minimized by numerous restrictions on the Cabins and Camp and to which the squirrel is "habituated";

- no loss of existing squirrel habitat will occur at these sites because only minor building or site modifications are permitted, and no vegetation removal or ground disturbance is generally authorized except within already cleared areas for fire prevention and hazard removal and maintenance;

- given the highly territorial nature of the squirrel and the relatively small areas occupied by physical structures and related facilities (5.5 acres for the Camp and 7 acres for the Cabins), hypothetically removing these structures as sought by Plaintiff CBD would disrupt the existing nearby squirrel habitat and at most create an additional territory for only one squirrel at each site (assuming growth of trees occurred after decades in these areas);

- the evidence does not indicate that the absence of at most one squirrel territory per site is placing the continued existence of the squirrel or its recovery at risk, given that the squirrel population has increased significantly in recent years as it continues to rebound from a 2017 wildfire on Mount Graham; and

- the Forest Service is engaged in efforts to restore and protect from wildfire and insect damage other, much larger areas of suitable habitat within the squirrel's potential range on Mount Graham.

FWS1182-1198, 1236-1250.[2] As explained more fully below, these facts and findings amply support the Service's expert determination that the continued, appropriately restricted operation of these recreational facilities is not likely to appreciably reduce the squirrel's chances of survival and recovery. And under the standard of review, Plaintiffs

---

[2] Cites in this brief to the Bates-numbered pages of the administrative record submitted by the Service are denoted by the prefix "FWS," while "USFS" is used to denote cites to the pages of the administrative record submitted by the Forest Service.

1    must identify a clear error of judgment by the Service. Plaintiffs fail to meet their burden

2    of surmounting this high threshold. Their challenge is based on misstatements of the legal

3    standards for assessing the impacts of a proposed agency action under ESA Section 7, an

4    incorrect portrayal of the BiOps and available habitat for the squirrel, and other erroneous

5    claims. The Court should grant summary judgment to Defendants on all claims.

6    **II.    LEGAL AND FACTUAL BACKGROUND**

7    **A.    The Endangered Species Act**

8        The ESA provides for the listing of species as threatened or endangered, 16 U.S.C.

9    § 1533, and protects listed species in several ways. As most pertinent here, Section

10   7(a)(2) directs each federal agency to ensure, in consultation with the Service or the

11   National Marine Fisheries Service ("NMFS") (the "consulting agency"),[3] that "any action

12   authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

13   continued existence of" any listed species or destroy or adversely modify designated

14   critical habitat. *Id*. § 1536(a)(2). If the "action" agency that is proposing the action, here

15   the Forest Service, determines that the action "may affect" listed species or critical

16   habitat, the action agency must pursue either "informal" or "formal" consultation with the

17   consulting agency, here the Service. 50 C.F.R. §§ 402.13-402.14.

18       "Informal" consultation is appropriate when an action may affect, but is "not

19   likely to adversely affect," a listed species. *Id*. § 402.14. Such a finding is appropriate

20   "when effects on listed species are expected to be discountable, or insignificant, or

21   completely beneficial." ESA Consultation Handbook, FWS1665-66. "Beneficial effects"

22   means "contemporaneous positive effects without any adverse effects to the species,"

23   "[d]iscountable effects" are effects that are "extremely unlikely to occur," and

24   "[i]nsignificant effects" pertain to the size of the impact and "should never reach the

_____

[3] Congress assigned responsibility for implementing the ESA to the Secretaries of the Department of Commerce and the Department of the Interior. *Id*. § 1533. The Department of Interior has responsibility for non-marine species and administers the ESA through the Service, while the Secretary of Commerce has responsibility for marine species and administers the ESA through NMFS. *See id*. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

scale" where "take" of individual members of a listed species occurs. *Id*. Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Take" for purposes of the ESA thus is not defined solely in terms of death or physical injury and includes harassment or other lesser impacts that may impact a listed species' behavior.

Under these standards, if a proposed agency action is likely to result in some non-insignificant adverse effects or non-injurious "take" of listed species, "formal" ESA consultation is required. 50 C.F.R. § 402.14. As part of formal consultation, the action agency provides a biological assessment to the consulting agency that includes a description of the proposed action, an analysis of the effects of the action on listed species and their habitat, the current conditions of the species and its habitat, and other necessary information. *Id*. § 402.12(f). At the conclusion of formal consultation, the consulting agency provides a biological opinion ("BiOp") to the action agency stating its expert opinion on whether the proposed agency action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Under the ESA and its regulations, not all harm or "take" of listed species rises to the level of causing "jeopardy." Rather, to "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Unless exempted, ESA Section 9 also prohibits any person, including a federal agency, from "taking" individual members of a listed species, within the meaning of "take" described above. 16 U.S.C. § 1538(a)(1)(B). However, the ESA provides that if a proposed agency action analyzed in formal ESA consultation may incidentally "take" members of a listed species, but the consulting agency finds that the proposed action is not likely to jeopardize the continued existence of the species or adversely modify its critical habitat, the BiOp will include an "incidental take statement" ("ITS") specifying

1   the amount or extent of anticipated take, reasonable and prudent measures to minimize

2   the impact of the take, and mandatory terms and conditions to implement the reasonable

3   and prudent measures. *Id*. § 1536(b)(4). Any take in compliance with the terms and

4   conditions of the ITS is exempt from ESA Section 9's prohibition. *Id*. § 1536(o)(2). If the

5   amount or extent of take specified in the ITS is exceeded, ESA Section 7(a)(2)

6   consultation must be reinitiated, which leads to a new or updated analysis of whether the

7   action is likely to cause jeopardy. 50 C.F.R. § 402.16(a).

8       **B.       The Mount Graham Red Squirrel and Its Habitat**

9       The endangered Mount Graham red squirrel is found in the Pinaleño Mountain

10  range (also known as Mount Graham[4]) in the Safford Ranger District of the Coronado

11  National Forest in Arizona. FWS1229-30. The squirrel is highly territorial such that one

12  squirrel occupies a given territory or "home range," which averages about 7.51 acres

13  although this may increase in fire-damaged areas as squirrels search more widely for

14  food, nest sites, and new territories. FWS1230. Each squirrel creates a "midden" within

15  its territory, which consists of piles of cone scales cached as food for over-wintering and

16  during times of cone failure. FWS1229. Middens are found in forested areas with a

17  higher tree canopy closure that allows for moisture levels that create prime storage

18  conditions for food and contain snags (dead trees that are left upright to decompose

19  naturally), piles and tangles of downed timber, and a higher volume of logs that provide

20  cover and safe travel routes from predators. *Id*.

21      The squirrel occupies two types of forested areas above about 7,500 feet in the

22  Pinaleño Mountains: higher elevation "spruce-fir" habitat consisting primarily of

23  Engelmann spruce and corkbark fir and lower elevation "mixed-conifer" stands

24  dominated by Douglas fir with white fir and southwestern white pine. FWS1230. The

25

26  ───────────────────

[4] Mount Graham is only the highest individual mountain in the Pinaleño Mountain range,

27  but the entire range is often referred to as Mount Graham. This brief employs that usage
    for brevity and convenience, but also refers to the Pinaleño Mountains where necessary to

28  clarify or emphasize that the entire mountain range is being discussed.

squirrel's potential range in the Pinaleño Mountains at these elevations extends from Clark Peak in the west to Turkey Flat in the southeast, although likely unoccupied habitat also exists further west to West Peak. *Id.*; FWS1256; FWS6421-22. Portions of this range have been affected to varying degrees by wildfires and insect damage in recent decades. FWS1231. Most recently, in 2017, the Frye Fire occurred at varying intensities in the majority of the squirrel's range outside West Peak, including in most of the higher-elevation "spruce-fir" areas on Mount Graham. FWS1231, 1233. However, not all areas affected by wildfire have become unusable for the squirrel. In the Frye Fire, some areas burned at high-to-moderate severity and removed the dense canopy, while other areas with low-severity ground fire still contain suitable, tree-canopied habitat that can be re-occupied by the squirrel in the near future. FWS1180-81, 1186, 1227-28, 1231.

Using the widely accepted concept that one midden equals one squirrel, the squirrel's population has been estimated and tracked since 1986 based on the number of middens found in annual surveys. FWS6418. These surveys, conducted by an interagency team from the Service, the Forest Service, and the Arizona Game & Fish Department, show increasing numbers of squirrels into 1998-2000, with peaks over 500, after which the population declined due to a decrease in habitat from insect outbreaks and wildfire. FWS1230. From 2001 to 2017, population estimates remained fairly stable, varying from 199 to 346. *Id.* After the Frye Fire in the summer of 2017, the population dropped to an estimated 35. *Id.*; FWS1228. Since the Frye Fire, the population estimate increased to 75 individuals in 2018, 78 in 2019, 109 in 2020, and remained at 109 in 2021. FWS6418. More recently, after the survey team looked more systematically on Mount Graham in order to locate squirrels that have established new territories post-Frye Fire, the estimated squirrel population increased substantially to 156 in 2022.[5]

_____

[5] *See* Mount Graham Red Squirrel Numbers Grow after Agencies Develop More Accurate Counts, Arizona Republic (Dec. 28, 2022), available at https://www.azcentral.com/story/news/local/arizona-environment/2022/12/28/mount-graham-red-squirrel-population-grows-more-accurate-count/69761934007/ (last visited

1          **C.    The Columbine Cabins**

2          By the 1890s, settlers had built log cabins near the Mount Graham Sawmill at a

3    place they called Columbine near the headwaters of the Ash Creek drainage, one of the

4    areas on Mount Graham currently occupied by the squirrel. FWS1227, 6433. Historically,

5    cabins were built at this site before the land became part of the Mount Graham Forest

6    Reserve in 1902. FWS1223. These first cabins were replaced long ago; the current 14

7    cabins at the site date from as early as 1923 to as late as 1955 and have been modified

8    over time. *Id*. Most of the cabins are relatively small, and have an average of two

9    bedrooms, a kitchen, a family room, and a bathroom or pit toilet. USFS0468. Occupancy

10   of these private residences varies widely, with some families occupying them most of the

11   summer and on occasional weekends in other periods, while many are visited only on key

12   weekends; average use is about 50 to 60 days per year. USFS0454, 0469. The proposed

13   action analyzed in the Cabins BiOp is the Forest Service's continued authorization of the

14   existing special use permits for these long-existing, modest summer cabins (through

15   expiration of the current permits in 2028). FWS1223.

16         Plaintiff CBD has long opposed the existence of the Cabins and has called for their

17   removal to create more habitat for the squirrel. FWS0017. However, the area occupied

18   and potentially affected by the Cabins is relatively small, and the vast majority of that

19   area already is functioning habitat for the squirrel. The permitted area of the Cabins is

20   about 25 acres, compared to the 5,094 acres in the Ash Creek drainage (which is not the

21   only area used by the squirrel on Mount Graham). FWS1227; USFS0122, 0434. And

22   within the 25-acre permitted Cabins area, the land that does *not* provide squirrel habitat

23   (e.g., the 14 cabins themselves, a water holding tank and spring box, roads, trails, and

24   open areas) accounts for only about *seven acres*. *Id*. In order to analyze potential noise

25
26   Sept. 8, 2023). This more current population estimate is relevant to the Court's
     consideration of any remedy, including whether irreparable harm exists as required for
27   the injunctive relief sought by Plaintiffs, as addressed below. *See Nw. Env't Def. Ctr. v.*
     *U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011) (citing cases
28   considering extra-record evidence in relation to a request for injunctive relief).

1    and visual disturbance to the squirrels in the area, the Forest Service also identified a 200-
2    foot buffer around the Cabins that represents an additional 20 acres. *Id*. This yields a total
3    45-acre "action area" surrounding the Cabins. As shown in an overhead, aerial
4    photograph, the great majority of this 45-acre action area for the Cabins is canopied,
5    wooded habitat rather than developed or unforested areas. FWS1255. The Cabins also are
6    somewhat distanced apart from each other and interspersed in this wooded habitat to the
7    point that it is hard to see them aerially. *Id*.; FWS1254.

8        Not only does the Cabins area already provide habitat, the squirrel is using that
9    habitat. At least nine middens have been found in the action area of the Cabins from 1996
10    to the present (with five of those middens found since 2008). FWS1234-35, 1241. Two
11    middens were active in 2008 (at the time of the prior ESA consultation for the Cabins).
12    FWS1234-35. The 2019 fall interagency survey found four middens active in the Cabins
13    area. *Id*. In spring 2020, three middens were active, one found in 2008 and two middens
14    that were new since 2008. *Id*. In fall 2020, the Forest Service found three active middens
15    within the Cabins area. Consistent with this continued squirrel presence over a long
16    period and based on the scientific literature and other Forest Service observations, the
17    Service found that "human presence does not appear to influence abundance (Gutzwiller
18    and Riffell 2008) or survivorship [of the squirrel], as the same red squirrel will occupy a
19    territory even after multiple visits and multiple capture events (e.g., as observed by
20    Koprowski 2005 and Koprowski et al. 2008)." FWS1237. Disturbance to squirrels also is
21    virtually non-existent during the off-season (November 15 to April 15) when use and
22    access to the site is restricted by gate closures and weather. FWS1223, 1239; USFS0468.
23    As to the rest of the year when cabin occupancy and planned maintenance may occur, the
24    Service found that disturbance "continues at levels of human presence, noise, and other
25    disturbance similar to those that have existed in the area for many years . . . and have not
26    inhibited the presence of nearby middens to the present time." FWS1239.

27        Numerous restrictions are included in the permits for the Cabins to minimize
28    disturbance to the squirrel. These include: (1) prohibiting vegetation removal except

within 30 feet of main buildings and 10 feet of associated structures for fire prevention and hazard removal, unless permission is obtained from the Forest Service; (2) prohibiting soil-disturbing activities outside of the 30-foot and 10-foot fire prevention areas without permission of the Forest Service; (3) prohibiting all vegetation removal or ground-disturbing activity within 92 feet of known middens, unless permission is obtained from the Forest Service; (4) enforcement of quiet hours between 10:00 p.m. and 6:00 a.m. and minimizing noise at all other times; (5) prohibiting outside lights unless needed for safety (for which permission is required from the Forest Service); (6) prohibiting animals other than common household pets, which must be leashed and under physical control when outdoors; (7) prohibiting feeding of wildlife; and (8) complying with annual inspections. FWS1224-26, 1238-39, 1242.

The permits for the Cabins also restrict maintenance and site modifications to necessary work that does *not* destroy or remove existing squirrel habitat, such as: rebuilding portions of buildings where rot or other damage has occurred; repair or replacement of roofs; limited modifications within the existing disturbed area such as porches or small, attached storage areas; maintenance of water systems; and minor road repair, replacement of culverts, and filling of holes or washouts in driveways. FWS1223. Any other activities that may affect nearby habitat – such as modifications outside of already cleared, disturbed areas or vegetation removal/ground disturbance outside of the adjacent fire prevention areas – will be evaluated on a case-by-case basis by the Forest Service, and a separate ESA consultation with the Service may be required if the effects of that activity fall outside of those analyzed in the Cabins BiOp. FWS1226.

The Forest Service has further advised permit holders for the Cabins that: (1) continued presence of squirrels within the Cabins area "is important for the continued survival of the [squirrel]"; (2) the permit conditions designed to minimize disturbance to squirrels and prevent removal of existing squirrel habitat are necessary to ensure that squirrels and other wildlife continue "to inhabit and co-exist in areas near your cabins";

1 and (3) the Cabins BiOp's finding of no jeopardy to the squirrel "will only remain valid if
2 we continue to find squirrels occupying the area." USFS1845-46.

3          **D.    The Organizational Camp**

4          The Camp, formerly known as the Arizona Church of Christ Bible Camp, is
5 located about three-quarters of a mile northeast of the Cabins and operated for decades
6 under a permit first issued in 1966. FWS1163, 1204. Unlike the Cabins, which have
7 existing permits that allow their occupancy and use, the Camp buildings and other
8 structural improvements were sold to a new legal entity, which has not been issued a
9 special use permit allowing camp occupancy at this time; very limited site repairs or
10 maintenance for emergency purposes for the protection of life or property may be
11 allowed if approved by the Forest Service. USFS1881, 2015-16; *see also* 36 C.F.R. §
12 251.50(b). The new owner has submitted a permit application, but the Forest Service has
13 advised that analysis under the National Environmental Policy Act ("NEPA") is required.
14 USFS2015-16. The NEPA process for any new permit has not yet been initiated or
15 completed, and thus permit re-issuance is neither imminent nor certain. However, to
16 settle a prior lawsuit by Plaintiffs, the Forest Service agreed to complete an ESA
17 consultation for the re-issuance of a permit for the Camp, as discussed below, should one
18 be granted. Thus, the proposed action analyzed in the Camp BiOp is the possible issuance
19 of a new permit for the Camp with a 20-year term. FWS1163, USFS1529-1538.

20          The Camp consists of six bunkhouses, a dining hall, bathroom facilities, a tool
21 shed, and water and electrical utilities. FWS1163. When authorized for use, the Camp is
22 permitted as an "organization camp," which is a public or semipublic camp that: (1) is
23 operated by a non-profit organization or governmental entity; (2) "provides a valuable
24 service to the public by using [Forest Service] lands as a setting to introduce young
25 people and/or individuals with a disability to activities that they may not otherwise
26 experience and to educate them on natural resource issues"; and (3) does not raise
27 revenues through commercial activities as its primary purpose. FWS1163, USFS1532.
28 *See also* USFS 1860, 1880 (current owner of the Camp stating that its purpose is

"[e]xclusively for charitable and educational purposes" and that it has "7 youth groups ready to enjoy the camp which has been in existence since 1967").

Like for the Cabins, CBD has long called for the removal of the Camp. FWS233. However, as for the Cabins, the area occupied or potentially affected by the Camp is relatively small, and most of the action area for the Camp already functions as habitat for the squirrel. The permitted area for the Camp is 5.9 acres – compared to the 5,094 acres in just the Ash Creek drainage on Mount Graham. FWS1163, USFS0434. About two acres of the 5.9-acre site are directly occupied by buildings, access roads, parking areas, and utilities. FWS1163. A 30-foot cleared, fire prevention zone around the buildings accounts for two more acres, while the water system accounts for about 1.5 acres. *Id*. The remaining about 0.4 acres of the 5.9-acre site provides squirrel habitat. FWS1179. For purposes of identifying the action area for the Camp and analyzing potential noise and visual disturbance to nearby squirrels, the Forest Service also identified a 200-foot buffer around the Camp that represents an additional 40.1 acres that either provides squirrel habitat or has been affected by fire to a degree that it does not currently provide such habitat. FWS1166, 1187, 1206. As shown in photos in the record, large portions of this 40.1-acre buffer – and areas immediately outside of it in the Ash Creek drainage – continue to contain forested, canopied habitat for the squirrel. FWS1206 (overhead photo of the Camp and buffer), FWS1207-1210 (showing forested areas around the Camp).[6]

Like for the Cabins, the squirrel has occupied the forested habitat surrounding the Camp since at least 1996. FWS1180. A total of five middens have been detected since that year within the Camp action area, three of which were currently active as of the date of the Camp BiOp. *Id*. The other two middens became inactive directly after the 2017 Frye Fire, one of which was in an area along the Camp water system that experienced

---

[6] There was low-intensity ground fire on the eastern side on the buffer, but it "still contains a dense live forest canopy post-fire." *Id*. On portions of the western side of the buffer and in the area of the Camp's water system, higher intensity fire occurred and live trees are sparse or lacking at this time. *Id*. *See also* FWS1205 (showing sparser tree cover in the middle portion of the western buffer area).

moderate-intensity burn. FWS1186. The other inactive midden experienced low-severity ground fire and thus squirrel habitat still remains (on the eastern side of the Camp), such that the midden could be active again in the near future. *Id*.; FWS1208. Another midden that had been inactive since 2013 became active again in March 2021, and one new midden developed within the action area in 2020. FWS1186-87. Yet another midden in the Camp action area has remained active for 10 years. Based on these facts, the Service found that: (1) the squirrel "can successfully occupy and persist in the Camp action area"; (2) "fire and its effects to [squirrel] habitat affect [squirrel] occupancy more than the presence and use of the Camp"; and (3) "it seems unlikely that continuing human-use levels and disturbance in the area will lead to long-term abandonment of the area by [the squirrel] if the current habitat within the Camp action area continues to be available." *Id*.

If issued, the Camp permit would allow the owner to operate and maintain the existing facilities for a maximum of 120 individuals, including campers and staff. USFS1533. The Camp's operational period would be limited to April 15 to November 15, with only limited access to check for damage from winter storms during other periods. FWS1164. Activities could include maintenance and preparation of the camp to receive campers and staff, weekly camping and educational events, and shutdown and fall maintenance of the facility. USFS1533. Yearly facility maintenance could include water system repair and maintenance, cleaning, painting, minor structural maintenance to buildings and minor road repair. *Id*. From time to time, more long-term maintenance or in-kind replacement might also occur to roofs, buildings, and/or utility systems. *Id*. Enlarging areas to allow additional vehicles or developing additional access routes beyond the permitted road would be prohibited without written permission from the Forest Service. USFS1535. In addition, no new Camp structures or facilities would be permitted without additional NEPA review and ESA consultation. *Id*.

Numerous restrictions would be included in any new Camp permit to minimize disturbance to the squirrels occupying the surrounding habitat. These include: (1) prohibiting vegetation removal except for fire prevention and hazard removal within the

already cleared 30-foot area around main Camp buildings and ten feet around smaller structures such as storage sheds and woodpiles, unless permission is obtained from the Forest Service; (2) prohibiting soil-disturbing activities outside of the 30-foot and 10-foot fire prevention areas and the footprint of utility systems, unless permission is obtained from the Forest Service; (3) prohibiting all vegetation removal or ground-disturbing activity within 92 feet of known middens, unless permission is obtained from the Forest Service; (4) quiet hours between 10:00 p.m. and 6:00 a.m. and minimizing noise at other times; (5) prohibiting outside lights other than those needed for safety, unless permission is obtained from the Forest Service; (6) prohibiting pets and other animals except service animals, which must be leashed and under control when outdoors; (7) prohibiting the feeding of wildlife; and (8) complying with annual inspections of the Camp and subjecting to annual reviews of the Camp operating plan. FWS1165-66, 1180, 1184.

### E.   Other Recreational Facilities on Mount Graham

Mount Graham is considered a destination recreation area. USFS0452. The Cabins and Camp thus are hardly the only recreational facilities located in or near squirrel habitat; these include a number of developed campgrounds, multiple dispersed recreation sites (some of which are popular group use areas or picnic sites), a lake shoreline used for swimming, hiking trails, and related parking and access roads. FWS1228, 1256, 6435; USFS0113, 0452, 0457. For example, the Riggs Lake area containing squirrels and some mixed-conifer squirrel habitat unaffected by the Frye Fire "is one of the most popular recreation sites on the mountain and heavily used by the recreating public from April 15th to November 15th." FWS1228. The Turkey Flat area also contains 74 similar cabins located in or near habitat at the southeastern end of the squirrel's range. FWS1230, 1237-38, 1240, 6434. These recreational facilities collectively occupy a very small area compared to that on Mount Graham that could support forested, high elevation habitat for the squirrel, and the Service has previously found that recreational activities on Mount Graham present a relatively low threat to the squirrel. FWS6417, 6435.

1        **F.      Procedural History**

2        In 2008, the Forest Service completed an ESA Section 7 consultation with the

3    Service for the proposed re-issuance of the special use permits for the Cabins and the 74

4    similar summer cabins located in the Turkey Flat area (for the period from January 1,

5    2009 through December 31, 2028). USFS0040-75. In its 2008 BiOp, the Service found

6    that these recreational cabins were not likely to jeopardize the continued existence of the

7    squirrel. USFS0056-57. The Service stated that the primary reasons for this finding was

8    that "these permitted structures have been occupied, and roads and trails have been used

9    in the action area since at least the 1940s" and that, "[d]espite this use, [the squirrel has]

10   continued to breed, nest, forage, create middens, and rear young apparently in co-

11   existence with these levels and times of summerhome permittee effects." *Id*.

12       In June 2020, Plaintiffs filed a lawsuit seeking re-initiation of the 2008

13   consultation for the Cabins pursuant to 50 C.F.R. §402.16, which lawsuit was settled in

14   December 2020. *Ctr. for Biological Diversity v. Christiansen*, No. 4:20-cv-00251-BGM

15   (D. Ariz. 2020), ECF No. 19. In the lawsuit, Plaintiffs also contended that the Forest

16   Service was required to consult "with respect to any potential Forest Service reissuance

17   of the special use permit for the [Camp]." *Id*. at 2. In the settlement, the Forest Service

18   agreed to complete a re-initiated consultation for the Cabins by April 1, 2021, and to

19   complete a consultation for the Camp by August 16, 2021. *Id*. at 3. Given that these

20   facilities are likely to result in some disturbance "take" of squirrels located within and

21   near these sites, the Forest Service requested initiation of "formal" ESA consultation and

22   provided detailed biological assessments to the Service. USFS1124-1152, 1529-1565.

23       On March 31, 2021, the Service provided the Forest Service with a biological

24   opinion for the completed re-initiated consultation for the Cabins finding that their

25   continued operation and existence (through permit expiration in 2028) was not likely to

26   jeopardize the continued existence of the squirrel. USFS1743. Likewise, on August 9,

27   2021, the Service provided the Forest Service with a biological opinion for the Camp

28   finding that its continued operation and existence was not likely to jeopardize the

1    continued existence of the squirrel. USFS1787. These "no-jeopardy" BiOps were both

2    amended on May 6, 2022, to incorporate additional information and provide a more

3    complete explanation of several issues following review of a notice of intent to sue from

4    Plaintiff CBD. FWS1221-1262; FWS1161-1220. On September 13, 2022, Plaintiffs filed

5    this lawsuit challenging the Service's findings in the amended BiOps (Claim 1) and

6    claiming that the Forest Service has arbitrarily and capriciously relied on the Cabins

7    BiOp (Claim 2). *See* ECF No. 1 ("Compl."), at ¶¶ 84-94, 96.

8    ### III.   STANDARD OF REVIEW

9          Under the applicable standard of review of the Administrative Procedure Act

10   ("APA"), a plaintiff must satisfy a "high threshold" to establish that agency action is

11   unlawful: "An agency's decision may be set aside only if it is 'arbitrary, capricious, an

12   abuse of discretion, or otherwise not in accordance with law.'" *River Runners for*

13   *Wilderness v. Martin*, 593 F.3d 1064, 1067-70 (9th Cir. 2010) (quoting 5 U.S.C. §

14   706(2)(A)). This standard "is highly deferential, presuming the agency action to be valid

15   and affirming the agency action if a reasonable basis exists for its decision." *Ranchers*

16   *Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*, 499 F.3d

17   1108, 1115 (9th Cir. 2007) (citations omitted)). The Court's role is "not to make its own

18   judgment" on the matters resolved by the agency, as the APA simply "does not allow the

19   court to overturn an agency decision because it disagrees with the decision." *River*

20   *Runners*, 593 F.3d at 1070. Rather, a plaintiff must show the agency has made "a clear

21   error of judgment." *Doe ex rel. Gortarez v. Dep't of Homeland Sec.*, No. CV 09-1329-

22   PHX-DGC, 2010 WL 3564831, at *1 (D. Ariz. Sept. 7, 2010) (quoting *Mt. St. Helens*

23   *Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004).

24   Courts are to be particularly deferential where "the agency is 'making predictions, within

25   its [area of] special expertise, at the frontiers of science,'" *Lands Council v. McNair*, 537

26   F.3d 981, 993 (9th Cir. 2008) (en banc)(brackets in original) (quotation omitted); *see also*

27   *Salmon Spawning & Recovery All. v. NMFS*, 342 F. App'x 336, 339 (9th Cir. 2009)

28

1  (declining to "second guess" a no-jeopardy finding by NMFS that relied on a
2  comprehensive analysis of the available scientific data).

3         The Court's review under the APA standard is limited to the evidence in the
4  administrative record considered by the agency for the challenged decisions, subject to
5  limited exceptions. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602
6  (9th Cir. 2014). In this context, summary judgment "is an appropriate mechanism for
7  deciding the legal question of whether the agency could reasonably have found the facts
8  as it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).

9  **IV.   ARGUMENT**

10      **A.   The Service Reasonably Found That the Cabins and Camp Are Not
11  Likely to Jeopardize the Continued Existence of the Squirrel**

12         Under the deferential standard of review, the Court should uphold the BiOps.
13  After reviewing the current status of the squirrel and its habitat, the continued presence of
14  the squirrel in the areas of the Cabins and the Camp notwithstanding their operation and
15  existence for years, and the likely minor effects these facilities would have on the squirrel
16  and its use of the surrounding habitat, the Service reasonably found that the continued
17  authorization of these facilities is not likely to appreciably reduce the squirrels' likelihood
18  of survival and recovery. FWS1228-1246; FWS1166-1194.

19         Plaintiffs emphasize that the squirrel is "extremely imperiled" and attribute its
20  current status mainly to wildfires, efforts to suppress or prevent wildfire, and the impacts
21  of past actions such as the Congressionally mandated 1988 construction of the
22  observatory on Mount Graham. ECF No. 130 ("Pls.' Mem.") at 1, 5-8. However, the
23  inquiry under ESA Section 7(a)(2) is centered on evaluating "how the [proposed] *agency
24  action* affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A) (emphasis
25  added), and Section 7's prohibition applies only to the extent a species' likelihood of
26  survival and recovery in the wild are "'appreciably' diminished *by the* [*action*]." *Salmon
27  Spawning & Recovery All.*, 342 F. App'x at 338 (emphasis added) (citing the Service's
28  regulatory definition of "to jeopardize" set forth in 50 C.F.R. § 402.02); *Wild Fish*

1    *Conservancy v. Salazar*, 628 F.3d 513, 522-23 (9th Cir. 2010) (ESA inquiry asks whether

2    the agency action "appreciably" reduces a species' likelihood of survival and recovery).

3            Thus, while the Service must analyze the effects of the proposed agency action

4    against the existing baseline condition of the squirrel and its habitat, *see* 50 C.F.R. §

5    402.14(g)(2), (4), the relevant inquiry under ESA Section 7(a)(2) is not whether adverse

6    effects on the species and its habitat remain from past actions or events outside human

7    control such as wildfire and insect damage, but rather whether, against that backdrop, the

8    proposed agency action under review would "place the existence of the species in

9    jeopardy." *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 957 (9th Cir. 2003). In

10   the BiOps here, after a detailed analysis of the baseline condition of the squirrel and its

11   habitat and the possible effects of the Cabins and the Camp on the squirrel, the Service

12   identified seven reasons – common to both the Cabins and the Camp – for its

13   determinations that the continued authorization of these facilities for the specified periods

14   will not likely jeopardize the continued existence of the squirrel. FWS1191-94, 1244-46.

15           <u>First</u>, the Service found that no death or physical injury to squirrels was

16   anticipated from vehicle traffic or other activities at the Cabins and Camp. The Service

17   found that vehicle strikes were "highly unlikely" or "discountable" due to the narrow,

18   two-track nature of the roads onsite, the presence of children at the Camp, and the limited

19   lines of site for the winding road within the Cabins area – all of which prevent vehicles

20   from going over 10 miles per hour. FWS1182, 1192-93, 1236-37, 1244. The Service also

21   found that the risk of vehicle strikes was further minimized by the restricted access to the

22   facilities from November 15 through April 15, which corresponds with the squirrel's

23   mating season when road crossings are more likely. FWS1182, 1193, 1237, 1244. The

24   Service also considered the potential for injury or death from vegetation removal or

25   service animals and/or pets, but ultimately found that no such "take" was anticipated and

26   instead that all "take" within the meaning of ESA Section 9 would be in the form of

27   harassment from noise and visual disturbance. FWS1182, 1196, 1236-37, 1247.

28

Second, the Service found that while noise and visual disturbance will occur during a portion of the year, the squirrel appears "to be habituated to human presence and disturbance as evidenced by the continuity of [squirrel] middens and occupancy" in the Cabin and Camp action areas over a long period. FWS1193, 1244. Since 1996, five separate middens have been found in the Camp area (three middens that were currently occupied) and nine separate middens have been found in the Cabins area (three middens that were currently occupied, one more than during the 2008 consultation for the Cabins). *Id.* The Service found that while occupancy time for middens in the Cabins area may be shorter than in less disturbed areas (average 8.7 versus 17.33 years, respectively), this "time frame is long enough to indicate that reproduction and habitat retention is occurring within the Cabin Area despite human presence." FWS1244-45.[7]

Third, the Service found that the great majority of the Cabins and Camp action areas already consist of functioning squirrel habitat. FWS1245 (38 acres of squirrel habitat in the Cabins area); FWS1193 (40.5 acres of squirrel habitat in the Camp area to the extent not affected by wildfire). The Service found that the continued occupation of this habitat by the squirrel in conjunction with the historic use patterns of the Cabins and Camp areas indicates that "the overall distribution of the subspecies is not being affected by the proposed action[s]." FWS1193, 1245. The Service further found that loss of existing squirrel habitat in the Cabins or Camp actions areas would not likely occur from the proposed actions because no vegetation removal or ground disturbance is authorized other than that for fire prevention and hazard removal in already cleared areas adjacent to physical structures and related infrastructure. FWS1163, 1189, 1193, 1242, 1245.

---

[7] The Service noted that the average maximum occupy time for middens in the Cabins area was 8.7 years with a 95% confidence interval of 3.6 to 13.7 years, and that "considering the average [squirrel] lifespan in the wild is 1.2-1.8 years (Goldstein et al. 2017), this indicates that, in the Cabin Area, a particular midden and its associated territory will persist between 2 to 11 (average 5.8) times the average lifespan for [a squirrel], and that reproduction and habitat retention is likely occurring within the Cabin Area despite human disturbance." FWS1241.

1        <u>Fourth</u>, the Service found that, given the permit stipulations that limit noise and

2    visual disturbance and prevent removal of existing habitat, as well as annual facility

3    inspections and monitoring of nearby middens for continued occupancy, the Cabins and

4    Camp will not affect the ability of squirrel to use the habitat within and near the Cabins

5    and Camp areas. FWS1193, 1245. <u>Fifth</u>, and relatedly, the Forest Service will continue to

6    provide annual briefings to Cabins permittees and Camp staff and educational outreach to

7    campers about the importance of avoiding disturbing, interacting with, or harming the

8    squirrel or its habitat, which the Service found further "reduces the likelihood of

9    disturbance to [individual squirrels] or habitat." FWS1193, 1245.

10        <u>Sixth</u>, the Service found that – recognizing that the great majority of the Cabins

11    and Camp areas already consist of squirrel habitat – removing their structures and

12    attempting to revegetate the cleared areas would provide little additional habitat (enough

13    for at most only one additional squirrel "home range" at each site assuming that other

14    nearby squirrels did not expand their territories to encompass these areas). FWS1194

15    (only 5.5 additional acres at the Camp); FWS1245 (only 7 additional acres at the Cabins).

16    Citing the then-most-recent estimate of the squirrel population, the Service found that this

17    reduction of one home range "does not appear to prevent [the squirrel] from persisting

18    within their range, nor does it push the subspecies over the tipping point and place

19    recovery of the species at risk," given that the squirrel increased "from 35 individuals

20    post-Frye Fire in 2017 to 109 individuals in 2020 and 2021 following the loss of

21    significant areas of [squirrel] habitat and multiple [squirrel] home ranges." FWS1194,

22    1245. In other words, the Service found that the most recent population data indicate that

23    additional suitable habitat is available for squirrel population expansion besides the small

24    areas occupied by buildings and related infrastructure at the Cabins and the Camp.

25        <u>Seventh</u>, the Service cited the fact that the Forest Service continues to implement

26    recovery actions identified in the 2011 draft revised recovery plan for the squirrel that

27    "prioritize management for [squirrel] recovery on the Coronado National Forest,"

28    including major efforts to restore and protect other, much larger areas of suitable habitat

for the squirrel on Mount Graham. FWS1194, 1246. One such major effort is the 5,752-acre Pinaleño Ecosystem Restoration Project, which has been ongoing for many years and involves thinning smaller trees, removing underbrush, and other vegetation reduction to reduce the amount of fuel for major wildfires. FWS2049-2053; USFS0282-289; FWS6445. *See also* FWS6448 (reforestation project in areas on Mount Graham that experienced moderate to high-severity burns from the Nuttall-Gibson Complex Fire in 2004). *Id*.; USFS0282-289; FWS6445, FWS6448.

On all of these grounds, the Service rationally found that the continued authorization of the Cabins and the Camp would not likely jeopardize the squirrel. FWS1191-94, 1244-46. As the Service found, the Cabins and the Camp have co-existed with the squirrel for decades on Mount Graham, without any apparent impact on its ability to occupy and use the forested habitat that already makes up most of the Cabins and Camp areas. The only expected impacts on the squirrel are noise and visual disturbance during a portion of the year, which will be kept at levels similar to those in the past that have not affected the squirrel's range or prevented it from using the surrounding habitat for sufficient periods of time to reproduce. On these facts, there is no evidence that the Cabins and Camp have reduced, or are likely in the future to reduce, the reproduction, numbers, or distribution of the species, such that that these facilities could "reduce appreciably" the species' chances of survival or recovery. 50 C.F.R. § 402.02.

The Service also reasonably found that the small footprint occupied by buildings and related infrastructure at the Cabins and Camp are neither preventing the squirrel from persisting nor placing its recovery at risk. As the Service found, the squirrel population has more than tripled since the 2017 Frye Fire, showing that other habitat is available for population growth and recovery. Removing the structures at the Cabins and Camp would not only be disruptive to and potentially injure or kill nearby squirrels, but it also would not instantly create any additional canopied habitat (which could take 60 to 80 years or longer to develop). USFS0458, 0493-94, 0507. Based on all of the foregoing, the Court

20

should uphold the Service's no-jeopardy determinations as supported by evidence in the administrative record and a reasonable exercise of the Service's expert judgment.

**B.    Plaintiffs' Arguments Challenging the No-Jeopardy Determinations Are Contrary to Law and Contradicted by the Record**

Attempting to sidestep the Service's reasoned and well-supported analyses, Plaintiffs misstate the legal standards for a jeopardy analysis under ESA Section 7 and mischaracterize the Service's no-jeopardy findings and the factual record in several respects. In particular, Plaintiffs present an inaccurate picture of the location and amount of other suitable habitat for the squirrel on Mount Graham that is outside of the Cabins and Camp action areas. As part of their attack on the no-jeopardy determinations, Plaintiffs also raise a series of narrower, erroneous arguments challenging the Service's analysis of the "environmental baseline" for the Camp; the size of the protective buffer established for middens; and the triggers for re-initiation of ESA consultation for the Cabins and the Camp if it becomes necessary to re-evaluate their impacts on the squirrel. Finally, Plaintiffs assert the Forest Service improperly relied on the BiOps. All of these claims lack merit and should be rejected by the Court for the reasons explained below.

**1.    Plaintiffs Misstate the ESA Section 7 Jeopardy Standard**

Plaintiffs first argue that the Service could not make any determination of whether the Cabins and the Camp are likely to jeopardize the squirrel, unless the Service first answers a mishmash of questions posited by Plaintiffs that supposedly pertain to a required "separate" analysis of the impacts of the proposed actions on the squirrel's chances of recovery. Pls.' Mem. 19-27. Plaintiffs assert the Service must first determine if the squirrel is "already in jeopardy" such that – according to Plaintiffs – any "minor impacts" or "loss or injury" to the squirrel from the proposed actions would compel a jeopardy determination. Pls.' Mem. 20, 22, 25. Plaintiffs also insist that even where a proposed action will have minor impacts as here, the Service cannot find whether an action will likely jeopardize a listed species without first identifying the "tipping point" where a more harmful, hypothetical, different agency action would jeopardize the

1    species. *Id*. at 22. None of these purported requirements are contained in ESA Section 7,
2    required by the Service's regulations, or supported by the case law.

3         To begin with, Plaintiffs incorrectly argue that the ESA requires an assessment of
4    a proposed action's impacts on the species' chances for *recovery* that is separate and
5    independent from the analysis of the impacts on the species' prospects for *survival.* In
6    *National Wildlife Federation v. NMFS* ("*NWF*"), 524 F.3d 917 (9th Cir. 2008), the Court
7    reviewed whether the consulting agency (there NMFS) could focus only on impacts of
8    the action on the species' survival, as NMFS did in that case. *Id*. at 931-33 & n.11. The
9    Court held that the consulting agency also must consider impacts to recovery as part of a
10   jeopardy analysis. *Id*. at 933. However, the Court explicitly recognized that survival and
11   recovery are "joint" and "intertwined" concepts that are often "'considered together in
12   analyzing effects, and it is difficult to draw clear-cut distinctions.'" *Id*. at 932 & n.11
13   (quoting preamble to ESA regulations, 51 Fed. Reg. 19296, 19934-35 (June 3, 1986).
14   Other decisions are in accord. *See*, *e.g.*, *Rock Creek All. v. FWS*, 663 F.3d 439, 443 (9th
15   Cir. 2011) (upholding BiOp that did not address recovery in "separate, distinct sections of
16   the biological opinion"); *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76
17   (2d Cir. 2018) (cleaned up) ("an independent analysis of recovery is not required in part
18   because it is hard to 'draw clear-cut distinctions' between survival and recovery").
19   Plaintiffs cite an older decision, *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1070
20   (9th Cir. 2004), but that case invalidated a now replaced regulatory definition of adverse
21   modification of critical habitat. *See* 50 C.F.R. § 402.02. The Court found that the wording
22   of that prior definition required *both* an impact to a species' chances of survival *and*
23   recovery in order to find adverse modification, inconsistent with the requirement to
24   consider impacts on both survival and recovery. *Gifford Pinchot*, 378 F.3d at 1070. As
25   the case law shows, while impacts on a species' chances of survival and recovery must be
26   considered, a "separate" analysis of survival and recovery are not required.

27        Contrary to Plaintiffs' claims, the ESA also does not require the Service to first
28   determine whether a species is "in jeopardy," as that concept appears nowhere in the

statute or regulations. *Lands Council*, 537 F.3d at 993 (courts may not "impose procedural requirements [not] explicitly enumerated in the pertinent statutes.") (brackets in original) (quotation omitted). Plaintiffs' argument relies on *NWF*, Pls.' Mem. at 25, but there the Court reviewed the application of the "environmental baseline" concept in a BiOp. The Court addressed whether the consulting agency (there NMFS) may simply compare the effects of the action to the risks posed by baseline conditions and perform a full jeopardy analysis only if the risks posed by the action are greater than those posed by baseline conditions. *NWF*, 524 F.3d at 930. The Court rejected this approach, reasoning that application of the jeopardy standard is influenced by baseline condition, such that the effects of the action must be considered "within the context" of baseline conditions. *Id*. at 930 (explaining that an action that "deepens the jeopardy" (baseline status) of a species may violate Section 7). Thus, the Court did not hold, as Plaintiffs assert, that the consulting agency must determine whether a species is "in jeopardy" or otherwise focus its analysis only on baseline conditions. *Id*. at 931 (holding instead that "[a]ny proposed agency action must be evaluated in the [context] of this baseline"). Indeed, the Court said the opposite – that there must be some volitional action by the agency that further harms the species before it can be said to jeopardize the continued existence of that species. *Id*. at 930 (an action "can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition.").

Plaintiffs' related claim that, if a species is "already in jeopardy," the Service must find jeopardy based on any additional harm, loss or injury to the species, is contrary to the law. Pls.' Mem. 22, 25. As discussed above, the regulatory definition of jeopardy (which Plaintiffs cite and do not challenge in this case) focuses on "whether a given federal action at the species level would *appreciably reduce the species'* likelihood for survival and recovery." *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014), aff'd, 806 F.3d 1234 (9th Cir. 2015) (citing 50 C.F.R. § 402.02) (emphasis added). The Service thus considers the action's effects on the species as a whole, not individuals, and some adverse effects are not inconsistent with a no-jeopardy determination. *Oceana,*

1    *Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014) (consulting agency "may

2    reasonably conclude that a given agency action, although likely to reduce the likelihood

3    of a species' survival and recovery to some degree, would not be likely to jeopardize the

4    continued existence of the species"); *Pac. Rivers v. United States Bureau of Land Mgmt.*,

5    No. 6:16-CV-01598-JR, 2018 WL 6735090, at *16 (D. Or. Oct. 12, 2018), report and

6    recommendation adopted, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, 815 F. App'x

7    107 (9th Cir. 2020) (noting that jeopardy is evaluated at the species level and finding that

8    a no-jeopardy finding was consistent with "limited adverse effects to individual fish"). As

9    these cases show, individual-level adverse effects are allowable without compelling a

10   conclusion that the action causes jeopardy at the species level.

11           Likewise, while the Service found that continued authorization of the Cabins and

12   the Camp would not push the species over the "tipping point" – for all the reasons for the

13   no-jeopardy determinations set forth above – the Service was not required to quantify or

14   precisely identify the point at which an agency action would materially reduce the

15   squirrel's chances of survival or recovery, as Plaintiffs claim. Pls.' Mem. 13, 16, 18, 20-

16   23; FWS1191-94, 1244-45. As the Service stated in amending the Section 7 regulations,

17   "there is nothing in the [ESA] or its regulations, or necessitated under the standards of the

18   [APA], requiring that a section 7(a)(2) analysis quantify or identify a 'tipping point.'"

19   Final Rule, Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976, 44,988 (Aug.

20   27, 2019). *See also* Proposed Rule, Revision of Regulations for Interagency Cooperation,

21   83 Fed. Reg. 35,178, 35,183 (July 25, 2018) ("Section 7(a)(2) provides the Services with

22   discretion as to how [they] will determine whether the statutory prohibition is exceeded.

23   We have not interpreted that statutory language as requiring the identification of a tipping

24   point. This interpretation is further supported by the fact that the state of science often

25   does not allow the Services to identify a 'tipping point' for many species."). Plaintiffs cite

26   *Center for Biological Diversity v. FWS*, 441 F. Supp. 3d 843 (D. Ariz. 2020), Pls.' Mem.

27   at 22, but there the Court found that the proposed action – a large open-pit mine that

28   would destroy existing habitat of the species and its main prey – would have "extensive

adverse impacts." *Id*. at 858. Here, no habitat will be lost and the only impacts on squirrels are noise and visual disturbance that, for decades, have not deterred the squirrel's use of the habitat in the Cabins and Camp action areas. While a tipping point analysis may be helpful in some cases, here the Service did not need to quantify or identify what higher level of impacts could conceivably jeopardize the squirrel in order to find the Cabins and Camp were not likely to do so given their minor expected impacts.

Courts in the Ninth Circuit also have rejected arguments exactly like those made by Plaintiffs here. In *Pacific Coast Federation of Fishermen's Associations v. Gutierrez*, 606 F. Supp. 2d 1195 (E.D. Cal. 2008), the Court found that the plaintiffs had taken the holding of *NWF* "too far by suggesting that whenever a listed species is in a state of 'jeopardy,' an agency is prohibited from taking any action that would cause *any* further 'deterioration in the species' pre-action condition,' even if that further deterioration is *de minimus*." *Id*. at 1213 (emphasis in original). Similarly, in *Native Village of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031 (D. Alaska 2013), the Court upheld a no-jeopardy determination for a project with adverse effects on the endangered Cook Inlet beluga whale, which had "very low abundance, no observable recovery within the population . . . and a high (26%) probability of extinction within the next 100 years." *Id*. at 1064 (footnote and citation omitted). In that case, the Court found that a separate "recovery" analysis was not required, that the consulting agency (there, NMFS) was not required to determine whether the whale was "already in jeopardy," and if so, make a jeopardy determination for any adverse effects on the species, and that NMFS also was not required to identify the "tipping point" at which survival or recovery would be placed at risk. *Id*. at 1063-65. As to the claim a "tipping point" analysis was required in all cases, the Court found the Ninth Circuit had indicated only that such an analysis was warranted where the action "would have significant negative impacts," but that was not the case for the project at issue. *Id*. n.244. The Court upheld the BiOp because NMFS had adequately evaluated the effects of the action and rationally concluded based on the nature of the

1  project that it would not jeopardize the species' chances of survival and recovery, as the

2  Service has done here. The Court should likewise reject Plaintiffs' same arguments here.

### 2.   Plaintiffs Mischaracterize the Service's BiOps

4       Not only do Plaintiffs misstate the applicable legal standards, they mischaracterize

5  the Service's no-jeopardy determinations and underlying findings. Contrary to Plaintiffs'

6  claims, the Service did not "fail[] to examine (or explain) why" the Cabins and Camp "do

7  not further impede any chance for recovery." Pls.' Mem. 27. Nor did the Service fail to

8  apply the regulatory definition of "jeopardy," i.e., determine whether these facilities

9  would appreciably reduce the likelihood of the squirrel's survival or recovery by reducing

10  the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02; Pls.' Mem.

11  at 18, n.6. The Service also did not rely entirely on the squirrel's population increase

12  from 2017 to 2021 to find that the Cabins and the Camp would not materially reduce the

13  species' chances of recovery, as Plaintiffs inconsistently assert. Pls.' Mem. 25-27.

14       As explained above, the Service's no-jeopardy determinations relied on a whole

15  series of findings. These findings go directly to the regulatory definition of jeopardy that

16  Plaintiffs incorrectly claim the Service failed to apply. As explained above, the Service

17  found among other things that the continued use and maintenance of the Cabins and

18  Camp: (1) would not likely kill or injure any squirrels from vehicle strikes, habitat loss,

19  or any other activity; (2) would only result in noise and visual disturbance during a

20  portion of the year to which the squirrel is habituated and that would not likely prevent

21  the squirrel's continued use of the surrounding habitat for sufficient periods to reproduce;

22  and (3) would not affect the squirrel's "overall distribution" on Mount Graham.

23  FWS1189, 1191-93, 1244-45. The Service thus found that the continued use and

24  maintenance of these facilities were not likely to result in any of the factors identified in

25  the regulatory definition of jeopardy that may reduce a species' chances of survival and

26  recovery, *i.e.*, a reduction in numbers, reproduction, or distribution. Nothing more was

27  required by the ESA or the Service's implementing regulations.

28

1    In terms of the facts and evidence cited by the Service, the Service also did not

2    rely wholly or even principally on the increase in the squirrel population from 2017 to

3    2021, as Plaintiffs claim. Rather, the Service relied in large part on: the continued

4    presence of middens in the Cabins and Camp action areas over a long period of time

5    despite some human disturbance during their operating season; the scientific literature

6    and Forest Service observations indicating that human presence does not appear to

7    influence squirrel abundance and survival; the permit restrictions on vegetation removal

8    and ground disturbance that protect the existing squirrel habitat outside of already cleared

9    or developed areas at the sites; the Forest Service's larger efforts to restore and protect

10   squirrel habitat on Mount Graham; and other facts such as the nature of the roads that

11   limit the risk of vehicle strikes. FWS1179-80, 1183-89, 1192-94, 1234-1246.

12   The Service did cite the increase in the squirrel population post-Frye Fire, but

13   Plaintiffs take this out of context. As explained above, the Service found that removing

14   the structures and related infrastructure at these facilities would provide little additional

15   habitat (enough for at most one squirrel "home range" at each). FWS1194, 1245. The

16   Service further found that this potential absence of territory does not appear to prevent

17   the squirrel from persisting within its range or place its recovery at risk because the

18   squirrel population increased from 35 to 109 "post-Frye Fire in 2017," *i.e.*, "following the

19   loss of significant areas of [squirrel] habitat and multiple [squirrel] home ranges."

20   FWS1194, 1245. In other words, the Service found that the evidence indicates that

21   despite the temporary or longer-term loss of much larger forested areas from wildfires,

22   including the Frye Fire in 2017, other suitable habitat continues to exist for population

23   expansion besides the relatively small non-habitat areas of the Cabins and the Camp. In

24   any event, the Service hardly "only chose to look at the trajectory of the squirrel's

25   population from 2017 to 2021," as Plaintiffs claim. *Id*. Both BiOps contain a discussion

26   of the estimated squirrel population from 1986 to 2021. FWS1168-69, 1230-31.

27   Plaintiffs' related suggestion that the Service does not know the "rough survival

28   and recovery needs" of the squirrel similarly is without basis. Pls.' Mem. 22, 25. While

27

the Service's 1993 recovery plan for the squirrel is currently under revision pending completion of a species status assessment, the Service prepared a draft revised recovery plan in 2011 recognizing that recovery of the squirrel – to the point where it no longer needs the protections of the ESA – will require long-term efforts to restore and protect large blocks of potential habitat on Mount Graham from further wildfire and insect damage. FWS1171, 1194, 1233, 1246, 6407, 6447-48. But for the BiOps here, the Service did not need to determine whether achievement of such long-term recovery objectives and the future de-listing of the squirrel is "possible" as Plaintiffs advance – an inherently uncertain question for most ESA-listed species. Pls. Mem. 19, 23, 25. Rather, the inquiry under ESA Section 7 is "whether a given federal action at the species level would appreciably reduce" the species' likelihood for survival and recovery; it is not concerned with "whether that federal action would itself implement or bring about recovery." *Cascadia Wildlands*, 49 F. Supp. 3d at 787. Here, the Service reasonably found and explained why the continued authorization of the Cabins and the Camp were not likely to appreciably reduce the species' likelihood of survival and recovery.

### 3. Plaintiffs Present an Inaccurate Picture of the Available Habitat

Besides misstating the applicable legal standards and mischaracterizing the BiOps, Plaintiffs also present an inaccurate picture of the amount of habitat currently available for the squirrel. Plaintiffs argue that "very little of the species' spruce-fir habitat remains" due to wildfire, "leaving open the question of whether there remains enough habitat to *ever* allow the species to recover to the point where it can be delisted." Pls. Mem. at 23. However, as noted above, the squirrel uses two types of habitat on Mount Graham: (1) higher elevation "spruce-fir" habitat (as referenced by Plaintiffs' statement) and (2) lower elevation "mixed-conifer" habitat. FWS1230. While canopied tree cover in most of the spruce-fir zone has been affected by wildfire in recent decades, "mixed-conifer" habitat for the squirrel currently exists in several distinct areas in the Pinaleño Mountains.

From west to east, these areas include Riggs Lake, the Ash Creek drainage (where the Cabins and the Camp are located), Grant Hill, and Turkey Flat. FWS1256 (map

identifying these areas); USFS0091 (map showing "Old Columbine" near the site of the Cabins and Camp in relation to Turkey Flat); FWS1237 (discussing a midden in the Turkey Flat area); FWS1228 (discussing the mixed-conifer forest between Turkey Flat in the southeast and Riggs Lake in the west, including the unburned area near the Riggs Lake picnic area); USFS0487, 0489 (noting the presence of the squirrel and suitable habitat in Turkey Flat). Plaintiff CBD has acknowledged that the squirrel is found in all four of these areas (Riggs Lake, Columbine (Ash Creek drainage), Grant Hill, and Turkey Flat), and has petitioned the Service to include these areas in a revised designation of critical habitat for the squirrel. FWS0002, 0016, 0409-10, 0414. CBD also submitted a map to the Forest Service of a portion of the squirrel's range (excluding Turkey Flat) showing not only that middens were found in multiple habitat areas outside of the Ash Creek drainage where the Cabins and Camp are located, but also that just this portion of the squirrel's range includes significant areas of suitable unoccupied habitat without middens. FWS0682.[8] As discussed above, the Service also found that the large increase in the squirrel population from 2017-2021 indicates that other suitable habitat currently exists for the squirrel to expand into and occupy post-Frye Fire.

Setting aside the currently available habitat for the squirrel, Plaintiffs fail to explain why the relatively small non-habitat portions of the Cabins and Camp areas must be converted to habitat for the squirrel's recovery – as opposed to all of the other areas on Mount Graham where additional habitat could be restored just as, or more, easily. While significant portions of the squirrel's range have been negatively affected by wildfire and insect damage in recent decades, this necessarily means that substantial areas are available for reforestation and restoration on Mount Graham. In fact, the total potential

---

[8] CBD's map shows areas with appropriate slope and trees grouped in certain height categories: less than 5 meters (gray areas); 5-10 meters (yellow areas), 10-20 meters (green areas), and 20-40 meters (blue areas). FWS682. Areas occupied by the squirrel have a minimum "LMH," or Lorey's Mean Height (average tree stand height weighted by basal area), of 10.5 meters; thus, CBD's own analysis indicates that at least the areas shown in green and blue currently are suitable habitat for the squirrel. FWS4050.

1  habitat for the squirrel within its range has been estimated at about 19,768 acres –

2  compared to the total of only 12.5 acres occupied by buildings and infrastructure at the

3  Cabins and Camp. FWS6435. The soil also is compacted and disrupted in the developed

4  areas of the Cabins (and thus likely the Camp as well). USFS0436-37. Even if the

5  structures were removed, compaction and altered soil structure would likely persist for 20

6  years. USFS0120, 0437. Trees would take 60 to 80 years or longer to grow. USFS0417,

7  492 (first a grassy stage would occur, then a shrub stage, then "eventual growth of tree

8  species"). More rapid reforestation – from natural growth or as part of Forest Service

9  restoration projects – can occur in numerous other, comparatively undisturbed areas on

10  Mount Graham, for example, the gray and yellow areas on CBD's map of a portion of the

11  squirrel's range (the latter of which already has trees between 5-10 meters). FWS0682.

12       Finally, Plaintiffs stress that more than 35 years ago, the Service issued a draft

13  BiOp indicating that the area of the Cabins and the Camp could potentially be used to

14  offset the habitat lost from the construction of the observatory on Mount Graham. Pls.'

15  Mem. 5-6, 9, 29. The 1988 draft BiOp was never finalized, since Congress directed that

16  the observatory be built. *Id*. In any event, the draft did not find that the relatively small,

17  developed portions of the Cabins and Camp were the only areas available for such an

18  offset on Mount Graham or that these areas were necessary for the squirrel's recovery.

19  The Service has now analyzed this issue in two finalized BiOps and found that the

20  authorization of the Cabins and the Camp are not likely to jeopardize the continued

21  existence of the squirrel for the reasons detailed above, including that the squirrel's

22  population trajectory indicates that other suitable habitat is available to support the

23  squirrel's recovery. The Service also made its 1988 statements about the Cabins and the

24  Camp before the evidence had accrued of decades of squirrel use and occupancy of the

25  Cabins and Camp action areas despite some level of human disturbance. For all of these

26  reasons, the 1988 draft BiOp for the observatory does not support Plaintiffs' arguments in

27  this case.

28

**4.     The Service Properly Analyzed the Effects of the Action in the Context of the Environmental Baseline**

Plaintiffs next raise a series of narrow complaints about the BiOps that each lack merit. Plaintiffs first assert that the Service improperly considered the effects of existing buildings, related infrastructure, and "human use patterns" of the Camp as part of the "environmental baseline" rather than as an effect of the proposed action of issuing a new 20-year permit for the Camp. Pls.' Mem. 28. Plaintiffs do not make this argument for the Cabins BiOp. *Id*. Contrary to Plaintiffs' argument, the Service properly included the effects of existing buildings and infrastructure in the "baseline" consistent with the ESA Section 7 regulations. But regardless of whether treated as part of the baseline or an effect of the action, the record shows that the Service considered the effects of the existing Camp structures and found they would not jeopardize the squirrel. As to "human use patterns," the Service plainly treated the effects of the future occupancy and use of the Camp as an effect of the proposed action, contrary to Plaintiffs' suggestion.

The "environmental baseline" is the condition of the listed species or its critical habitat "without the consequences . . . caused by the proposed action." 50 C.F.R. § 402.02. It is defined by the ESA regulations to include "the past and present effects of all Federal, State, or private actions and other human activities in the action area, the anticipated effects of all proposed Federal projects in the action that have already undergone formal or early section 7 consultation, and the effect of State or private actions which are contemporaneous with the consultation in process." *Id*. The Camp was constructed decades ago under a permit first issued in 1966; new buildings or significant modifications to existing ones are not part of the proposed new permit. FWS1163. For this reason, the present effects of the Forest Service's prior authorization to construct the Camp are properly included in the "environmental baseline" since that baseline includes "the past and present effects of *all* Federal, State, or private actions and other human activities in the action area" – without regard to whether those past actions underwent ESA consultation in the past (since any such limitation would yield a skewed, inaccurate

1    baseline). 50 C.F.R. § 402.02 (emphasis added). *See also Nw. Env't Def. Ctr. v. NMFS*,

2    647 F. Supp. 2d 1221, 1238 (D. Or. 2009) (upholding a BiOp that included "existing

3    docks and structures" in the environmental baseline).

4         In any event, whether effects are included in the environmental baseline or treated

5    as part of the proposed action, the Service is required to consider both together in the

6    jeopardy analysis (and did so here). As the Ninth Circuit explained in *NWF*, the Service

7    must consider the effects of proposed actions "within the context of other existing human

8    activities that impact the listed species," and determine whether "jeopardy might result

9    from the agency's proposed actions in the present and future human and natural

10   contexts." *NWF*, 524 F.3d at 930. The Section 7 regulations thus require the Service to

11   "*[a]dd* the effects of the action and cumulative effects *to the environmental baseline*" to

12   determine whether the action jeopardizes the species. 50 C.F.R. § 402.14(g)(4) (emphasis

13   added). Consistent with these requirements, the Service considered the potential effects

14   of the continued existence of the Camp buildings and related infrastructure along with the

15   potential effects of its operation. As explained above, the Service found that the small

16   portion of the Camp area containing buildings and related infrastructure (5.5 acres) was at

17   most enough for one squirrel "home range," and the evidence does not indicate that the

18   absence of a single home range places the continued existence or recovery of the squirrel

19   at risk. FWS1194. Plaintiffs' argument is form over substance at best and not persuasive.

20        As to "human use patterns," Plaintiffs rely on an isolated statement in the Forest

21   Service's biological assessment for the Camp to suggest that the Service excluded the

22   effects of future occupancy and use of the Camp from the effects of the action. Pls.'

23   Mem. 28 (citing USFS1537). But the Service's BiOp for the Camp makes no reference to

24   "human use patterns" being included in the baseline (contrary to Plaintiffs' suggestion it

25   says the "same"). Rather, at the page cited by Plaintiffs in the "environmental baseline"

26   section of the Camp BiOp, the Service merely briefly describes the type of activities that

27   "currently occur" during the Camp operating season, which is entirely appropriate for a

28   description of the existing baseline conditions faced by the species in the Camp action

area. FWS1180. More importantly, the Service's subsequent, 8-page description of the "effects of the action" makes clear that the Service treated the effects of future "human use" of the Camp – including the potential for vehicle strikes, disturbance, and habitat alteration or removal from fire prevention and hazard removal – all as effects of the proposed action. FWS1182-1189; *see also* FWS1192-93 (explaining why these potential effects of the proposed action would not occur or not likely jeopardize the squirrel).

### 5.  The Service Fully Explained Why 92-Foot Midden Buffers Are Appropriate Along with Other Related Protections

Plaintiffs' next argument fixates on the 92-foot buffer established by the Forest Service around middens near the Cabins and the Camp – while ignoring the related, additional restrictions on vegetation removal and ground disturbance in all areas more than 30 feet from buildings (and 10 feet from smaller structures). FWS1164-65, 1238-39. Plaintiffs argue that the Service failed to use the "best scientific and commercial data available" in finding the 92-foot buffer sufficient and purportedly did not "explain adequately" its finding that a larger 200-foot buffer was not necessary. Pls.' Mem 30-34. Plaintiffs' argument is not well founded and is contradicted by the record.

First, Plaintiffs' argument relies on the prior use of a 200-foot midden buffer for what they incredulously claim is an "analogous" situation: the Pinaleño Ecosystem Restoration Project that – unlike the Cabins and Camp – involves cutting trees (up to 9 inches in diameter in some areas and up to 18 inches in others) and related ground disturbance in 5,752 forested acres that include squirrel home ranges. Pls.' Mem. 32-33; FWS2049-2053, 2079-2080; FWS1239. As the Service explained,

> [i]n the case of the Pinaleño Ecosystem Restoration Project, the larger buffer was selected for middens and nests within Forest Restoration Areas because of the more aggressive treatment to restore forest conditions and create future [squirrel] habitat, while at the same time decreasing wildland fire susceptibility around areas containing known middens. Vegetation removal of this nature has the potential to adversely affect [squirrel] habitat and middens; therefore, for projects that involve aggressive vegetation alteration, a larger buffer is used to avoid direct effects to [squirrel]

> middens from silvicultural and fuels treatments. . . . The proposed action to reissue the Organizational Camp Special Use Permit on Mt. Graham does not authorize any vegetation removal other than what is specified for fire prevention and hazard removal; therefore, the smaller 92-foot buffer is appropriate for this action.

FWS1185-86; *see also* FWS1193, 1239-40.

The Service further explained that – contrary to Plaintiffs' portrayal – the midden buffers must be considered *along with the other measures* that restrict vegetation removal and ground disturbance at the Cabins and the Camp:

> [o]utside of the 92-foot buffers, the conservation measures further reduce disturbance to [squirrel] by requiring permittees to obtain approval from the Forest Service prior to any vegetation removal other than what is specified for fire prevention and hazard removal, and disturbing any soil beyond the 30-ft fire prevention area around the Camp and associated utilities and roads. This limits the footprint of activities causing noise and disturbance to the 5.5-acre area that currently does not provide habitat for [the squirrel]; therefore, [squirrels] are unlikely to be within this area and the effects of noise and disturbance to them are minimized.

FWS1186, 1240 (similar finding for the Cabins). Thus, Plaintiffs' claim that removal of vegetation and ground disturbance – potentially affecting squirrel nests – can occur "anywhere outside of 92 feet of a midden" is not correct. Pls.' Mem. 31. The only vegetation removal and ground disturbance that can occur under the permits – without further permission from the Forest Service that may require further discussion or consultation with the Service – is within the already cleared fire prevention and hazard removal zone around existing buildings and related infrastructure. FWS1165, 1226.

Plaintiffs nevertheless insist that the Service was arbitrary to not use the same 200-foot midden buffer from the Pinaleño Ecosystem Restoration Project because that project originally used a 92-foot midden buffer for some areas and a 200-foot buffer for other areas, and the buffer was extended to 200 feet for all areas post-Frye Fire. Pls.' Mem. 33. But that change indicates only that after the Frye Fire, a 200-foot midden buffer was appropriate for all areas of a project involving significant vegetation removal and ground disturbance in squirrel habitat. It does not establish that a 200-foot buffer is required after

34

1  the Frye Fire for proposed actions like those here that involve essentially no vegetation

2  removal and ground disturbance outside of already cleared areas. This is especially true

3  here since the proposed actions at issue have other protections that are in addition to, and

4  work in conjunction with, the midden buffer.

5      Plaintiffs also incorrectly assert that the Service failed to comply with the ESA's

6  requirement to use the "best scientific and commercial data available." 16 U.S.C. §

7  1536(a)(2). As the Ninth Circuit has made clear, this provision only requires the Service

8  to consider the available scientific information. *See*, *e.g.*, *Kern Cty. Farm Bureau v.*

9  *Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) ("[w]ithout any evidence in the record that

10  [the Service] ignored relevant information, we hold that [the Service] satisfied its duty to

11  base its listing determinations on the best available data"). Plaintiffs do not point to any

12  scientific evidence that the Service did not consider; indeed, Plaintiffs point to the same

13  study (Wood et al. 2007) that the Service relied upon for the 92-foot midden buffer. Pls.'

14  Mem. 14 (citing FWS7382, 1167, 1229). In sum, the Service did not fail to consider any

15  scientific evidence or fail to explain why a 92-foot midden buffer was appropriate.

16  Plaintiffs merely disagree with the Service's scientific judgment on this issue, which is

17  insufficient under the deferential standard of review. *Friends of Del Norte v. California*

18  *Dep't of Transportation*, No. 18-CV-00129-JD, 2023 WL 2351649, at *10 (N.D. Cal.

19  Mar. 3, 2023) ("Mere differences in opinion . . . are not sufficient grounds for rejecting

20  the analysis of agency experts") (citation omitted).

21              **6.    The BiOps Include Appropriate Triggers for Re-Initiation of**
22              **Consultation If Necessary to Re-Evaluate the Cabins and Camp**

23      In their final argument about the BiOps, Plaintiffs erroneously assert that the

24  Service did not include appropriate triggers for re-initiation of consultation if the

25  expected amount of "take" was exceeded. Pls.' Mem 34-39. Under the ESA regulations,

26  the Service can use a "surrogate" measure of take for this purpose, such as "ecological

27  conditions," where "it is not practical to express the amount or extent of anticipated take

28  or to monitor take-related impacts in terms of individuals of listed species." 50 C.F.R. §

1    402.14(i)(1)(i). Here, the only anticipated "take" is impacts from noise and visual

2    disturbance, and the Service found that it was not practical to express the amount or

3    extent of such "harassment" take "in terms of individual squirrels" because individuals

4    are difficult to detect; in fact, midden surveys are used to estimate the squirrel population

5    for precisely this reason. FWS1196-97, 1247-48. Further, because midden use naturally

6    cycles (middens are created, used, or abandoned over time due to fire and other natural

7    factors), the Service could not anticipate whether more or fewer squirrels will occupy the

8    areas of the Cabins and Camp in a given year. FWS1196-97, 1247-48. However, because

9    the Service did not expect that noise and visual disturbance "take" would "lead to long-

10   term abandonment" of the Cabins and Camp areas by the squirrel, the Service determined

11   that re-initiation of consultation would be triggered if no active middens are present in the

12   Cabins or Camp action areas for more than two consecutive fall seasons (since absence

13   for one fall season has occurred a number of times in the past for the Cabins and the

14   Camp and absence for two consecutive fall seasons previously occurred once for the

15   Camp). FWS1180, 1196-97, 1247-48, 2724.

16        In this way, the re-initiation trigger for harassment "take" connects directly to the

17   no-jeopardy determinations. The Service expected that noise and visual disturbance

18   "take" would occur, but that such "take" would not jeopardize the squirrel because it

19   would not prevent the squirrel's continued use of the habitat in the Cabins and Camp

20   action areas (a finding well-supported by the continued midden presence in those areas

21   over an extended period). FWS1193, 1196, 1244-5, 1247. But if that reasonable

22   expectation supporting the no-jeopardy determinations proves incorrect and squirrels

23   appear to have abandoned the areas based on the absence of active middens for two

24   consecutive fall seasons, then re-initiation of consultation is required to re-evaluate the

25   impacts of the Cabins and/or the Camp on the squirrel. However, to ensure that such a re-

26   examination is in fact warranted, the BiOps provide that the Service and the Forest

27   Service will work together to "determine if extraneous factors (such as tree disease or

28   poor cone crops) are contributing to the lack of [squirrel] presence, or if the lack of

36

1  [squirrel] presence is due to the proposed action and therefore re-initiation of consultation

2  is warranted." FWS1197, 1248-49.

3  Plaintiffs' two complaints about the Service's entirely reasonable approach are

4  meritless. First, Plaintiffs assert the authorized take is unlawfully "co-extensive with the

5  scope of the project[s]" because it purportedly "cannot be reached until the project itself

6  is complete." Pls.' Mem. 35. This is untrue given that (1) harassment take could be

7  exceeded in two consecutive fall seasons of the absence of active middens, starting in fall

8  2022 because the BiOps were issued in May 2022 and (2) the permits for the Cabins

9  permits do not expire until 2028, FWS1223, while the proposed 20-year permit for the

10  Camp has not even been issued yet. Thus, re-initiation could be triggered well before the

11  proposed agency actions reviewed in the BiOps are "complete."

12  Plaintiffs' second complaint is that the numerical trigger used – two consecutive

13  fall seasons of the absence of active middens – is purportedly "unclear." Specifically,

14  Plaintiffs assert that the Service must "conclusively" find that the absence of active

15  middens is due to the proposed actions, and Plaintiffs speculate the Service will blame

16  any absence on "fluctuations in environmental conditions" merely because the Service

17  has generally observed that such conditions can affect midden use. Pls.' Mem. 35-38. But

18  Plaintiffs offer no evidence for their speculation the Service will apply this re-initiation

19  trigger so as to become an entirely fictional one; indeed, such an assumption would be

20  contrary to the presumption of regularity that attaches to agency actions. *Safari Club Int'l*

21  *v. Haaland*, 31 F.4th 1157, 1177 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1002 (2023).

22  The BiOps also state the agencies will "determine if extraneous factors" are contributing

23  to midden absence and then lists two such specific factors (tree disease and poor cone

24  crops), *i.e.*, the Service must find that a specific, identifiable extraneous factor is leading

25  to midden absence, otherwise re-initiation appropriately would be triggered.

26  Plaintiffs also ignore that other circumstances may trigger re-initiation of

27  consultation. Anticipated "take" also would be exceeded (and re-initiation triggered) if a

28  squirrel is found injured or killed in the Cabins or Camp action areas and this is attributed

1    to the proposed actions – again, since no injury or death is expected due to the Cabins and

2    the Camp. FWS1197, 1248. Re-initiation is also triggered if new information reveals

3    effects of the agency action "in a manner or to an extent not considered" in the BiOps.

4    FWS1199, 1250. If Plaintiffs believe that any of these re-initiation triggers occur in the

5    future and the Service fails to re-initiate, they are free to bring a new lawsuit alleging that

6    re-initiation is required (as they previously did for the 2008 Camp BiOp). Plaintiffs'

7    claim that the Service will act unlawfully or in bad faith in the future is not only

8    unsupported, but premature at best.

9             **7.    The Forest Service Did Not Unreasonably Rely on the BiOps**

10           Separate from their claim that the BiOps are arbitrary and capricious, Plaintiffs

11   briefly claim that the Forest Service unlawfully relied on the BiOps based solely on

12   Plaintiffs' various arguments challenging the Service's findings in the BiOps. Pls.' Mem.

13   39-40. This claim fails at the outset for the Camp given that the Forest Service has not

14   relied on the Camp BiOp – it has not yet taken the proposed action analyzed in that BiOp

15   (the issuance of a new permit) and possibly may never do so. Presumably for this reason,

16   Plaintiffs' complaint does not include a claim against the Forest Service for reliance on

17   the Camp BiOp; it contains only such a claim for the Cabins BiOp. Compl. ¶ 96. For this

18   reason, the "reliance" claim against the Forest Service for the Camp is barred. *See*, *e.g.*,

19   *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (finding that

20   when allegations are not in the complaint, "raising such claim in a summary judgment

21   motion is insufficient to present the claim to the district court").

22           More broadly, Plaintiffs' view that any legal error in the BiOps automatically

23   equates to a violation of law by the Forest Service is unwarranted. Courts have found that

24   "when we are reviewing the decision of an action agency to rely on a BiOp, the focus of

25   our review is quite different than when we are reviewing a BiOp directly. In the former

26   case, the critical question is whether the action agency's reliance was arbitrary and

27   capricious, not whether the BiOp itself is somehow flawed." *City of Tacoma, Wash. v.*

28   *Fed. Energy Regul. Comm'n*, 460 F.3d 53, 75 (D.C. Cir. 2006). Indeed, the Ninth Circuit

has found that an agency's reliance on a BiOp is not arbitrary and capricious and "will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information . . . which challenges the [BiOp's] conclusions," and such new information was available to the action agency but withheld from the consulting agency. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) (citation omitted). Here, Plaintiffs do not identify any information withheld by Forest Service, or any other respect in which it arbitrarily relied on the Service's expert judgment in the BiOps. Plaintiffs cite *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1127 (9th Cir. 2012), but there the Court found that the challenged BiOp completely failed to examine a factor that may affect ESA-listed species that was explicitly discussed in the action agency's related NEPA analysis. *Id*. at 1124. Plaintiffs do not identify here any potential impact of the Cabins and the Camp on the squirrel that the Forest Service was aware of, but the Service completely failed to address. This case therefore does not support Plaintiff's argument. For all of these reasons, Plaintiffs' separate claim against the Forest Service fails.

## C.     The Court Should Not Grant Plaintiffs' Requested Remedy

The Court should grant summary judgment to Defendants. But if the Court finds any error in the BiOps, Defendants request an opportunity to further brief the appropriate remedy. Plaintiffs request that the BiOps be vacated and remanded for completion of new ESA consultations within an unspecified time frame, and they also vaguely ask the Court to set aside the Forest Service's "reliance on [the BiOps]" and issue an ill-defined order that "habitat conditions in the areas at issue are not allowed to deteriorate further due to the actions under review." Pls. Mem. 40. But courts need not vacate agency actions as a matter of course. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) ("Whether agency action should be vacated depends on how serious the agency's errors are "and the disruptive consequences of an interim change that may itself be changed." (quotation omitted)). This test cannot be applied until the Court issues a

1   decision, but the Court may find a limited error that could be rectified with further

2   explanation by the Service.

3          The Court also may not grant the kind of additional injunctive relief demanded by

4   Plaintiffs without a showing that the traditional four-factor test is met, including that

5   irreparable harm will occur absent such relief. *See Monsanto Co. v. Geertson Seed*

6   *Farms*, 561 U.S. 139, 162, 165-66 (2010). Plaintiffs have made no such showing, nor

7   could they. No permit has been issued for the Camp or is imminent. As to the Cabins, no

8   evidence suggests their continued seasonal use during the period of any re-initiated

9   consultation – along lines similar to their use for the past 70+ years – will cause

10  irreparable harm to the squirrel. To the contrary, as noted above, the squirrel's population

11  most recently increased from 109 in 2021 to 156 in 2022, further confirming that the

12  existence of the Cabins and the Camp present no risk of harm to the continued recovery

13  of the squirrel. For these reasons, any remedy should be limited to a remand without

14  vacatur of the BiOps for issuance of new or amended BiOps on a time frame that takes

15  into account the time needed and other workload of the Service and the Forest Service.

16  **V.     CONCLUSION**

17         The Service reasonably found that the continued authorization of the Cabins and

18  Camp are not likely to jeopardize the continued existence of the Mount Graham red

19  squirrel. These long-existing recreational sites have co-existed with the squirrel for

20  decades on Mount Graham. Their operation is not expected to cause the death or injury of

21  any squirrels, and many restrictions are in place to ensure that visual or noise disturbance

22  is minimal and does not prevent the squirrel from continuing to use the surrounding

23  habitat. On these facts, Plaintiffs have not remotely shown that the Service has made a

24  clear error of judgment that could warrant finding the BiOps are arbitrary and capricious

25  under the deferential standard of review. The Court should grant summary judgment to

26  Defendants on all claims.

27         Respectfully submitted this 8th day of September, 2023.

28                          TODD KIM
                            Assistant Attorney General

1

2

United States Department of Justice
Environment & Natural Resources Division

3

4

S. JAY GOVINDAN, Section Chief
BRIDGET KENNEDY MCNEIL,
Assistant Section Chief

5

6

7

8

9

10

11

*/s/ Clifford E. Stevens, Jr.*
CLIFFORD E STEVENS, JR.
Senior Trial Attorney (D.C. Bar No. 463906)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20004
Tel: (202) 353-7548
Fax: (202) 305-0275
clifford.stevens@usdoj.gov

12

*Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28