TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

S. JAY GOVINDAN, Section Chief
BRIDGET KENNEDY MCNEIL, Assistant Section Chief
CLIFFORD E. STEVENS, JR.
Senior Trial Attorney (D.C. Bar No. 463906)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20004
Tel: (202) 353-0368
Fax: (202) 305-0275
clifford.stevens@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al., | No. 4:22-cv-0412-JAS-AMM |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Randy Moore, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ................................................................................................ 1

II. ARGUMENT ..................................................................................................... 2

    A.  The BiOps Are Lawful and Supported by the Administrative Record ................. 2

        1.  The Service Explained Why the Cabins and Camp Will Not Likely Reduce the Squirrel's Reproduction, Numbers, or Distribution ................................. 2

        2.  Plaintiffs Misstate the ESA Section 7 Case Law ........................................... 8

        3.  There Is No Discrepancy Between the BiOps and Prior Service Findings That Required More Explanation ................................................................. 12

        4.  The Proposed Actions Are Not Required to Recover the Squirrel .............. 15

    B.  The Service Correctly Analyzed the Effects of Existing Camp Structures as Part of the Environmental Baseline ............................................................................ 17

    C.  The Permits Include Sufficient Protections for Squirrel Habitat ........................ 22

    D.  The BiOps Include Proper Triggers for Re-Initiation of Consultation ............... 26

    E.  The Forest Service Did Not Unreasonably Rely on the BiOps ......................... 29

    F.  Any Remedy Should Be Limited to Remand Without Vacatur ......................... 30

III. CONCLUSION .............................................................................................. 30

i

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases** **Page(s)**

3

4
*Akiak Native Cmty. v. U.S. Postal Serv.*,
213 F.3d 1140 (9th Cir. 2000) ........................................... 28

5
*Aluminum Co. of Am. v. Bonneville Power Admin.*,
6
175 F.3d 1156 (9th Cir. 1999) ............................................. 9

7
*Am. Rivers v. Fed. Energy Regul. Comm'n*,
8
895 F.3d 32 (D.C. Cir. 2018).................................... 9, 19, 20

9
*Appalachian Voices v. U.S. Dep't of Interior*,
25 F.4th 259 (4th Cir. 2022) ............................................. 10
10

11
*AquAlliance v. U.S. Bureau of Reclamation*,
287 F. Supp. 3d 969 (E.D. Cal. 2018) ........................... 12, 13
12

13
*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ........................................ 29, 30
14

15
*Cascadia Wildlands v. Thrailkill*,
49 F. Supp. 3d 774 (D. Or. 2014) ..................................... 15

16
*Ctr. for Biological Diversity v. FWS*,
17
441 F. Supp. 3d 843 (D. Ariz. 2020) .............................. 10, 27

18
*Ctr. for Biological Diversity v. Salazar*,
19
804 F. Supp. 2d 987 (D. Ariz. 2011) ................................. 10

20
*Ctr. for Biological Diversity v. U.S. Forest Serv.*, ,
--- F. Supp. 3d ---, 2023 WL 5310633 (D. Mont. Aug. 17, 2023) ......................................... 21
21

22
*Defs. of Wildlife v. Fish & Wildlife Serv.*,
No. 16-CV-01993-LHK, 2016 WL 4382604 (N.D.Cal. Aug. 17, 2016) ............................... 23

23
*Defs. of Wildlife v. Zinke*,
24
849 F.3d 1077 (D.C. Cir. 2017)........................................... 28

25
*Defenders of Wildlife v. U.S. Department of the Interior*,
26
931 F.3d 339 (4th Cir. 2019) .............................................. 9

27
*FCC v. Fox Television Stations, Inc.*,
28
556 U.S. 502 (2009) ........................................................ 12

ii

*Idaho Dep't of Fish & Game v. NMFS,*
    850 F. Supp. 886 (D. Or. 1994) ................................................................................ 9

*In re: Operation of Mo. River Sys. Litig.,*
    421 F.3d 618 (8th Cir. 2005) ................................................................................. 28

*Julia S. v. Comm'r of Soc. Sec.,*
    No. 3:18-CV-00175-AA, 2019 WL 1368569 (D. Or. Mar. 25, 2019) .................. 6, 7

*Mayo v. Jarvis,*
    203 F. Supp. 3d 31 (D.D.C. 2016) ........................................................................... 6

*Miccosukee Tribe of Indians of Fla. v. United States,*
    697 F. Supp. 2d 1324 (S.D. Fla., 2010) .................................................................. 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................ 16

*Native Vill. of Chickaloon v. NMFS,*
    947 F. Supp. 2d 1031 (D. Alaska 2013) ........................................................... 10, 11

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    524 F.3d 917 (9th Cir. 2008) .......................................................................... passim

*Nat'l Wildlife Fed'n v. NMFS,*
    184 F. Supp. 3d 861 (D. Or. 2016) ........................................................................... 9

*Nw. Env't Def. Ctr. v. NMFS,*
    647 F. Supp. 2d 1221 (D. Or. 2009) ...................................................................... 19

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,*
    817 F. Supp. 2d 1290 (D. Or. 2011) ...................................................................... 26

*Oregon Natural Resources Council v. Allen,*
    476 F.3d 1031 (9th Cir. 2007) .......................................................................... 27, 28

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,*
    606 F. Supp. 2d 1122 (E.D. Cal. 2008) .................................................................... 9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
    426 F.3d 1082 (9th Cir. 2005) ................................................................................. 9

*Pac. Rivers v. U.S. Bureau of Land Mgmt.,*
    No. 6:16-CV-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018) ...................... 13

iii

*Rock Creek Alliance. v. U.S. Forest Service,*
    703 F. Supp. 2d 1152 (D. Mont. 2010) ................................................................ 14

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ............................................................................... 25

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
    666 F. Supp. 2d 1137 (E.D. Cal. 2009) ........................................................... 6, 15

*Swan View Coalition v. Barbouletos,*
    No. 06-cv-73-M-DWM, 2008 WL 5682094 (D. Mont. June 13, 2008) .................. 20

*Swan View Coal. v. Barbouletos,*
    348 Fed. Appx. 295 (9th Cir. 2009) .................................................................... 19

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
    878 F.3d 725 (9th Cir. 2017) ............................................................................... 10

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ........................................................................ 10, 29


**Statutes**

16 U.S.C. § 1532(19) ................................................................................................ 11

16 U.S.C. § 1536(a)(2) ............................................................................................... 1


**Regulations**

50 C.F.R. § 402.02 ............................................................................................ passim

50 C.F.R. § 402.14(h)(2) ........................................................................................... 23

50 C.F.R. § 402.14(i)(2) ............................................................................................ 23

iv

# I.    INTRODUCTION

Plaintiffs fail to grapple with the facts and evidence reasonably relied on by the U.S. Fish & Wildlife Service ("Service") in finding that the proposed continued operation of the recreational residences ("Cabins") and the organization camp ("Camp") is not likely to jeopardize the survival or recovery of the Mount Graham red squirrel ("squirrel") and thus complies with Section 7(a)(2) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1536(a)(2). The most important evidence – which Plaintiffs neither dispute nor address in their briefs – is that the Service has now learned from over 25 years of surveys that the squirrel has continued to occupy and live in the forested habitat comprising most of the Cabins and Camp areas, all while human occupancy and recreational activities have occurred at these facilities at similar levels that would occur in the future. ECF No. 134 ("Defs.' Opp.") 8, 11-12.

Plaintiffs also fail to rebut the Service's finding that loss of squirrel habitat at the Cabins and Camp is not likely. In addition to the protective buffers around squirrel middens, no vegetation removal or ground disturbance is authorized by the U.S. Forest Service ("Forest Service") for these facilities except that necessary for fire prevention and hazard removal in already cleared areas immediately adjacent to structures. *Id.* at 18, 34. Plaintiffs also do not dispute that no death or physical injury of any squirrel is expected from activities at the sites. *Id*. at 17. Thus, as the Service found, the sum total of likely effects on the squirrel from the continued occupancy and use of the Cabins and Camp is noise and visual disturbance to the squirrels living near these facilities (during their 7-month operating season). *Id*. And all evidence before the Service is that such noise and visual disturbance – to which the squirrel appears "habituated" and is minimized by multiple permit terms for these facilities – does not prevent the squirrel from occupying and reproducing in the Cabins and Camp areas. *Id*. at 8-9, 12-13, 17-18.

Contrary to Plaintiffs' various arguments, this is not remotely a case in which the Service failed to explain its decision. In two detailed biological opinions ("BiOps"), the Service fully explained why the available facts and evidence show that the continued

operation of these facilities is not likely to reduce the reproduction, numbers, or distribution of the squirrel and thus is not likely to jeopardize its existence or recovery. As part of the environmental baseline considered in a jeopardy analysis, the Service also examined whether the relatively small areas occupied by existing structures and related infrastructure at these sites placed the continued survival or recovery of the squirrel at risk. The Service expressly found to the contrary, based on the squirrel's population increase since 2017 indicating that other suitable habitat is available on Mount Graham to support continued population growth and recovery. *Id*. at 19, 27. Plaintiffs either ignore or fail to rebut the facts and evidence cited by the Service that support its no-jeopardy determinations. The Court therefore should grant summary judgment to Defendants.

## II.    ARGUMENT

### A.    The BiOps Are Lawful and Supported by the Administrative Record

Plaintiffs' continued assertion that the Service did not analyze whether the Cabins and Camp "appreciably reduce the 'likelihood' of the squirrel's recovery" – apart from their impacts on the species' prospects for *survival* – is incorrect. ECF 136 ("Pls.' Reply") 2-3, 16. Under the ESA regulations, to "[j]eopardize the continued existence of" a species "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Applying this standard, the Service examined whether the continued operation of the Cabins and Camp would reduce the reproduction, numbers, or distribution of the squirrel. Finding that result would not likely occur, the Service reasonably determined that the Cabins and Camp would not likely jeopardize the squirrel's *survival or recovery*. Defs.' Opp. 17-20; FWS1182-98, 1236-50. Plaintiffs' arguments to the contrary are not supported by the case law or the administrative record.

#### 1.    The Service Explained Why the Cabins and Camp Will Not Likely Reduce the Squirrel's Reproduction, Numbers, or Distribution

As Plaintiffs concede, the ESA does not require the Service to separately assess the impacts of a proposed action on a species' chances for survival versus its recovery.

2

*See* Pls.' Reply 11; Defs.' Opp. 22. Survival and recovery are "joint" and "intertwined" concepts that are often "'considered together in analyzing effects, and it is difficult to draw clear-cut distinctions.'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF*"), 524 F.3d 917, 932 & n.11 (9th Cir. 2008) (quoting 51 Fed. Reg. 19226, 19934 (June 3, 1986)). Indeed, the regulatory definition of jeopardy expressly contemplates that a proposed action may materially reduce the likelihood of survival *or* recovery "*by reducing the reproduction, numbers, or distribution of that species.*" 50 C.F.R. § 402.02 (emphasis added). The Service thus analyzed whether the continued use and occupancy of the Cabins and Camp would reduce the reproduction, numbers, or distribution of the squirrel, and determined that they likely would not.

As to the impact of the Cabins and Camp on the squirrel's "numbers," the Service found that no death or physical injury to squirrels was anticipated from vehicle traffic or other activities. FWS1182, 1192-93, 1236-37, 1244. The Service also considered the potential for injury or death of squirrels from vegetation removal allowed for fire prevention or hazard removal but found that no such "take" was anticipated. FWS1183, 1196, 1236-37, 1247. The Service instead found that all "take" within the meaning of ESA Section 9 would be noise and visual disturbance to the squirrels located within about 200 feet of the facilities, but that human presence "does not appear to influence [squirrel] abundance . . . or survivorship," and thus use and maintenance of the facilities "will not affect the ability of [squirrel] habitat with the action area from functioning as suitable habitat." FWS1166, 1183-85, 1193, 1196, 1227, 1237-40, 1245, 1247. Thus, no loss of individual squirrels is expected, i.e., no reduction in the species' numbers.

As to "distribution," the Service found that, while noise and visual disturbance to nearby squirrels will occur during a portion of the year, the squirrel appears "to be habituated to human presence and disturbance as evidenced by the continuity of [squirrel] middens and occupancy" in the Cabin and Camp action areas over a long period. FWS1193, 1186, 1244-45. The administrative record is replete with evidence supporting this finding. USFS54 ("Mountain-wide, active middens are known to be visible from

3

trails; others are just beyond visual range from Forest roads (depending on cover, from 3 yards out)"); FWS1183 ("in 2018, the Forest Service removed two hazard trees within 10 feet of one midden in the Turkey Flat cabin area; this [squirrel] was observed foraging just after the treatment was completed and has remained in the area"); *Id*. (citing scientific literature finding that "the same red squirrel will occupy a territory even after multiple visits and multiple capture events[.]"). As to the recreational facilities here, since 1996, five separate middens have been found in the Camp area (three middens that were currently occupied) and nine separate middens have been found in the Cabins area (three middens that were currently occupied, one more than during the 2008 ESA consultation for the Cabins). Defs.' Opp. 8, 11-12. As the Service found and is amply supported by the record, "the overall distribution of the [squirrel] is not being affected by the proposed action[s,]" and all evidence indicates that the continued operation of the facilities as has historically occurred is "unlikely" to lead to long-term abandonment of the squirrel habitat in the Cabins and Camp areas. FWS1186-87, 1196, 1193, 1245.[1]

As to "reproduction," the Service examined whether middens have been occupied for periods long enough in the Cabins and Camp areas for squirrel reproduction to occur. FWS1180, 1244-45. Plaintiffs assert that the presence of these facilities "plainly 'reduce' the squirrel's 'reproduction,'" based on the Service's finding that "'middens in the Cabins area are occupied for 8.7 [years] versus 17.33 years in less disturbed areas[.]" Pls.' Reply 9. But as explained in our opening brief and ignored by Plaintiffs, the Service analyzed whether the midden occupancy period in the Cabins area was sufficient for reproduction. Defs' Opp. 18. The Service found that the average period of midden occupancy was 8.7 years with a 95% confidence interval of 3.6 to 13.7 years, and that

> considering the average [squirrel] lifespan in the wild is 1.2-1.8 years (Goldstein et al. 2017), this indicates that, in the Cabin Area, a

---

[1] Plaintiffs suggest that "7 youth groups" would use the Camp at the same time, Pls.' Reply 3, 19, but the permit would allow for a maximum of 120 individuals including campers and staff. USFS1533. The owner of the Camp only stated that it had "7 youth groups ready to enjoy the camp[,]" not that all would do so at once. Defs.' Opp. 10-11.

> particular midden and its associated territory will persist between 2
> to 11 (average 5.8) times the average lifespan for [a squirrel], and
> that reproduction and habitat retention is likely occurring within the
> Cabin Area despite human disturbance.

FWS1241, 1244-45 (noting this "time frame is long enough to indicate that reproduction and habitat retention is occurring"). Similarly, as to the Camp, the Service found that the five middens found there since 1996 have been active for periods several times longer than the average lifespan of the squirrel, such that reproduction is likely occurring. FWS1180.[2] Given that the Service considered this issue, Plaintiffs unsurprisingly are unable to point to any evidence in the administrative record that the Cabins and Camp are likely to reduce squirrel reproduction in the habitat surrounding these sites.

In sum, the Service reasonably found based on the evidence in the administrative record that the continued occupancy and use of the Cabins and Camp have not reduced, and are not likely in the future to reduce, the "reproduction, numbers, or distribution" of the squirrel, such that these facilities are not likely to "reduce appreciably" the species' chances of survival or recovery within the regulatory definition of "jeopardy." 50 C.F.R. § 402.02. Plaintiffs' overarching challenge to the reasonableness and lawfulness of the Service's no-jeopardy determinations fails on this basis alone.

Plaintiffs seize on the fact that the Service did not explicitly use the words "reduce appreciably" in the Cabins BiOp, while admitting the Service did so in the Camp BiOp as part of a section reciting the regulatory definition of jeopardy. Pls.' Reply 16; FWS1192. This argument elevates form over substance. By definition, where the proposed action is not expected to reduce the "reproduction, numbers, or distribution" of a species as here, the action is not likely to appreciably reduce the likelihood of its survival or recovery. 50 C.F.R. § 402.02. For the same reason and contrary to Plaintiffs' argument, counsel for

---

[2] The five middens are: (1) BC 127 (active for more than 10 years); (2) BC 56 (active from 1997 to 2013, or 16 years, and active again in 2021); (3) BC 91 (active from 2006 to 2017, or 11 years); (4) BC 146 (appeared in 2020 and already active long enough for reproduction); and (5) CO 108 (active from 2014 until the Frye Fire in 2017). *Id*.

Defendants are not engaged in "post hoc justification" merely by citing the Service's findings in the BiOps that the Cabins and Camp would not likely reduce the squirrel's reproduction, numbers, or distribution. Pls.' Reply 15. The agency's path "may reasonably be discerned" and thus impermissible post hoc rationalization is not at issue. *See*, *e.g.*, *Mayo v. Jarvis*, 203 F. Supp. 3d 31, 38 (D.D.C. 2016), *vacated on other grounds*, 875 F.3d 11 (D.C. Cir. 2017) (finding no post hoc rationalization where the Service's discussion of the relevant "considerations make obvious why [it] does not consider that activity to constitute harassment"); *Julia S. v. Comm'r of Soc. Sec.*, No. 3:18-CV-00175-AA, 2019 WL 1368569, at *3 (D. Or. Mar. 25, 2019) (where defendants are "not providing new justifications for an otherwise unsupported decision, the post-hoc rule is not violated."). Counsel for Defendants are not creating new justifications for the BiOps; rather, we are only pointing to what the Service found.

Moreover, the Court must determine whether the agency applied the correct jeopardy standard based on the whole record, *San Luis & Delta-Mendota Water Auth. v. Salazar*, 666 F. Supp. 2d 1137, 1158 (E.D. Cal. 2009), and other record evidence confirms that the Service applied the same and correct regulatory definition of jeopardy for both the Cabins and Camp. *See*, *e.g.*, FWS1666, 1763, 1911 (ESA Section 7 Handbook considered for both BiOps that refers to regulatory standard and includes the words "reduce appreciably"). The Cabins and Camp BiOps were also prepared in the same time frame by the same Service personnel, and there is no reason to believe the Service applied different jeopardy standards for the two facilities. FWS1200, 1250.

Plaintiffs likewise erroneously argue that the Service did not apply the correct jeopardy standard because the Service used the allegedly "vague" phrase "place recovery of the species at risk" at points in the BiOps. Pls.' Reply 10 (citing FWS1194, 1245). But as Plaintiffs inconsistently admit, the Ninth Circuit itself has referred to the jeopardy standard in terms of when "survival and recovery will be placed at risk[.]" *Id*. at 4 (quoting *NWF*, 524 F.3d at 936). This is merely a shortform for the jeopardy standard. The Service's mere use of this phrase at points in its analysis hardly establishes that it

1    failed to apply the regulatory definition of jeopardy. As discussed above, that definition

2    requires an examination of the degree to which the action will reduce the reproduction,

3    numbers, or distribution of the species, and the Service performed that analysis.

4        Plaintiffs also take out of context the Service's limited use of the phrase. In the

5    part of the BiOps cited by Plaintiffs, the Service was *not* assessing whether the proposed

6    actions, i.e., permits authorizing continued *occupancy and use* of the Cabins and Camp

7    would jeopardize the species, but rather the effects of the areas occupied by *existing*

8    *structures*. FWS1194, 1245. As explained below, the Service correctly examined the

9    present effects of these structures as part of the "environmental baseline" rather than as

10   an effect of the proposed actions, since these structures were built decades ago. In doing

11   so, the Service found that the small areas occupied by existing structures at most could

12   support one squirrel at each site (assuming trees regrew after 60-80 years) and:

> [t]his reduction of one home range does not appear to prevent [the
> squirrel] from persisting within their range, nor does it push the
> subspecies over the tipping point and place recovery of the species at
> risk because the [squirrel] population increased from 35 individuals
> post-Frye Fire in 2017 to 109 individuals in 2020 and 2021
> following the loss of significant areas of [squirrel] habitat and
> multiple [squirrel] home ranges.

18   FWS1194, 1245; Defs.' Opp. 19, 30. The Service thus found that the population data

19   indicate that other suitable habitat is available for squirrel population expansion besides

20   the areas occupied by buildings and related infrastructure at the Cabins and Camp (only

21   5.5 acres at the Camp and 7 acres at the Cabins). *Id*.[3] Plaintiffs do not show this finding is

22   inconsistent with the jeopardy standard. As explained in our opening brief, the ESA

---

[3] Plaintiffs again wrongly cry "post hoc rationalization" as to Defendants' argument here.
Pls.' Reply 7. The Service cited the squirrel's population increase directly in the context
of examining whether land occupied by existing structures was necessary for the squirrel.
The clear inference drawn by the Service is that this increase could not have occurred if
other habitat for the squirrel was not available. As for Plaintiffs' other claims of "post hoc
rationalization," that is not occurring here because the agency's path "may reasonably be
discerned" from the administrative record. *Julia S.*, 2019 WL 1368569, at *3.

1    regulations require examining the effects of the proposed action in the context of the
2    baseline. Defs.' Opp. 32. The Service did that here by examining whether existing
3    structures occupied areas necessary for the squirrel's continued survival or recovery and
4    found that they did not. In short, the Service properly applied the regulatory definition of
5    jeopardy and reasonably found that the proposed actions, in the context of the baseline,
6    were not likely to appreciably reduce the squirrel's likelihood of survival or recovery.

7             **2.    Plaintiffs Misstate the ESA Section 7 Case Law**

8             Lacking any evidence in the administrative record to contradict the Service's
9    findings under the jeopardy standard, Plaintiffs fall back on purely legal arguments that
10   misstate the case law and ignore the Service's findings.

11            Plaintiffs first argue that "the Camp and Cabins 'reduc[e] the reproduction,
12   numbers, or distribution of [the squirrel],' [(citation omitted)]; that is, both actions
13   'caus[e] additional harm' because neither 'removes [the] species from jeopardy entirely,
14   or [] lessens the degree of jeopardy.'" Pls.' Reply 8, citing *NWF*, 524 F.3d at 930. *NWF*
15   holds nothing of this kind. As explained in our opening brief, *NWF* addressed only
16   whether the consulting agency (in that case, the National Marine Fisheries Service
17   ("NMFS")) may simply compare the effects of the action to the risks posed by existing,
18   baseline conditions and perform a full jeopardy analysis only if the risks posed by the
19   action are greater than those posed by baseline conditions. *NWF*, 524 F.3d at 930; Defs.'
20   Opp. 23. The Service did not do that here and instead fully analyzed the effects of the
21   proposed actions. In addition, in the sentence selectively quoted by Plaintiffs, *NWF* states
22   only that under a jeopardy approach described by NMFS, an agency "*may* still take
23   action" that "removes a species from jeopardy" or lessens the degree of jeopardy. *NWF*,
24   524 F.3d at 930 (emphasis added). While an agency certainly may take action that
25   benefits a listed species, *NWF* did not find that a proposed action necessarily would
26   reduce a species' reproduction, numbers, or distribution if it did not improve conditions
27   for the species or eliminate past harms, as Plaintiffs posit. To the contrary, *NWF* states
28

8

1    that an action "can only 'jeopardize' a species' existence if that agency action causes

2    some deterioration in the species' pre-action condition." *Id.*

3          More broadly, Plaintiffs' continued reliance on *NWF* and other inapposite cases

4    that involved much more significant effects on listed species is unavailing here. Plaintiffs

5    repeatedly cite *NWF* for the erroneous propositions that the Service must determine in all

6    cases whether a species is already "in jeopardy" and must identify the "tipping point"

7    where a more harmful agency action would cause jeopardy. Pls.' Reply 4-5, 8, 10-11, 15,

8    16, 18. As explained in our opening brief, other district courts in the Ninth Circuit have

9    rejected identical arguments. Defs.' Opp. 25-26. But as Plaintiffs additionally ignore,

10   *NWF* did not involve anything like the modest recreational facilities at issue in this case.

11   *NWF* concerned the impacts of multiple major dams and related facilities in the Pacific

12   Northwest that the Ninth Circuit found had resulted in a "very high mortality rate" for

13   ESA-listed fish species. *NWF*, 524 F.3d at 923. Similarly, Plaintiffs rely on *Defenders of*

14   *Wildlife v. U.S. Department of the Interior*, 931 F.3d 339 (4th Cir. 2019), Pls.' Reply 4,

15   but in that case, the proposed 600-mile pipeline would kill listed bees (including

16   reproducing queens), cause "depressed rates of growth, reproduction, and recruitment"

17   for a listed mussel, and result in the clearing of 3,275 acres of habitat for a listed bat.

18   *Defenders of Wildlife*, 931 F.3d at 348, 356, 360. Other cases relied on by Plaintiffs

19   involved similar large projects or other actions that were expected to cause mortality or

20   loss of functioning habitat for listed species.[4]

21   _____

22   [4] Pls.' Reply 11-12 (citing *Nat'l Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861 (D. Or. 2016) (same project in *NWF*)); *Id.* at 12 (citing *Idaho Dep't of Fish & Game v. NMFS*, 850 F. Supp. 886, 891 (D. Or. 1994) (same)); *Id.* at 12 (citing *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999) (same)); *Id.* at 7, 15, 22 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1087 (9th Cir. 2005) (involving another large water project and noting fish mortality and loss of summer habitat for newly hatched and migrating fish)); *Id.* at 4, 18, 19, 27 (citing *Am. Rivers v. Fed. Energy Regul. Comm'n*, 895 F.3d 32, 46 (D.C. Cir. 2018) (multiple hydroelectric facilities that the BiOp found resulted in "*continual degradation* of benthic habitats by sedimentation, reducing water velocities, changing flow patterns, and changing water chemistry both above and below dams.") (internal

In relying on snippets of text from such cases devoid of their context, Plaintiffs overlook that whether a proposed agency action materially reduces a species' chances of survival or recovery is a factual and scientific question for each ESA biological opinion. In cases where the actions will result in mortality and lost habitat, more analysis may be required to determine whether such adverse impacts will rise to the level of jeopardizing the species' chances of survival or recovery. *See*, *e.g.*, *Native Vill. of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031, 1063 n.244 (D. Alaska 2013) (finding a "tipping point" analysis is not required unless the action "would have significant negative impacts"). But this is a much more straightforward case. Here, while noise and visual disturbance of squirrels is expected during the operating season for the Cabins and Camp, the Service found that individual squirrels would not be killed or injured, loss of existing squirrel habitat was not likely, and there was no expected change in the squirrel's continued use of the Cabins and Camp areas given their habituation to human activity and the numerous

---

quotation marks and citation omitted)); *Id.* at 13 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1135 (E.D. Cal. 2008) (involving California's massive Central Valley water project and noting river-temperature-dependent mortality of listed fish)); *Id.* at 5, 19 (citing *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 265, 267 (4th Cir. 2022) (304-mile natural gas pipeline affecting almost 7,000 acres of land including multiple kilometers of listed fish habitat)); *Id.* at 13, 15, 16 (citing *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 993,1000 (D. Ariz. 2011) (finding that military base operations "could result in losses of numerous [listed species] population sites" and discussing the extent to which the action "*will reduce* the reproduction, numbers, and distribution" of listed species) (internal quotation marks and citation omitted, emphasis added)); *Id.* at 4 (citing *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 736 (9th Cir. 2017) (finding fishery was "currently responsible for killing two to three [listed] loggerheads and leatherbacks [turtles] (each) per year")); *Id.* at 4, 29 (citing *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 517 (9th Cir. 2010) (finding hatchery "seriously disrupted the [listed] migratory trout's migration and spawning activity")); *Id.* at 5, 14, 28 (citing *Ctr. for Biological Diversity v. FWS*, 441 F. Supp. 3d 843, 858 (D. Ariz. 2020) (finding that large open-pit mine would have impacted thousands of acres of the Coronado National Forest and resulted in what the Court characterized as "extensive adverse impacts" on a listed snake, including "decreased groundwater levels culminating in loss of prey and prey habitat for the [snake], and loss of its own habitat.")).

1   permit restrictions limiting disturbance. FWS1182-98, 1236-50. The Service's no-

2   jeopardy determinations are more than reasonable on these facts.

3        Given what Plaintiffs concede are the "modest" effects of the Cabins and Camp on

4   the squirrel, Pls.' Reply 10, Plaintiffs' arguments rest on the claim that any amount or

5   kind of "take" of the squirrel that triggers formal consultation compels a jeopardy

6   conclusion. *Id*. 1, 3-4, 6, 9-10. Plaintiffs stress that formal (rather than informal)

7   consultation is conducted only where there are "adverse impacts" on the species and

8   claim that the Service "necessarily" found "significant negative impacts" on the squirrel

9   by conducting formal rather than informal consultation. *Id*. at 1, 8-9. But as explained in

10  our opening brief, formal consultation is required where any kind or amount of "take" is

11  expected, and "take" within the meaning of ESA Section 9 includes not only death or

12  physical injury but also minor harassment or other lesser impacts. Defs.' Opp. 3-4, 16; 16

13  U.S.C. § 1532(19). Here, the only expected "take" is noise and visual disturbance to

14  squirrels living near the Cabins and Camp, which the Service reasonably found – based

15  on more than 25 years of midden survey data, other observations, and the scientific

16  literature – would not prevent squirrels from using those areas as habitat.

17       Nothing in the case law compels a jeopardy determination on these facts. *See*

18  Defs.' Opp. 23-24 (citing cases upholding a no-jeopardy finding in formal consultation).

19  Plaintiffs notably provide no response to our citation of *Native Village of Chickaloon*,

20  947 F. Supp. 2d 1031, in which a no-jeopardy determination was upheld in formal

21  consultation involving the endangered Cook Inlet beluga whale. Defs.' Opp. 25-26. As

22  that case illustrates, there is no inconsistency in a no-jeopardy finding for an endangered

23  species like the squirrel where the proposed action is expected to involve some "take" or

24  adverse effects that trigger formal consultation. If that were the case, many activities on

25  Mount Graham would violate ESA Section 7(a)(2), including actions intended to increase

26  squirrel habitat in the long term such as the Pinaleño Ecosystem Restoration Project that

27  involves cutting trees and related ground disturbance. FWS2046-53; Defs.' Opp. 19-20.

28  Plaintiffs' ultimate theory – that any action with adverse effects on the squirrel

1    necessarily violates ESA Section 7 – is contradicted by the case law and ignores the

2    Service's findings that the proposed actions here will not likely have effects that cause

3    jeopardy by reducing the squirrel's reproduction, numbers, or distribution.

### 3.    There Is No Discrepancy Between the BiOps and Prior Service Findings That Required More Explanation

6        Given the explicit findings in the BiOps applying the regulatory definition of

7    jeopardy, Plaintiffs cannot show that the Service failed to provide a "reasoned

8    explanation" for its no-jeopardy determinations. Yet Plaintiffs make this exact claim

9    relying on statements made by the Service over 30 years ago about the potential use of

10   the Cabins and Camp areas as possible offsets for the impacts of constructing the

11   observatory on Mount Graham. Plaintiffs rely on *FCC v. Fox Television Stations, Inc.*,

12   556 U.S. 502, 537 (2009) ("*FCC*") for the proposition that under the applicable standard

13   of review of the Administrative Procedure Act ("APA"), an agency cannot "change

14   course" and disregard prior "contrary" factual conclusions underlying a prior policy, and

15   claim the Service did that here by not explicitly discussing the Service's 30-plus-year-old

16   statements in its ESA Section 7 analyses for the observatory. Pls.' Reply 7. This

17   argument fails for three reasons. First, as noted in our opening brief, these decades-old

18   statements were made before the mounting evidence of squirrel occupancy and use of the

19   Cabins and Camp areas from the annual midden surveys. Defs.' Opp. 8, 11-12, 18, 30.

20       Second, district courts in the Ninth Circuit have rejected similar arguments in the

21   ESA Section 7 context. In *AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d

22   969, 1066-67 (E.D. Cal. 2018), the plaintiffs argued that the Service's BiOp for a U.S.

23   Bureau of Reclamation ("Reclamation") water transfer project was unlawful because the

24   BiOp for that project "abandoned" without explicit discussion protective measures for a

25   listed snake that were applied in "older biological opinions" in favor of new measures

26   proposed by Reclamation. The court agreed that the Service "cannot change its own

27   policy or precedent without providing a reasoned justification for doing so. . . . However .

28   . . the conservation measures are *not [Service] policy*." *Id*. at 1067 (emphasis in original).

1    "Rather, they are part of the action agency's (i.e., Reclamation's) proposed Project.

2    Neither the ESA nor the APA prohibits changed positions under these circumstances." *Id*.

3    at 1067-68 (footnote omitted). The court held the "relevant question here is whether [the

4    Service] lawfully concluded that the proposed Project would not jeopardize [the snake]."

5    *Id*. at 1068; *see also Pac. Rivers v. U.S. Bureau of Land Mgmt.*, No. 6:16-CV-01598-JR,

6    2018 WL 6735090, at *11 (D. Or. Oct. 12, 2018) (finding that "the cases cited by

7    plaintiffs regarding an agency's 'change in course' are inapt, as each involved changes to

8    the acting agency's own policies. Via their BiOps, neither [the Service] nor NMFS are

9    proposing agency action or endorsing any change to their policies; they are instead

10    reviewing another agency's action . . . for compliance with section 7 of the ESA")

11    (footnote omitted). Likewise here, the Service has not made any change in its own

12    policies or course of conduct. Whether to permit the continued use of the Cabins and

13    Camp is a question for the Forest Service. The Service simply analyzed whether the

14    Forest Service's proposed action to permit the continued use of these facilities would

15    jeopardize the existence or recovery of the squirrel and found it likely would not.

16        Third, even assuming *FCC* has any relevance here, Plaintiffs do not identify any

17    actual inconsistency in factual findings that requires further explanation by the Service.

18    Plaintiffs point only to the Service's late 1980s identification of the Cabins and Camp

19    areas as elements of two of three possible "reasonable and prudent alternatives," or RPAs

20    to the planned observatory on Mount Graham, which two RPAs mainly consisted of

21    limiting the observatory to one peak on Mount Graham along with multiple other

22    measures. Pls.' Reply 6; FWS1610-19. Identifying the Cabins and Camp as pieces of

23    alternatives to the jeopardy found likely to flow from a different proposed action is hardly

24    equivalent to a finding that the continued use of those specific areas in and of themselves

25    would jeopardize the squirrel as Plaintiffs suppose. Pls.' Reply 6. That requires a

26    jeopardy analysis specific to those areas – which the Service has now done – and based

27    on everything learned over the past three decades, the Service found that the use and

28    occupancy of the Cabins and Camp are not likely to jeopardize the squirrel. Indeed, the

1    potential use of the Cabins and Camp as elements of RPAs were later removed by the

2    Service based on Congressional legislation that both authorized construction of the

3    observatory and required a full jeopardy analysis for the Cabins and Camp before they

4    could be removed (since that was not done in the observatory BiOp). FWS1639-40.

5          Plaintiffs' additional reliance on *Rock Creek Alliance. v. U.S. Forest Serv*ice, 703

6    F. Supp. 2d 1152, 1202 (D. Mont. 2010) is misplaced. There, the court found more

7    explanation was required where an earlier BiOp found a population was "crucial" to the

8    species' survival, while a later one found the population was "relatively insignificant." *Id*.

9    at 1202. No such direct inconsistency in factual findings exists here. In its 1980s analyses

10   for the observatory, the Service did not find that the Cabins and Camp were the only

11   areas available for the squirrel. FWS1613. And even if the Service had found that the

12   Cabins and Camp areas were "indispensable" as Plaintiffs claim (which is not the case),

13   Pls.' Reply 1, the Service has now found – based on a large body of more current data

14   and evidence – that squirrels can occupy and productively use the existing habitat

15   comprising the great majority of the Cabins and Camp areas. *See* Defs.' Opp. 7-8, 11, 18-

16   19. There is no inconsistency because even accepting that the Cabins and Camp areas are

17   important for the squirrel, the appropriately restricted use and occupancy of these areas is

18   not incompatible with the squirrel's survival or recovery.

19         And to the extent Plaintiffs claim the Service was required to explain why the

20   relatively small areas occupied by the existing structures are not necessary for the

21   squirrel's survival or recovery, the Service has already provided that explanation. As

22   discussed above, the Service found that the total of 12.5 acres occupied by the existing

23   structures would at most support one additional squirrel at each site, and that this

24   potential absence of habitat does not appear to place survival or recovery of the squirrel

25   at risk, given that its population gain since the Frye Fire in 2017 shows that other habitat

26   is available to support population growth and recovery. *See id*. at 19, 27, 30, 32. Thus,

27   this is not a case where the agency has failed to explain any "contrary" past factual

28   findings. The Service has already fully explained why: (1) most of the Cabins and Camp

1  areas already consist of functioning habitat for the squirrel; and (2) the small areas

2  occupied by structures at these sites are not necessary for the squirrel's survival or

3  recovery because the evidence indicates that other suitable habitat is available.

4       The Court also must evaluate the reasonableness of the Service's inference

5  regarding the availability of other habitat based on the whole record. *San Luis & Delta-*

6  *Mendota Water Auth.*, 666 F. Supp. at 1158. As explained in our opening brief, the record

7  identifies several other significant areas on Mount Graham that currently support the

8  squirrel, including the Riggs Lake area, Grant Hill, Turkey Flat, and the parts of the Ash

9  Creek drainage other than where the Cabins and Camp are located. Defs.' Opp. 7, 11, 28-

10  29. Plaintiffs suggest these four areas provide insufficient habitat, Pls. Reply n.2, but as

11  explained in our opening brief and Plaintiffs do not dispute, the Center for Biological

12  Diversity's *own analysis* shows that significant other unoccupied habitat exists for the

13  squirrel on Mount Graham. Defs.' Opp. 29 n.8 (citing FWS682, FWS4050).

14       **4.**    **The Proposed Actions Are Not Required to Recover the Squirrel**

15       Given the evidence of other habitat to support the squirrel's survival and recovery,

16  Plaintiffs attempt to move the ESA bar by arguing that the question is whether the

17  amount of habitat currently available on Mount Graham is sufficient to fully recover the

18  species to the point where it could be entirely removed from the list of threatened and

19  endangered species, i.e., *de-listed*. Pls.' Reply 8 n.2; *see also id*. at 2. But ESA Section

20  7(a)(2) does not require that a proposed agency action remove the conditions that

21  underlie the species' continued ESA listing; nor does the statute bar an action from

22  proceeding unless the species can be de-listed today. Rather, the question is "whether a

23  specific action is reasonably likely to appreciably reduce the likelihood of both survival

24  and recovery of a listed species." *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774,

25  787 (D. Or. 2014), aff'd, 806 F.3d 1234 (9th Cir. 2015) (citing 50 C.F.R. § 402.02)

26  (Section 7 analysis is not concerned with "whether that federal action would itself

27  implement or bring about recovery"); Defs.' Opp. 16-17. The Service reasonably found

28

1   that the Cabins and Camp are not likely to reduce the squirrel's likelihood of survival or

2   recovery, and that is all that the ESA requires.

3          While there is no requirement that a proposed agency action alleviate past harms,

4   the Forest Service and the Service are engaged in many other actions to recover the

5   squirrel, contrary to Plaintiffs' suggestions. Pls.' Reply 1-2, 30. As evident from the

6   BiOps, the agencies are doing annual midden surveys, monitoring sites near squirrels,

7   engaging in education and outreach to recreational users about the squirrel, and using

8   appropriate permit terms for authorized activities to minimize impacts on the squirrel.

9   Defs.' Opp. 6, 8-9, 12-13. The Forest Service also continues to implement actions

10  identified in the Service's updated 2011 draft recovery plan for the squirrel, including

11  major efforts to restore and protect other, large areas of habitat. *Id*. at 19-20. As Plaintiffs

12  do not dispute, a large amount of potential habitat in fact exists on Mount Graham –

13  almost 20,000 acres. *Id*. at 30 (citing FWS6435). Restoring enough habitat to the point

14  where the squirrel could be de-listed will take many decades. FWS6447-49. But nothing

15  in the ESA or the case law requires that proposed agency actions like those here – that the

16  Service found will not likely reduce the species' numbers, reproduction, or distribution –

17  may not occur until there is enough habitat to entirely de-list the species.

18         Under the standard of review, the question for the Court in this case is whether

19  "the agency [examined] the relevant data and articulate[d] a satisfactory explanation for

20  its action including a 'rational connection between the facts found and the choice made.'"

21  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

22  (1983) (citation omitted). The Service more than met that standard here. In the BiOps, the

23  Service fully explained why the available scientific and other evidence shows that the

24  continued occupancy and use of the Cabins and Camp – as restricted by the permits and

25  with levels of activity similar to those have occurred for decades at these sites – is not

26  likely to jeopardize the continued existence or recovery of the squirrel.

27

28

**B.    The Service Correctly Analyzed the Effects of Existing Camp Structures as Part of the Environmental Baseline**

In addition to fully analyzing the potential effects of the proposed continued occupancy and use of the Cabins and Camp, the Service examined the effects of the existing structures on the squirrel. Plaintiffs nevertheless continue to assert in their reply that because the Service treated structures as part of the environmental baseline, the Service did not consider these effects for the Camp. Pls.' Reply 17-20. Plaintiffs again ignore the Service's explicit findings in the BiOps. As explained above and in our opening brief, the Service's jeopardy analyses included an assessment of the potential effects of the Camp buildings and infrastructure and found that: (1) the small portion of the Camp area containing buildings and related infrastructure (5.5 acres) was at most enough for one squirrel home range, and (2) the evidence does not indicate that the absence of a single home range places the continued existence or recovery of the squirrel at risk given that the recent population increases for the squirrel show that other habitat is available on Mount Graham to support population growth and recovery. FWS1194. As explained above, that second finding is also supported by other evidence in the record.

Contrary to Plaintiffs' argument, the Camp structures are properly part of the environmental baseline. Under the Section 7 regulations, the environmental baseline includes three categories: (1) "the past and present impacts of all Federal, State, or private actions and other human activities in the action area," (2) "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation," and (3) "the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. The Camp structures fall within the first category: "the past and present impacts of all Federal, State, or private actions and other human activities in the action area[.]" *Id*. The Camp was built nearly 60 years ago under a permit issued in 1966. Defs.' Opp. 31. Thus, as previously explained in our opening brief, the past, permitted construction of the Camp represents a

1    past federal and private action or past human activity in the action area properly included

2    in the environmental baseline. *Id*.

3        Plaintiffs make two arguments why the Camp structures purportedly do not fit

4    within the definition of the environmental baseline, neither of which responds to

5    Defendants' argument or is supported by the regulatory language. First, Plaintiffs claim

6    that the effects of the Camp structures do not fit within the second category included in

7    the environmental baseline, i.e., "the anticipated impacts of all proposed Federal projects

8    in the action area that have already undergone formal or early section 7 consultation."

9    Pls.' Reply 17. But all three categories in the definition address different things, and thus

10   there can be no requirement that an activity fall within all three categories

11   simultaneously. The first category covers the impacts of *past* federal, state, or private

12   actions or human activities in the action area, like construction of the existing Camp

13   buildings and infrastructure here. Only do such *past* actions and human activities have

14   both "*past* and present impacts" to include in the baseline. 50 C.F.R. § 402.02 (emphasis

15   added). The second category by its terms only applies to "*proposed* Federal projects" that

16   have undergone ESA consultation, but which may not yet have occurred (and thus would

17   not fit within the first category). *Id*. (emphasis added). The past construction of the Camp

18   is not a proposed action, let alone part of the proposed action here (a new special use

19   permit for the continued operation of the Camp). The third category is for

20   "contemporaneous" state or private actions (which are not subject to ESA consultation),

21   and thus would not fit within the first or the second category. *Id*. Again, past construction

22   of the Camp is not a contemporaneous action. Neither the second nor the third categories

23   apply to the Camp structures, but that is irrelevant because the first category does apply.

24       Plaintiffs' second argument relies on a clarifying sentence at the end of the

25   regulatory definition that similarly has no application here. This sentence states that

26   consequences to listed species "from ongoing *agency* activities or existing *agency*

27   facilities that are not within the agency's discretion to modify are part of the

28   environmental baseline." *Id*. (emphasis added). This sentence by its plain terms applies to

"existing *agency* facilities." The sentence only clarifies that "agency facilities" are included in the environmental baseline when the agency lacks discretion to modify them; it does not purport to more broadly address when past actions or other past human activities (such as Camp construction) are included in the baseline. The Camp buildings are not "agency facilities"; they are privately-owned facilities as evidenced by the fact that they were recently sold to new owners. Defs.' Opp. 10. In short, apart from citing inapplicable portions of the regulatory definition of the environmental baseline, nowhere do Plaintiffs address Defendants' clearly stated argument: the Camp buildings and infrastructure constitute a past "Federal" action or "human activit[y] in the action area" and thus are properly included in the environmental baseline. Nor do Plaintiffs address the case law confirming that existing structures are included in the baseline. *See id*. at 31-32 (citing *Nw. Env't Def. Ctr. v. NMFS*, 647 F. Supp. 2d 1221, 1238 (D. Or. 2009)).

Even the cases cited by Plaintiffs support this approach. *See* Pls.' Reply 18. As discussed above, in *NWF*, 524 F.3d at 930, the plaintiffs challenged a BiOp addressing the proposed operations of multiple dams and related facilities in the Pacific Northwest. The Ninth Circuit held that "[t]he current existence of the . . . dams constitutes an 'existing human activity'" and "acknowledge[d] that the existence of the dams must be included in the environmental baseline[.]" *Id*. at 930. By contrast, the Ninth Circuit found that "the *operation* of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act" and thus were effects of the action. *Id*. at 931 (emphasis added). The Court further found that a proposed action "must be evaluated in the [context] of this baseline in order to properly determine whether the proposed actions will jeopardize the listed [species at issue]." *Id*.; *see also Swan View Coal. v. Barbouletos*, 348 Fed. Appx. 295, 296 (9th Cir. 2009) (finding that consulting agency properly used actual habitat conditions when analyzing the environmental baseline). The Service's analysis followed this guidance: it considered the effects of the existing Camp structures as part of the environmental baseline, while considering the effects of the Camp's future operation as effects of the proposed agency action.

The remaining cases on which Plaintiffs rely cannot save their argument. *See* Pls.' Reply 18. In *American Rivers*, 895 F.3d at 46, 48, the consulting agency "exclu[ded] [] the historic impacts" of certain activities that began as early as the 1920s as "beyond the scope of the consultation." In other words, those activities were not analyzed as part of the environmental baseline nor did the jeopardy analysis "account for the effect of degraded conditions on threatened species." *Id*. at 47. As explained above, the Service included (rather than excluded) the Camp buildings and infrastructure in its jeopardy analysis in this case, and thus *American Rivers* can be distinguished on its facts. *Swan View Coalition v. Barbouletos* also is inapposite. *See* Case No. 06-cv-73-M-DWM, 2008 WL 5682094 (D. Mont. June 13, 2008). There, the consulting agency analyzed the baseline as including "degraded conditions resulting from the [action agency's] refusal to enforce its own ban on spring snowmobiling[.]" *Id*. at *1. In so doing, the consulting agency "facilitate[d] a conclusion that allows the agencies to claim that they have improved the situation[,]" even though prior management decisions actually required the action agency to do more. *Id*. at *15-16. No such issue exists here: the Camp structures are an existing human activity that were properly included in the baseline and the potential effects associated with their use were analyzed by the Service to ensure the jeopardy analysis accurately captures all sources of impacts on the squirrel. FWS1194.

In a last-ditch attack on the Service's approach, Plaintiffs claim the BiOp should have analyzed the environmental baseline by examining "the condition of the Camp area as it existed *before* it was authorized[.]" Pls.' Reply 19. At the threshold, Plaintiffs' insistence that the initial authorization of the Camp deprived the squirrel of "essential recovery habitat" lacks a factual basis. *See id*. As previously explained, the area occupied or potentially affected by the Camp is relatively small. Defs.' Opp. 11. Most of the action area for the Camp functions as habitat for the squirrel and the overall acreage occupied by structures and infrastructure is 5.5 acres – just a fraction of the 5,094 acres in just the Ash Creek drainage on Mount Graham. *See id*. Moreover, there is no legal basis for Plaintiffs' contention that the Service was required to analyze the Camp area as it existed

20

before the buildings and infrastructure were constructed in 1966. While Plaintiffs cite *American Rivers* in support of this argument, the D.C. Circuit held in that case that the "jeopardy analysis is arbitrary because it fails to account for effects of degraded conditions on threatened species" and otherwise failed "to account for the impact of continued operations of the existing dams." *Am. Rivers*, 895 F.3d at 46-47. As explained at length above, the Camp BiOp is free of such errors. Nor is Plaintiffs' position feasible from a factual standpoint. Plaintiffs appear to contend that the Service should have analyzed "unimpaired habitat" in lieu of including the Camp buildings and infrastructure in the environmental baseline. Pls.' Reply 19. But Plaintiffs point to no information in the record on which such a hypothetical analysis could be based. Such an analysis would be based on flawed assumptions that do not reflect actual, baseline conditions at the Camp and thereby skew the jeopardy analysis. The ESA, however, requires the Service to use the best scientific and commercial data available in carrying out its obligations under ESA Section 7, a requirement that applies equally when analyzing the environmental baseline. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, --- F. Supp. 3d ---, 2023 WL 5310633, at *4, 7 (D. Mont. Aug. 17, 2023). Here, the Service properly analyzed the environmental baseline based on actual habitat conditions, rather than speculating about the condition of "unimpaired habitat" as it may have existed almost six decades ago.

Finally, there is no merit to Plaintiffs' continued insistence that the Service treated the future operation of the Camp as part of the baseline rather than the proposed action (a new operating permit for the Camp). Pls.' Reply 19. As pointed out in our opening brief – and Plaintiffs have no response – the Camp BiOp contains an 8-page section entitled "EFFECTS OF THE ACTION" that makes clear the Service treated the effects of the proposed future use and operation of the Camp – including the potential for vehicle strikes, noise and visual disturbance from seasonal Camp occupancy, and habitat alteration or removal for fire prevention and hazard removal – all as effects of the proposed action. FWS1182-89; Defs.' Opp. 32-33. Plaintiffs' arguments regarding the environmental baseline have no legal or factual basis and should be dismissed.

1

**C.      The Permits Include Sufficient Protections for Squirrel Habitat**

2      In addition to their erroneous arguments regarding the environmental baseline,

3  Plaintiffs continue to obfuscate the facts about the protections for existing squirrel habitat

4  outside of the 92-foot buffers around middens. In their opening brief, Plaintiffs entirely

5  ignored that *in addition to* the midden buffers, the permits for the Cabins (and any future

6  permit for the Camp) prohibit vegetation removal and ground disturbance for any reason

7  other than fire prevention and hazard removal and then only within an already cleared

8  zone that ends 30 feet from buildings (and 10 feet from smaller structures such as storage

9  sheds and outhouses), unless written permission is obtained from the Forest Service. *See*

10  Defs.' Opp. 8-9, 12-13, 18, 34; FWS1186, 1224, 1240.

11      In their reply, Plaintiffs shift to hypothesizing that these additional prohibitions

12  must not actually exist because "it would make little sense for [the Service] to adopt these

13  [midden] buffers if the protections offered *outside* those zones were the same as inside."

14  Pls.' Reply 23 (emphasis in original). Plaintiffs' speculations are beside the point because

15  the record unequivocally shows that the restrictions for areas outside of the midden

16  buffers do in fact exist. USFS1845 (Letter to Cabins permittees stating that, "[a]ny

17  ground, soil, or vegetation disturbance beyond the 30ft fire prevention zone around your

18  cabin is prohibited without written [Forest Service] permission"); FWS1188 ("If the

19  Camp permittee wants to remove, alter, or damage any existing live vegetation within the

20  permitted area, they will need to obtain permission from the Forest Service, which can

21  analyze each request on a case-by-case basis and prohibit this action if it may impact [the

22  squirrel] or its habitat. The same can be said for soil disturbing activities (including

23  enlarging areas for vehicles) outside the 30-foot fire prevention area"). Numerous other

24  pages of the record confirm the existence of these protections for squirrel habitat outside

25  of the midden buffers.[5]

26

27  _____

[5] *See* FWS1186, 1240 (stating that for both the Cabins and Camp, "[o]utside of the 92-
28  foot [midden] buffers," permittees must obtain approval from the Forest Service "prior to
any vegetation removal other than what is specified for fire prevention and hazard

1    Besides questioning the existence of these additional protections without any

2    factual basis, Plaintiffs distort the function and role of the midden buffers. Plaintiffs first

3    claim that the prohibitions outside of the midden buffers, "[i]f true" (which they are),

4    mean that the Service incorrectly found that the midden buffers do not "further

5    minimize" changes to squirrel habitat. Pls.' Reply 23. Contrary to this argument, the

6    midden buffers trigger an additional level of Service review for any vegetation removal

7    or ground disturbance within 92 feet of a midden. FWS1165, 1237. In areas outside of the

8    midden buffers but more than 30 feet from existing structures, the Forest Service may

9    confer with the Service before the Forest Service provides any written permission to the

10   permittee for vegetation or ground disturbing activity, but the midden buffers make such

11   further discussion (and possibly a separate ESA Section 7 consultation) a requirement

12   before the Forest Service can authorize the permittee to undertake the disturbance.

13   FWS1165, 1226. Thus, the practical effect of the midden buffers is that any vegetation

14   removal or ground disturbing activities by permittees within 92 feet of a known midden –

15   even in the already cleared areas adjacent to buildings and related infrastructure – is

16   prohibited without the approval of *both* the Forest Service and the Service.

17   However, extending the size of the midden buffers to 200 feet would not provide

18   any additional protections for squirrel habitat, let alone prevent the proposed continued

19   authorization of the Cabins and Camp as Plaintiffs assert. Pls.' Reply 23. The Service

20   must analyze the action as proposed by the action agency; the ESA does not allow the

21   Service to dictate any specific approach to avoiding jeopardy. *Defs. of Wildlife v. Fish &*

22   *Wildlife Serv.*, No. 16-CV-01993-LHK, 2016 WL 4382604, at *18 (N.D. Cal. Aug. 17,

23   2016) ("[the Service] can evaluate *only the Federal action proposed*, not the action as

24   [the Service] would like to see that action modified.") (emphasis in original). Under the

25   ESA regulations, the Service may propose a reasonable and prudent alternative to the

26

27   removal"); FWS1165, 1184, 1187, 1225, 1238; USFS1534, 1536, 1747, 1760-61, 1763,
     1791, 1810-11, 1813 (multiple references to the prohibition on vegetation removal and
28   ground disturbance in all areas "beyond the 30-ft fire prevention zone/area").

1   proposed action, but only if it finds jeopardy is likely to result from the proposed actions.

2   50 C.F.R. § 402.14(h)(2). Where incidental "take" is expected, the Service can also

3   propose reasonable and prudent measures to minimize the "take," but those "cannot alter

4   the basic design, location, scope, duration, or timing of the action and may involve only

5   minor changes." *Id.* at 402.14(i)(2). Here, the Forest Service proposed the continued use

6   of the Cabins and Camp as they currently existed, and the Service found no jeopardy with

7   the permit restrictions in place. Thus, to the extent Plaintiffs are suggesting that extending

8   the midden buffers would require removing existing structures or rejecting the proposed

9   actions without a jeopardy finding, that would be at odds with the proposed actions,

10  outside the scope of the Service's ability to craft limited reasonable and prudent

11  measures, and thus contrary to the Service's obligations and authority under the ESA.

12          Extending the size of the midden buffers would also not provide any additional

13  protections for squirrel habitat. Because middens have occasionally been found more than

14  92 feet but less than 200 feet from structures, extending the midden buffers to 200 feet

15  would only increase the instances that a midden buffer would extend into areas occupied

16  by existing structures and the already cleared fire prevention zone adjacent to structures.[6]

17  Neither of these areas function as habitat for the squirrel. This is yet another respect in

18  which the use of a 200-foot midden buffer for the Pinaleño Ecosystem Restoration

19  Project does not support using the same size buffer for the Cabins and Camp. As the

20  Service fully explained in the BiOps, use of a 200-foot midden buffer was appropriate for

21  that forest restoration project because it involved "aggressive vegetation alteration" in

---

23  [6] At the time of the BiOps, two of the three active middens at the Cabins were 200 feet or
24  more from the nearest cabin and thus extending the midden buffers would have no effect.
    FWS1235. The third active midden had been located 144 feet from a cabin but shifted
25  more recently to 194 feet. *Id.* The closest midden found at the Cabins (72 feet from a
    cabin, 15 feet from an outhouse) has been inactive since the area was severely burned.
26  FWS1234. Another midden at the Cabins inactive at the time of the BiOps was found 115
27  feet from a cabin. FWS1235. At the Camp, the four middens active at the time were 140,
    160, 180, and 240 feet from structures, respectively. USFS1541. Three inactive middens
28  at the Camp were 71, 600, and 2,528 feet from structures, respectively. *Id.*

1   squirrel habitat; thus, a larger midden buffer for that project in fact reduced disturbance

2   of *forested areas* near middens. *See* Defs.' Opp. 33-34; FWS1185-86, 1188, 1239-40.[7]

3   By contrast, no significant vegetation alteration is authorized or expected at the Cabins

4   and Camp and extending the midden buffers to 200 feet would not protect any additional

5   habitat. Citing various information about "average" home range sizes, Plaintiffs claim

6   that 200-foot buffers would encompass more of the "average" squirrel home range. Pls.'

7   Reply 20-21. But regardless, the territories of the squirrels *at the Cabins and Camp*

8   cannot extend into the cleared areas adjacent to structures, as the Service found.

9   FWS1186, 1240. Plaintiffs' claim that 92-foot midden buffers fail to prevent destruction

10  of "habitat features in which squirrels build their nests," i.e., "hollow trees, hollow snags,

11  hollow logs," fails for the same reason. Pls.' Reply 21. There are no such nesting features

12  where existing structures are located or in the adjacent cleared areas – and extending the

13  midden buffers to 200 feet would only potentially include more such areas.

14      On these facts, the Service reasonably found that a 200-foot buffer was not

15  necessary to protect the existing habitat at the Cabins and Camp. Significant vegetation

16  alteration in squirrel habitat is not contemplated at these sites. Rather, as the Service

17  found, the combination of the midden buffers and the restriction on vegetation removal

18  and ground disturbance more than 30 feet from structures will likely limit the "footprint

19  of activities causing noise and disturbance to the [] area that currently does not provide

20  habitat for [the squirrel]" and thus squirrels "are unlikely to be within this area and the

21  effects of noise and disturbance to them are minimized." FWS1186, 1240.

22

---

23  [7] Plaintiffs' claim again of "post hoc rationalization" as to the reasons for the larger
24  midden buffers for the Pinaleño Ecosystem Restoration Project is meritless. Pls.' Reply
    23. The challenged BiOps themselves explain that these buffers were necessary because
25  of the vegetation removal of that project. FWS1185-86, 1188, FWS1239-40. Plaintiffs'
    apparent assumption that this explanation had to appear in the BiOp *for the Pinaleño*
26  *project* has no legal basis; because an explanation is provided in the BiOps for the Cabins
    and Camp, the Court is not improperly supplying a "reasoned basis for the agency's
27  decision that the agency itself has not given." Pls.' Reply 23 (quoting *San Luis & Delta-*
    *Mendota Water Auth. v. Locke*, 776 F.3d 971, 1048 (9th Cir. 2014)).

28

**D.      The BiOps Include Proper Triggers for Re-Initiation of Consultation**

There also is no merit to Plaintiffs' continued argument that the incidental take statement in each BiOp is unlawful because re-initiation of consultation "depends on the outcome of an amorphous, pre-consultation process" and is "based on undefined criteria[.]" Pls.' Reply 27. As an initial matter, the Service determined that no squirrels are anticipated to be injured or killed by the occupancy and use of the Cabins and Camp. Thus, the BiOps provide that re-initiation of consultation is required if any squirrel is found injured or killed and this injury or death can be attributed to the Cabins and Camp. FWS01197, 1248. Plaintiffs do not challenge this re-initiation trigger. Rather, Plaintiffs' arguments are directed at the trigger for noise and visual disturbance from human activity. The Service found such "take" to be impractical to express "in terms of individual squirrels" because individuals are difficult to detect, and thus midden surveys will be used to determine continued squirrel presence. FWS1196-97, 1247-48. Although midden use undergoes natural cycles, the Service did not expect that noise and visual disturbance "take" would "lead to long-term abandonment" of the Cabins and Camp areas by the squirrel. FWS1180, 1196-97, 1247-48. Rather, the Service found that re-initiation would be triggered if no active middens are present in the Cabins or Camp action areas for more than two consecutive fall seasons and that lack of presence is due to the proposed actions, rather than other extraneous factors. FWS1196-97, 1247-48.

On these facts, Plaintiffs incorrectly claim there is "no objectively verifiable trigger[.]" Pls.' Reply 28. To the contrary, the BiOps clearly define the trigger: the absence of active middens in the action area for more than two consecutive fall seasons that is due to the proposed action. FWS1196-97, 1247-48. As the record shows, middens are created, used, or abandoned over time due to tree disease, poor cone crops, fire, and other natural factors that are wholly unrelated to human presence or the proposed actions. FWS1169, 1196-97, 1229, 1231, 1247-49. Plaintiffs fail to cite any legal authority that would allow the Service and the Forest Service to impute "take" to an agency action and require re-initiation of consultation without first establishing that the action itself caused

the take, rather than such extraneous natural factors. *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1298, 1305 (D. Or. 2011) (discussing the importance of a surrogate establishing a causal link between the proposed action and any resulting take). For these reasons, the BiOps appropriately require re-initiation of consultation only when the absence of middens is due to the proposed actions, rather than other factors. *See Miccosukee Tribe of Indians of Fla. v. United States*, 697 F. Supp. 2d 1324, 1331 (S.D. Fla., 2010) (noting that one of the important factors for establishing a numerical incidental take trigger is the ability to determine the extent to which the take is attributable to the action under review versus other environmental factors).

Plaintiffs' reliance on *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) and *Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843 is misplaced for at least three reasons. First, the annual midden surveys provide an objective and reliable metric for measuring whether squirrels are present and whether the take limit has been exceeded. This fact distinguishes the BiOps from the unreliable modeling used to detect excess take in *Center for Biological Diversity*. *See* 441 F. Supp. 3d at 861-63. It also allows for the agencies to re-initiate consultation during the life of the permits, unlike in *Allen*, where re-initiation of consultation would have been triggered only at the end of the logging project. *See Allen*, 476 F.3d at 1038. Thus, Plaintiffs incorrectly argue that the trigger for re-initiation is improper because it is "impermissibly coextensive with the action's effects." Pls.' Reply 26. The Court in *Allen* found that the BiOp was unlawful because it would not permit the project to be halted so that the action agency could re-initiate consultation. *See* 476 F.3d at 1032-33. Here, annual fall surveys will provide ongoing information about incidental take, and re-initiation can occur well before the end of the permit periods. *See* Defs.' Opp. 37.

Second, the BiOps state that if an absence of middens occurs during two consecutive fall monitoring surveys, then the Service and the Forest Service will work together to determine if the lack of squirrel presence is due to the proposed actions. While Plaintiffs characterize this as an "amorphous pre-consultation process," Pls.' Reply 27,

the work by these two stakeholder agencies presents a much different and more streamlined scenario than the one the Court rejected in *Center for Biological Diversity*. There, the consulting and action agencies had to involve two other federal agencies, academic institutions, "and/or other appropriate sources of expertise to seek consensus" about whether the metrics in the BiOp had been exceeded. 441 F. Supp. 3d at 863. Third, there is no merit to Plaintiffs' contention that the BiOps are structured so that it will not allow for the "immediate" re-initiation of consultation.  Pls.' Reply 28. The BiOps fully explain why data from two years of surveys is necessary. FWS1196-97, 1247-48; *see also* Defs.' Opp. 36. Plaintiffs do not dispute these scientific conclusions. To the extent that Plaintiffs are implying that the agencies have an incentive to delay re-initiation, there is no factual or legal basis for this assertion. As explained in our opening brief, both agencies are entitled to the presumption of regularity. Defs.' Opp. 37; *see also Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000).

Finally, Plaintiffs attack the Service's use of a surrogate to express incidental take, rather than a numerical limit in terms of numbers of squirrels taken. Pls.' Reply 28-29. An incidental take statement like that here that utilizes a surrogate for take must explain why it was impracticable to express a numerical measure. *Allen*, 476 F.3d at 1037. Here, where the BiOps authorize incidental take only in the form of "noise and visual disturbance," the Service provided a clear and thorough explanation about why it was impracticable to express take numerically, as discussed above. The Service further explained its reasoning for using the surrogate it did. This is all that the ESA and the standard of review require. Plaintiffs offer no explanation for how the Service would numerically determine the instances that squirrels experience noise or visual disturbance.

Overall, Plaintiffs' attacks on the re-initiation trigger for noise and visual disturbance – which is inherently difficult to measure precisely – seem to demand that the Service guarantee the perfect accuracy or success of its approach. In case after case, courts have made clear that the ESA does not demand such precision and certainty. *See In re: Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 635 (8th Cir. 2005) (under jeopardy

1  analysis, the Service is not required to guarantee success of the plan: it must simply have

2  a rational basis to expect it to work); *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1084

3  (D.C. Cir. 2017) (the ESA does not demand certainty). This Court should not impose

4  such a requirement on the agencies here. The Service's approach is rational and relates to

5  the Service's expectation based on the evidence that noise and visual disturbance will not

6  lead to long-term abandonment of the Cabins and Camp areas by the squirrel. But if that

7  happened and it could not be attributed to extraneous factors, the agencies will re-initiate

8  consultation to further examine the impacts of these facilities.

9        **E.    The Forest Service Did Not Unreasonably Rely on the BiOps**

10         Plaintiffs' final claim that the Forest Service unreasonably relied on the BiOps

11  also lacks merit. Plaintiffs have not identified any respect in which the Forest Service

12  acted improperly in relying on the Service's expertise. Plaintiffs cite *Wild Fish*

13  *Conservancy*, 628 F.3d at 532. Pls.' Reply 29. But as Plaintiffs admit, there the court

14  found errors discernible by the action agency without technical or scientific expertise,

15  including the BiOp's failure to "articulate . . . a rational connection between the facts

16  found and the choice made" and to include any required monitoring for incidental take.

17  *Wild Fish Conservancy* 628 F.3d at 532 (internal quotation marks and citation omitted).

18  No such errors exist here. As purported comparable errors in this case, Plaintiffs cite only

19  the Service's analysis of the effects of Camp structures as part of the environmental

20  baseline and the alleged "conspicuous absence of any recovery analysis." Pls.' Reply 29.

21  But as explained above, courts have recognized that existing structures are included in the

22  baseline, and thus the Forest Service had no reason to believe that improper. Likewise, as

23  to a "recovery analysis," the Ninth Circuit and other courts have recognized that no

24  separate recovery analysis is required. Defs.' Opp. 22. As explained above, the Service

25  also analyzed impacts on both survival and recovery by examining whether the proposed

26  actions would reduce the species reproduction, numbers, or distribution of the squirrel,

27  and found that they would not. The Forest Service had no reason to consider that analysis

28  insufficient given the regulatory definition of jeopardy relying on those three factors.

**F.   Any Remedy Should Be Limited to Remand Without Vacatur**

Plaintiffs' arguments as to remedy are also not persuasive. Remand without vacatur is not limited to where vacatur could result in environmental harm, contrary to Plaintiffs' assertion. Pls.' Reply 30; *see Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012). Rather, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id*. at 992 (citation omitted). Here, any error found by the Court potentially could be rectified with further explanation by the Service in new or amended BiOps that likewise find no jeopardy. On those facts, vacatur of the BiOps would introduce unnecessary disruption for permit holders and the Forest Service given that the BiOps provide an exemption for the limited but otherwise unlawful noise and visual disturbance "take" expected. FWS1195-98; 1246-49; Defs.' Opp. 4-5. Plaintiffs also do not show that any harm to the squirrel would likely occur from remand without vacatur. No new permit has been issued for the Camp or is imminent. As to the Cabins, their continued seasonal occupancy along lines similar to how they have been used for decades is not likely to impede the survival or recovery of the squirrel during the limited period of any remand with the protective permit conditions in place.

## III.   CONCLUSION

The Service reasonably found that the continued occupancy and use of the Cabins and Camp is not likely to jeopardize the squirrel's survival or recovery. Over 25 years of surveys and other data show that operation of these facilities is not incompatible with the squirrel's use of the forested areas that already make up most of the Cabins and Camp areas. Permit restrictions will minimize disturbance to nearby squirrels and prevent loss of existing squirrel habitat. No other effects to the squirrels are expected – no reduction in the squirrel's reproduction, numbers, or distribution. Plaintiffs' arguments lack merit because they misstate the law and ignore or fail to rebut the facts and reasonable findings made by the Service that amply support its no-jeopardy determinations. The Court should grant summary judgment to Defendants and dismiss Plaintiffs' claims.

Respectfully submitted this 13th day of December, 2023.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

S. JAY GOVINDAN, Section Chief
BRIDGET KENNEDY MCNEIL,
Assistant Section Chief

*/s/ Clifford E. Stevens, Jr.*
CLIFFORD E STEVENS, JR.
Senior Trial Attorney (D.C. Bar No. 463906)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20004
Tel: (202) 353-7548
Fax: (202) 305-0275
clifford.stevens@usdoj.gov

*Attorneys for Defendants*